**Nos. 2023-1208, -1209**

# United States Court of Appeals for the Federal Circuit

QUALCOMM INCORPORATED,

*Appellant*,

v.

APPLE INC.,

*Appellee*.

Appeals from the United States Patent and Trademark Office, Patent Trial and Appeal Board in Nos. IPR2018-01315, -01316

## BRIEF OF APPELLANT QUALCOMM INCORPORATED

I. SASHA MAYERGOYZ
JONES DAY
110 N. Wacker Dr., Ste. 4800
Chicago, IL 60606
(312) 782-3939

JENNIFER L. SWIZE
JONES DAY
51 Louisiana Ave. N.W.
Washington, DC 20001
(202) 879-3939
jswize@jonesday.com

DAVID B. COCHRAN
JONES DAY
901 Lakeside Ave.
Cleveland, OH 44114
(216) 586-3939

MATTHEW J. RUBENSTEIN
JOHN M. GRAVES
JONES DAY
90 South 7th St., Ste. 4950
Minneapolis, MN 55402
(612) 217-8800

*Counsel for Appellant Qualcomm Incorporated*

Claim 1:

> A multiple supply voltage device comprising:
>
> a core network operative at a first supply voltage; and
>
> a control network coupled to said core network wherein said control network is configured to transmit a control signal, said control network comprising: an up/down (up/down) detector configured to detect a power state of said core network; processing circuitry coupled to said up/down detector and configured to generate said control signal based on said power state;
>
> one or more feedback circuits coupled to said up/down detector, said one or more feedback circuits configured to provide feedback signals to adjust a current capacity of said up/down detector;
>
> at least one first transistor coupled to a second supply voltage, the at least one more first transistor being configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on;
>
> at least one second transistor coupled in series with the at least one first transistor and coupled to said first supply voltage, the at least one second transistor being configured to switch on when said first supply voltage is powered on and to switch off when said first supply voltage is powered down;
>
> at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor.

Appx80-81 (8:44-9:3).

# CERTIFICATE OF INTEREST

Case Nos. 23-1208, -1209

*Qualcomm Incorporated v. Apple Inc.*

Filing Party/Entity: Qualcomm Incorporated

I certify the following information and any attached sheets are accurate and complete to the best of my knowledge.

Date: March 20, 2023 Signature: */s/ Jennifer L. Swize*
Name: Jennifer L. Swize

**1. Represented Entities** (Fed. Cir. R. 47.4(a)(1)) – Provide the full names of all entities represented by undersigned counsel in this case.

Qualcomm Incorporated

**2. Real Party in Interest** (Fed. Cir. R. 47.4(a)(2)) – Provide the full names of all real parties in interest for the entities. Do not list the real parties if they are the same as the entities.

None

**3. Parent Corporations and Stockholders** (Fed. Cir. R. 47.4(a)(3)) – Provide the full names of all parent corporations for the entities and all publicly held companies that own 10% or more stock in the entities.

None

**4. Legal Representatives –** List all law firms, partners, and associates that (a) appeared for the entities in the originating court or agency or (b) are expected to appear in this court for the entities. Do not include those who have already entered an appearance in this court. Fed. Cir. R. 47.4(a)(4).

Jones Day: David M. Maiorana, Joseph M. Sauer, Matthew W. Johnson, Joshua R. Nightingale, and Richard A. Graham (no longer with firm).

**5. Related Cases** – Provide the case titles and numbers of any case known to be pending in this court or any other court or agency that will directly affect or be directly affected by this court's decision in the pending appeal. Do not include the

originating case number(s) for this case. Fed. Cir. R. 47.4(a)(5). *See also* Fed. Cir. R. 47.5(b).

None

**6. Organizational Victims and Bankruptcy Crimes** – Provide any information required under Fed. R. App. P. 26.1(b) (organizational victims in criminal cases) and 26.1(c) (bankruptcy case debtors and trustees). Fed. Cir. R. 47.4(a)(6).

Not Applicable

# TABLE OF CONTENTS

**Page**

CERTIFICATE OF INTEREST .......... i
TABLE OF AUTHORITIES .......... v
TABLE OF ABBREVIATIONS .......... viii
STATEMENT OF RELATED CASES .......... ix
STATEMENT OF JURISDICTION .......... 1
STATEMENT OF THE ISSUE .......... 2
INTRODUCTION .......... 2
STATEMENT OF THE CASE .......... 4
A. The ’674 Patent .......... 4
B. Apple’s IPR Grounds .......... 9
C. The Board’s Original Final Written Decisions .......... 13
D. This Court’s Decision In The Prior Appeal .......... 14
E. The Board’s Final Written Decision On Remand .......... 17
SUMMARY OF ARGUMENT .......... 20
STANDARD OF REVIEW .......... 21
ARGUMENT .......... 22
I. APPLE’S GROUND 2 IS IMPERMISSIBLE UNDER THE PLAIN MEANING OF SECTION 311(b) .......... 22
A. Section 311(b) Prohibits Grounds That Are Not Based Only On Prior Art Patents Or Printed Publications .......... 22
B. The Proper Interpretation Of Section 311(b) Comports With The Court’s Precedent .......... 26
C. Apple’s Ground 2 Contravenes The Plain Meaning Of Section 311(b) .......... 32
1. Apple Defined The Basis Of Ground 2 As Including AAPA .......... 32
2. Apple Extensively Used AAPA As The Basis Of Ground 2 .......... 34

**TABLE OF CONTENTS**
(continued)

**Page**

II. THE BOARD'S DECISION IS WRONG ....................39

A. The Board's Statutory Interpretation, Based On Recent Director Guidance, Is Wrong ....................40

B. The Board's Other Reasoning Merely Adheres To The Same Erroneous View ....................43

CONCLUSION ....................47

ADDENDUM

CERTIFICATE OF COMPLIANCE

# TABLE OF AUTHORITIES

**Page(s)**

**CASES**

*Alexander v. Sandoval*,
532 U.S. 275 (2001)....................22

*Allergan, Inc. v. Teva Pharms. USA, Inc.*,
15-CV-1455, 2017 U.S. Dist. LEXIS 225041
(E.D. Tex. Aug. 3, 2017)....................31

*Ariosa Diagnostics v. Verinata Health, Inc.*,
805 F.3d 1359 (Fed. Cir. 2015)....................30

*Constant v. Advanced Micro-Devices, Inc.*,
848 F.2d 1560 (Fed. Cir. 1998)....................43

*Facebook, Inc. v. Windy City Innovations, LLC*,
953 F.3d 1313 (Fed. Cir. 2020)....................21

*FanDuel, Inc. v. Interactive Games LLC*,
966 F.3d 1334 (Fed. Cir. 2020)....................21, 46

*Finjan, Inc. v. Sophos, Inc.*,
No. 14-cv-1197, 2016 WL 2988834
(N.D. Cal. May 24, 2016)....................31

*Hyosung TNS Inc. v. ITC*,
926 F.3d 1353 (Fed. Cir. 2019)....................30

*In re Mouttet*,
686 F.3d 1322 (Fed. Cir. 2012)....................38

*In re Rudy*,
956 F.3d 1379 (Fed. Cir. 2020)....................40

*Intuitive Surgical, Inc. v. Ethicon LLC*,
25 F.4th 1035 (Fed. Cir. 2022)....................34

*Kingdomware Techs., Inc. v. United States*,
579 U.S. 162 (2016)....................22

*Koninklijke Philips N.V. v. Google LLC*,
948 F.3d 1330 (Fed. Cir. 2020)....................*passim*

*Lone Star Silicon Innovations LLC v. Iancu*,
809 F. App'x 773 (Fed. Cir. 2020)....................29, 30

**TABLE OF AUTHORITIES**
(continued)

**Page(s)**

*Matal v. Tam*,
137 S. Ct. 1744 (2017)....................22

*Myore v. Nicholson*,
489 F.3d 1207 (Fed. Cir. 2007)....................22

*Norfolk Dredging Co. v. United States*,
375 F.3d 1106 (Fed. Cir. 2004)....................22

*PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*,
491 F.3d 1342 (Fed. Cir. 2007)....................43

*Qualcomm, Inc. v. Apple Inc.*,
24 F.4th 1367 (Fed. Cir. 2022)....................*passim*

*SAS Inst., Inc. v. Iancu*,
138 S. Ct. 1348 (2018)....................26, 28, 34, 41

*Shea v. United States*,
976 F.3d 1292 (Fed. Cir. 2020)....................24

*Thaler v. Vidal*,
43 F.4th 1207 (Fed. Cir. 2022)....................22

*Unwired Planet, LLC v. Google Inc.*,
841 F.3d 1376 (Fed. Cir. 2016)....................21, 40

*Williams v. Taylor*,
529 U.S. 362 (2000)....................24

*Yates v. United States*,
574 U.S. 528 (2015)....................23

*Yeda Rsch. v. Mylan Pharms. Inc.*,
906 F.3d 1031 (Fed. Cir. 2018)....................29, 30, 39, 44

**STATUTES**

5 U.S.C. § 706....................21

28 U.S.C. § 1295....................1

35 U.S.C. § 101....................40

35 U.S.C. § 102....................2, 22

35 U.S.C. § 103....................*passim*

## TABLE OF AUTHORITIES
(continued)

**Page(s)**

35 U.S.C. § 141 .......... 1
35 U.S.C. § 301 .......... 25
35 U.S.C. § 311 .......... *passim*
35 U.S.C. § 319 .......... 1

**OTHER AUTHORITIES**

Black's Law Dictionary (9th ed. 2009) .......... 23
Elise Corbin, N.Y. Times Crossword Puzzle (Feb. 2, 2023) .......... 24
Merriam-Webster.com Dictionary .......... 23
Merriam-Webster's Collegiate Dictionary (11th ed. 2006) .......... 23, 24
Oxford English Dictionary (2d ed. 1989) .......... 24
Oxford English Dictionary (3d ed. 2004) .......... 24

# TABLE OF ABBREVIATIONS

The following abbreviations are used in this brief:

| Abbreviation | Term |
|---|---|
| ’674 patent | U.S. Patent No. 8,063,674 |
| AAPA | applicant admitted prior art |
| AIA | America Invents Act |
| Apple | Apple Inc. |
| Board | Patent Trial and Appeal Board |
| challenged claims | claims 1, 2, 5-9, 12, 13, and 16-22 of U.S. Patent No. 8,063,674 |
| Doyle | U.S. Patent No. 4,717,836 |
| I/O | input/output |
| IPR | *inter partes* review |
| Majcherczak | U.S. Patent Publication No. 2002/0163364 |
| Matthews | U.S. Patent No. 6,646,844 |
| Park | Park, J. C. & Mooney, V. J. (Nov. 2006). Sleepy Stack Leakage Reduction. *IEEE Transactions on Very Large Scale Integration (VLSI) Systems*, 14(11), 1250-1263 |
| POC | power-on/off-control |
| POSITA | person of ordinary skill in the art at the time of the invention |
| USPTO or PTO | United States Patent and Trademark Office |
| Qualcomm | Qualcomm Incorporated |
| Steinacker | U.S. Patent No. 7,279,943 |

# STATEMENT OF RELATED CASES

There was a previous appeal of the Board's original Final Written Decisions in the IPRs underlying the present appeal: *Qualcomm Incorporated v. Apple Inc.*, Nos. 20-1558, -1559. The Court's decision is reported at 24 F.4th 1367 (Fed. Cir. 2022) (Taranto, Bryson, Chen, JJ.).

The patent at issue in the prior and present appeals, U.S. Patent No. 8,063,674, was previously asserted in the following litigations, both of which have been resolved:

- *Mobile Electronic Devices and Radio Frequency and Processing Components*, 337-TA-1093 (ITC); and
- *Qualcomm Incorporated v. Apple Inc.*, No. 3-17-cv-02398 (S.D. Cal.).

## STATEMENT OF JURISDICTION

This appeal arises from two *inter partes* review proceedings filed by Apple Inc. before the Patent Trial and Appeal Board pursuant to 35 U.S.C. § 311 et seq. After a prior appeal in which the Court remanded these proceedings to the Board, the Board issued a Final Written Decision on Remand on November 10, 2022, jointly addressing the two IPRs and holding the challenged claims of U.S. Patent No. 8,063,674 unpatentable under 35 U.S.C. § 103. On November 17, 2022, Qualcomm Incorporated timely filed notices of appeal. This Court has jurisdiction under 28 U.S.C. § 1295(a)(4)(A) and 35 U.S.C. §§ 141(c) & 319.

## STATEMENT OF THE ISSUE

In an IPR proceeding, the petitioner may request cancellation of claims of a patent "only on the basis of prior art consisting of patents or printed publications":

> **(b) Scope.—** A petitioner in an inter partes review may request to cancel as unpatentable 1 or more claims of a patent only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications.

35 U.S.C. § 311(b).

Did the Board err in interpreting Section 311(b) to permit Apple's Ground 2, which consists of so-called applicant admitted prior art (AAPA) in view one or more prior art patents or printed publications?

## INTRODUCTION

Apple's Ground 2—the only ground on which the Board found the challenged claims unpatentable, and the only ground at issue in this appeal—exceeds the congressionally limited scope of *inter partes* review, as set forth in 35 U.S.C. § 311(b). Section 311(b) limits an IPR challenge by requiring it to be "only on a ground that could be raised under section 102 or 103 and only on the basis of prior art consisting of patents or printed publications." Because Apple's Ground 2 is not "only on the basis of prior art consisting of patents or printed publications," the Board erred in deciding this ground.

This is the second time this case has been before the Court. In the prior appeal, the Court interpreted Section 311(b)'s phrase "prior art consisting of

patents or printed publications" to exclude AAPA. *See Qualcomm, Inc. v. Apple Inc.*, 24 F.4th 1367 (Fed. Cir. 2022). The Court explained: "We agree with Qualcomm and the PTO that the 'patents or printed publications' that form the 'basis' of a ground for *inter partes* review must themselves be prior art to the challenged patent," *id.* at 1374, and thus that "AAPA contained in the challenged patent is not 'prior art consisting of patents or printed publications.'" *Id.* at 1375.

The Court then remanded for the Board to answer a narrow and specific question: "whether AAPA improperly formed the 'basis' of Apple's challenge." *Id*. at 1377. The Board's erroneous answer to that question is the reason for this appeal.

Based on the clear and indisputable record, the Board should have answered the question "yes," AAPA improperly formed the basis of Apple's Ground 2. This is immediately clear from Apple's own definition of the basis for Ground 2, e.g.: "§ 103: Applicants Admitted Prior Art (AAPA) in view of Majcherczak." Appx205. Even beyond that, Apple consistently argued AAPA in such a manner that AAPA plainly formed the "basis" for Ground 2.

The Board, however, answered the question "no." According to the Board, if a ground includes AAPA "in combination with reliance on one or more prior art patents or printed publications," the ground necessarily satisfies Section 311(b). Appx23. For this interpretation of the statute, the Board relied on the current

guidance from the Director of the Patent Office, which the Director issued shortly after this Court's decision in the prior appeal. Appx5267. Thus, simply because Apple's Ground 2 included the Majcherczak and/or Matthews references, and did not include AAPA alone, the Board viewed Ground 2 as consistent with Section 311(b).

The Board's conclusion is contrary to the plain meaning of the statute, and its patentability determination for Ground 2 exceeded the statutory limit explicitly set forth in Section 311(b). The Board's judgment of unpatentability should be reversed, and the challenged claims upheld as patentable.

## STATEMENT OF THE CASE

### A. The '674 Patent

The '674 patent, which issued on November 22, 2011, is entitled "Multiple Supply-Voltage Power-Up/Down Detectors." Appx68 (capitalization altered); *see* Appx68-83. The patent is generally directed to use of a feedback technique for more efficiently and quickly detecting powering on or off (up or down) devices with multiple supply voltages (e.g., cell phones). Appx68; Appx80 (7:65). In particular, the patent claims a feedback circuit coupled to an up/down detector, which provides significant advantages such as "reducing the leakage current while also improving the power-up/down detection speed." Appx68. This solution takes into account and balances multiple challenges in the complex systems of devices

operating on multiple supply voltages.

To situate its claimed improvements over the prior art, the patent's Background section explains that advances in semiconductor fabrication had allowed devices to become more compact and have lower voltage requirements for their internal operating and core applications, while still operating at high speeds. Appx77 (1:14-17). These devices, however, still needed to interface with older technologies using higher voltage levels, and therefore the input/output (I/O) circuits of the devices remained at higher operating voltages. Appx77 (1:20-22). As a result, newer devices often "include[d] dual power supplies: one lower-voltage power supply for the internally operating or core applications, and a second higher-voltage power supply of the I/O circuits and devices." Appx77 (1:22-25). For example, a lower voltage V1 could be used for a core logic network, while a higher voltage V2 might be required for an I/O network. Appx77 (1:22-25).

Devices with multiple supply voltages require additional components to function, such as level shifters that "facilitate communication between the core and I/O devices." Appx77 (1:28-29). But level shifters could cause problems. For instance, in relation to a device "[p]owering down or power collapsing" ("a common technique used to save power when no device operations are pending or in progress"), "level shifters, whether through stray currents or the like," could send an erroneous transmission. Appx77 (1:32-40). The patent thus explains that

"[i]t has been found useful to have the I/O devices in a known state when the core networks are powered down" in order to avoid any miscommunications. Appx77 (1:41-42). But the patent further notes that the added hardware or software for placing the device in a known state can cause power leakages and delays in switching times. Appx77 (1:41-54).

The '674 patent notes that the stray-current problem could be solved by using "power-up/down detectors to generate a power-on/off-control (POC) signal internally … [that] instructs the I/O devices when the core devices are shut down," though it notes this type of system "still ha[d] problems with leakage and switching times." Appx77 (1:55-58); Appx78 (3:10-11). The patent depicts that system in Figure 1, "a circuit diagram illustrating standard POC system 10 for multiple supply voltage devices," Appx77 (1:58-60), and identifies this system as "PRIOR ART":




(PRIOR ART)
FIG. 1

Appx69. The ’674 patent describes Figure 1 as a “conventional POC system for multiple supply voltage devices,” Appx78 (4:18-19), though the patent does not associate this system with any reference or existing product.

As the ’674 patent explains in describing Figure 1, when I/O power supply 104 is on and core power supply 103 is off, powering on the core power supply results in “a period in which all three transistors [M1, M2, and M3] within power up/down detector 100 are on,” producing a virtual short “to ground causing a significant amount of current to flow from I/O power supply 104 to ground.” Appx77 (2:25-29). The patent notes that “[t]his ‘glitch’ current consumes unnecessary power.” Appx77 (2:29-30). Although the glitch current can be reduced by reducing the size of transistors M1-M3, such a reduction limits “the actual amount of current that can pass through the transistors” and reduces their switching speeds, which “translates into less sensitivity in detecting power-up/down of core supply voltage 103 or longer processing time for power-up/down events.” Appx77 (2:33-39).

To overcome the leakage and switching time issues associated with the system of Figure 1, the ’674 patent inventors created a device with a feedback circuit capable of increasing the speed of the power-up/down detection while simultaneously reducing power consumption. Appx68; Appx78 (3:20-22). An example of their claimed invention is depicted in Figure 4:




FIG. 4

Appx73.

As shown in Figure 4, the feedback network 310 provides feedback signals to transistor M8 in order to adjust a current capacity of the up/down detector. Appx78 (3:31-34); Appx79 (6:4-5). Specifically, during a power-up transition (i.e., $V_{core}$ transitioning from low to high), M8 transitions from on to off. Appx79 (6:12-18). When M8 is off, the current capacity of the power up/down detector 40 is decreased. Appx79 (6:12-18). During a power-down transition (i.e., $V_{core}$ transitioning from high to low), M8 transitions from off to on. Appx79 (6:21-28). When M8 is on, the current capacity of the power up/down detector 40 is increased, and the "power up/down detector 40 will detect the $V_{core}$ 301 powering down more quickly than the existing POC networks." Appx79 (6:21-28). The device and its feedback technique disclosed in the '674 patent thus provide fast and energy-efficient power up/down detection.

Claim 1 is representative:

> 1. A multiple supply voltage device comprising: a core network operative at a first supply voltage; and
>
> a control network coupled to said core network wherein said control network is configured to transmit a control signal, said control network comprising: an up/down (up/down) detector configured to detect a power state of said core network; processing circuitry coupled to said up/down detector and configured to generate said control signal based on said power state;
>
> one or more feedback circuits coupled to said up/down detector, said one or more feedback circuits configured to provide feedback signals to adjust a current capacity of said up/down detector;
>
> at least one first transistor coupled to a second supply voltage, the at least one more first transistor being configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on;
>
> at least one second transistor coupled in series with the at least one first transistor and coupled to said first supply voltage, the at least one second transistor being configured to switch on when said first supply voltage is powered on and to switch off when said first supply voltage is powered down;
>
> at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor.

Appx80-81 (8:44-9:3).

### B. Apple's IPR Grounds

In June 2018, Apple filed two IPR petitions collectively challenging claims 1, 2, 5-9, 12, 13, and 16-22 of the '674 patent. Appx199-271; Appx2521-2605.

Apple challenged the claims only on Section 103 grounds, raising two such grounds against each claim. Appx205; Appx2526. For instance, in IPR2018-01315, Apple "request[ed] an IPR of the Challenged Claims on the grounds set forth in the table shown below," Appx204-205, which is reproduced here:

| Ground | '674 Patent Claims | Basis for Rejection |
|---|---|---|
| **Ground 1** | **1, 2, 5-7** | §103: Steinacker in view of Doyle and Park |
| **Ground 2a** | **1, 2, 5, and 6,** | §103: Applicants Admitted Prior Art (AAPA) in view of Majcherczak |
| **Ground 2b** | **7** | §103: AAPA in view of Majcherczak and Matthews |

Appx205.[1]

As shown, Apple defined the "Basis" of its principal ground (Ground 1) as "Steinacker in view of Doyle and Park," a three-reference combination of two prior art patents (Steinacker and Doyle) and a prior art printed publication (Park). Appx205; Appx214.

As likewise shown, Apple defined the "Basis" of Ground 2 (comprising Grounds 2a and 2b) as "Applicants Admitted Prior Art (AAPA) in view of

[1] The IPR2018-01315 proceedings are generally representative of the IPR2018-01316 proceedings. Accordingly, this brief principally cites only the IPR2018-01315 proceedings and refers to, e.g., "petition" in the singular.

Majcherczak," a patent application publication.[2] Appx205; *see* Appx1418-1429 (Majcherczak). As Apple indicated, this ground did not rely solely on prior art patents or printed publications. Rather, Apple asserted so-called "AAPA," which Apple identified as Figure 1 and related statements in the '674 patent. Appx212; Appx240. As shown, Apple expressly stated that the evidence forming the "Basis" of Ground 2 was "AAPA in view of Majcherczak." Appx205 (punctuation omitted).

Consistent with its definition of Ground 2, Apple's arguments for unpatentability relied extensively on the AAPA—in fact, for almost every claim limitation. Appx240-267. Apple's petition contended that "the only substantive difference from the perspective of the claims between the prior art POC system 10 described in the AAPA and the purportedly inventive POC network 40 illustrated in FIG. 4 of the '674 Patent is the inclusion of a feedback network." Appx242. Apple thus relied on Majcherczak for only that narrow aspect of the claims. Appx253-255; Appx260-262.

Apple also visually depicted the fact that AAPA formed the basis for Ground 2 by repeatedly presenting diagrams of its asserted combination: the

[2] For the claims challenged in Ground 2b, Apple also included Matthews, another prior art patent. Appx205-206; *see* Appx1430-1442 (Matthews). Because Ground 2a is representative of Ground 2b for purposes of this appeal, this brief uses "Ground 2" to refer to both.

AAPA system as its base system, modified to include the feedback transistor from Majcherczak. *E.g.*, Appx247; Appx251; Appx253; Appx256; Appx258. For instance, Apple depicted its AAPA/Majcherczak ground by depicting the blue-dotted aspect of Majcherczak that Apple combined into the "AAPA POC System" of Figure 1 of the '674 patent:




Appx247.

Apple's arguments as to an alleged motivation to combine the AAPA and Majcherczak rested on the same framework—Apple started with the AAPA system and argued why a skilled artisan would have been motivated to modify that system by adding a single element from Majcherczak (its feedback transistor) into the AAPA system. *See, e.g.*, Appx246 (arguing that "a POSITA would have found it obvious to integrate [a] feedback transistor … from Majcherczak[] … into the … system … of the AAPA").

### C. The Board's Original Final Written Decisions

The Board instituted each IPR, and on January 3, 2020, issued its Final Written Decisions. Appx672-755 (IPR2018-01315); *accord* Appx3003-3086 (IPR2018-01315). The Board found the challenged claims unpatentable, but only under Apple's Ground 2. The Board rejected Ground 1, which was based on the combination of Steinacker, Doyle, and Park. Appx753.

For Ground 2, the Board itself recognized that Apple presented "AAPA, Majcherczak" (and also Matthews, for some claims) as the "References/***Basis***." Appx680 (emphasis added). The Board's table is reproduced here:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 5, 6, 8, 9, 12, 13, 17–21 | 103(a) | AAPA,[7] Majcherczak |
| 7, 16, 22 | 103(a) | AAPA, Majcherczak, Matthews[8] |

Appx680.

Both before and after institution, Qualcomm challenged Ground 2 as impermissible under Section 311(b) because, in purporting to use the '674 patent itself as a reference for unpatentability, the ground violated the statute's limitation that the basis of an IPR ground can be only prior art patents or printed publications. Appx318-319; Appx403-406; Appx497-498; *accord* Appx2652-2653; Appx2738-2740; Appx2828-2829. The Board, however, disagreed, determining that because "AAPA is admitted to be prior art and is found in the '674 patent," the AAPA met

the statutory requirement "that the 'prior art consist[] of patents or printed publications.'" Appx689-690 (bracketing by the Board). The Board then proceeded to consider that ground on its merits. Appx693. In ultimately finding the claims unpatentable under Ground 2, the Board adopted Apple's extensive reliance on the AAPA. For claim 1, for instance, the Board, just like Apple, relied on AAPA as the base system and for multiple limitations, and relied on Majcherczak for only one limitation. Appx693-699.

### D. This Court's Decision In The Prior Appeal

On Qualcomm's prior appeal from the Board's Final Written Decisions, this Court had essentially two questions before it: (1) the "main argument on appeal" regarding whether "AAPA constitutes 'prior art consisting of patents or printed publications' under § 311(b) such that it may form 'the basis' of a ground in *inter partes* review," *Qualcomm*, 24 F.4th at 1373, and (2) Apple's argument that the Board's judgment could alternately be upheld based on Ground 1, *id.* at 1377. In its February 1, 2022 decision, the Court "reject[ed] Apple's alternative ground for affirmance," and the Board's judgment that the claims are not unpatentable under Ground 1 is now final. *Id.*

With respect to the first issue—whether AAPA qualifies as "prior art consisting of patents or printed publications"—the Court "h[e]ld that it does not." *Id.* at 1373; *see id.* at 1373-75 (part A of the Court's opinion). The Court thus

disagreed with Apple's statutory interpretation. As it did before the Board, Apple argued to the Court that Ground 2, which Apple acknowledged was "based on AAPA," Appx5087, was permissible because Section 311(b) should be interpreted so that "any 'prior art'—including AAPA—that is contained in any patent or printed publication, regardless of whether the document itself is prior art, can be used as a basis for a challenge in *inter partes* review." *Qualcomm*, 24 F.4th at 1373; *see also* Appx5082 (arguing, e.g., that Section 311(b) permits Ground 2 because "the statute's plain text permits grounds based on 'prior art consisting of patents,' and the AAPA here qualifies because it is literally prior art consisting of (i.e., in the form of) a patent"); Appx5100-5121.

Rejecting Apple's interpretation, the Court explained that the plain text of Section 311(b) "limits 'the basis' of any 'ground' in an *inter partes* review to 'prior art consisting of patents or printed publications,'" which "excludes any descriptions of the prior art contained in the challenged patent," i.e., AAPA. *Qualcomm*, 24 F.4th at 1374; *see id.* (explaining that "prior art consisting of patents or printed publications" "exclud[es] patents which themselves are not prior art"). "In other words, § 311(b) does not permit AAPA in this case to be the basis of a ground in an *inter partes* review, because it is not contained in a document that is a prior art patent or prior art printed publication." *Id.* at 1375.

In the next section of its opinion, the Court turned to the point that "evidence beyond prior art documents," "such as expert testimony and party admissions [e.g., AAPA]," is not "categorically excluded" from an IPR. *Id.* at 1376; *see id.* at 1375-76 (part B of the Court's opinion).

For convenience, this brief at times refers to evidence, including prior art, that does not qualify as a prior art patent or printed publication—e.g., "evidence such as expert testimony and party admissions [that] are not themselves prior art references," *id.* at 1376—as "<u>non-311(b) evidence</u>."

In this part of its opinion, the Court explained that the statute and the Court's precedent "permit[] consideration of" non-311(b) evidence in an IPR, "at least to some extent." *Id.* at 1375. For instance, where such evidence concerns "the scope and content of the prior art," it can "provide a factual foundation as to what a skilled artisan would have known at the time of invention." *Id.* at 1376. "Thus, even though evidence such as expert testimony and party admissions are not themselves prior art references, they are permissible evidence in an *inter partes* review for establishing the background knowledge possessed by a person of ordinary skill in the art." *Id.*

In the final sections of its analysis, the Court reiterated that "the Board incorrectly interpreted § 311(b)'s 'prior art consisting of patents or printed publications' to encompass AAPA contained in the challenged patent." *Id.* at

1376-77 (part C of the Court's opinion and the following coda). The Court made clear: "At bottom, Section 311 provides a limit on what prior art can be the basis for an *inter partes* review challenge and both the courts and the PTO must adhere to that limit." *Id.* at 1377.

Having held that Section 311(b) art does not encompass AAPA, the Court explained that the "next contested issue is whether AAPA improperly formed the 'basis' of Apple's challenge," and that a remand would "allow the Board to address this issue in the first instance." *Id.* The Court therefore vacated the original Final Written Decisions and remanded for the Board to "determine whether Majcherczak forms the basis of Apple's challenge, or whether the validity challenge impermissibly violated the statutory limit in Section 311." *Id.* The Court directed the Board to "determine whether Apple's petition nonetheless raises its § 103 challenge '*on the basis* of prior art consisting of patents or printed publications.'" *Id.* at 1369 (emphasis by the Court).

Apple petitioned for rehearing en banc, which the Court denied. Appx5253-5254.

### E. The Board's Final Written Decision On Remand

For the remand proceedings, the Board permitted two rounds of simultaneous briefing to address "whether Majcherczak forms the basis of Apple's challenge, or whether the validity challenge impermissibly violated the statutory

limit in section 311." Appx844-846. The Board denied Qualcomm's request for an oral hearing. Appx5.

In its briefing, Qualcomm maintained its position that Apple's Ground 2 is contrary to the plain text of Section 311(b) because Apple did not raise Ground 2 only on the basis of prior art consisting of patents or printed publications. Appx879-893. As Qualcomm noted, Apple itself expressly defined the "Basis" of Ground 2 as including the AAPA, and Apple used the AAPA "for almost every claim element" while relying on "Majcherczak for only a limited aspect of the claims." Appx885. Qualcomm further explained that Apple did not use the AAPA as evidence of general or background knowledge of the skilled artisan, but instead impermissibly used the AAPA itself as a purported prior art reference. Appx920-929.

Apple's remand briefing relied heavily on guidance issued by the Director for the proposition that Ground 2 is permissible simply because it includes one or more prior art patents or printed publications. Appx5264-5270 (June 9, 2022 USPTO Memorandum on "Updated Guidance on the Treatment of Statements of the Applicant in the Challenged Patent in Inter Partes Reviews Under § 311" (capitalization altered)). The Director issued this "Updated Guidance" shortly before the start of the remand proceedings. Appx5264; *see* Appx17-18. The Updated Guidance supersedes 2020 guidance from the prior Director (Appx5255-

5263), and directs that the Updated Guidance "shall be followed by all members of the Patent Trial and Appeal Board." Appx5264; *see* Appx17-18. Under its test, a ground that "relies on admissions in the specification [of the challenged patent] in combination with reliance on at least one prior art patent or printed publication" complies with Section 311(b). Appx5267.

On November 10, 2022, the Board issued its Final Written Decision on Remand, jointly addressing the two IPRs and "the issue before" it of "whether AAPA improperly formed the 'basis' of Petitioner's challenge." Appx23; *see* Appx1-67. The Board determined that "[t]he answer to this question is found in the Updated Guidance." Appx23. According to the Board, and citing the Updated Guidance, if a petition "relies on admissions in combination with reliance on one or more prior art patents or printed publications, those admissions do not form 'the basis' of the ground," and the ground comports with Section 311(b). Appx23 (quoting Appx5267). Because Ground 2 included at least one prior art patent or printed publication, the Board held that it complied with Section 311(b). Appx23-24 ("Because Petitioner's grounds involve a combination of AAPA and prior art patent(s), AAPA does not form the basis of the ground"; "[i]nstead, it is the prior art patents—Majcherczak and, when used, Matthews—that form the basis of the challenge and AAPA is simply being used to provide missing limitations").

In a concurrence, Judge Galligan agreed with the Board's conclusion only to the extent that it was compelled by the Updated Guidance. Appx66. Judge Galligan declined to join or express any opinion on the majority's broader discussion. Appx66; *see* Appx24-30.

Proceeding to the merits of Ground 2, the Board adhered to its patentability analysis from its original Final Written Decisions, which had treated the AAPA as if it were itself a Section 311(b) prior art reference. Appx29 (the Board noting that its "application of the prior art patent(s) and AAPA" to the challenged claims is "substantially identical to that in the [original] Final Decision[s]," but for "the correction of obvious typographical errors").

Qualcomm appealed.

## **SUMMARY OF ARGUMENT**

Under Section 311(b), Apple's Ground 2—AAPA in view of Majcherczak—is not permissible in this IPR. The statute limits the basis of an IPR ground to "only … prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). The basis of Ground 2 exceeds that statutory limitation. Apple expressly defined the "basis" of Ground 2 as including AAPA, and Apple's arguments repeatedly and consistently used AAPA to form the basis for Ground 2. Apple's Ground 2 is contrary to the statutory limit on IPRs, and the Board thus erred in rendering a patentability determination for Ground 2.

In deeming Apple's Ground 2 permissible, the Board misread the plain language of the statute. Applying the Director's Updated Guidance, the Board found Ground 2 permissible because it includes Majcherczak, a prior art printed publication. But mere inclusion of one or more prior art printed publications (or patents) is not the statutory inquiry. The statute demands that the *basis* for a ground be *only* prior art patents or printed publications.

The Court should correct the Board's erroneous statutory interpretation and reverse the Board's judgment.

## STANDARD OF REVIEW

The Court "review[s] Board determinations under the standards provided in the Administrative Procedure Act ('APA'), 5 U.S.C. § 706." *Unwired Planet, LLC v. Google Inc.*, 841 F.3d 1376, 1379 (Fed. Cir. 2016). "'Under 5 U.S.C. § 706(2)(A), (E), the Board's actions here are to be set aside if 'arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law….'" *Id.* (citation omitted). The Court "review[s] the Board's statutory interpretation de novo." *Id.*; *see also, e.g.*, *Facebook, Inc. v. Windy City Innovations, LLC*, 953 F.3d 1313, 1321 (Fed. Cir. 2020). Thus, on review of a Board decision in an *inter partes* review, the Court will "'hold unlawful and set aside agency action … not in accordance with law.'" *FanDuel, Inc. v. Interactive Games LLC*, 966 F.3d 1334, 1339 (Fed. Cir. 2020) (quoting 5 U.S.C. § 706(2)).

# ARGUMENT

## I. APPLE'S GROUND 2 IS IMPERMISSIBLE UNDER THE PLAIN MEANING OF SECTION 311(b)

### A. Section 311(b) Prohibits Grounds That Are Not Based Only On Prior Art Patents Or Printed Publications

"In statutory construction, [courts] begin 'with the language of the statute.'" *Kingdomware Techs., Inc. v. United States*, 579 U.S. 162, 171 (2016); *see also Myore v. Nicholson*, 489 F.3d 1207, 1211 (Fed. Cir. 2007). A statute's plain meaning derives from its text and structure. *Alexander v. Sandoval,* 532 U.S. 275, 288 (2001); *Norfolk Dredging Co. v. United States*, 375 F.3d 1106, 1110 (Fed. Cir. 2004). And because "inquiry into the meaning of the statute's text ceases when 'the statutory language is unambiguous and the statutory scheme is coherent and consistent,'" *Matal v. Tam*, 137 S. Ct. 1744, 1756 (2017), the interpretive process for unambiguous statutes both "begins and ends with the plain meaning of the text." *Thaler v. Vidal*, 43 F.4th 1207, 1213 (Fed. Cir. 2022).

This is just such a case. Section 311(b) of the Patent Act limits petitioners to challenging a patent claim "only on a ground that could be raised under section 102 or 103 and *only on the basis* of prior art *consisting of* patents or printed publications." 35 U.S.C. § 311(b) (emphases added). This language unambiguously limits the evidence that can be used as the "basis" of an IPR ground. As the Court held in the prior appeal, Section 311(b) "provides *a limit on what prior art can be the basis* for an *inter partes* review challenge and both the

courts and the PTO must adhere to that limit." *Qualcomm*, 24 F.4th at 1377 (emphasis added). In particular, the permissible "basis" for an IPR ground is limited to "only … prior art consisting of patents or printed publications." 35 U.S.C. § 311(b). That limitation prohibits a petitioner from using AAPA to form the basis of an IPR ground. *See Qualcomm*, 24 F.4th at 1375 ("§ 311(b) does not permit AAPA in this case to be the basis of a ground in an *inter partes* review.").

The key phrase—"only on the basis of prior art consisting of patents or printed publications"—is comprised of common English words. "Ordinarily, a word's usage accords with its dictionary definition." *Yates v. United States*, 574 U.S. 528, 537 (2015).

Start with "on the basis of," an everyday English idiom that simply means "according to, based on." Merriam-Webster.com Dictionary, https://tinyurl.com/mr3smh4v (last visited Mar. 20, 2023). Thus, Section 311(b) limits IPR grounds to those *based on* prior art patents or printed publications.

"Basis" (or "based on") is itself ordinary English language. The plain meaning of "basis" is "foundation" or "fundamental"—a basis of something is fundamental to it, or the foundation on which it rests, as numerous dictionaries demonstrate. *See* Black's Law Dictionary (9th ed. 2009) ("A fundamental principle; an underlying fact or condition."); Merriam-Webster's Collegiate Dictionary (11th ed. 2006) ("the bottom of something considered as its

foundation"; "the principal component of something": "something on which something else is established or based"); Oxford English Dictionary (2d ed. 1989) ("[t]he bottom of anything, considered as the part on which it rests or is supported"; "[t]he main constituent, fundamental ingredient"; "a foundation, support"). Ordinary usage of "basis" is in accord. *See, e.g.*, Elise Corbin, N.Y. Times Crossword Puzzle, at 41 Across (Feb. 2, 2023) (answer to clue "Foundation" is "BASIS").

The surrounding statutory text is also informative. Indeed, "it is a 'cardinal principle of statutory construction that courts must give effect, if possible, to every clause and word of a statute.'" *Shea v. United States*, 976 F.3d 1292, 1300 (Fed. Cir. 2020) (quoting *Williams v. Taylor*, 529 U.S. 362, 364 (2000)). Section 311(b) explicitly directs that an IPR ground can be "*only* on the basis of prior art *consisting of* patents or printed publications." 35 U.S.C. § 311(b) (emphases added). This context twice reinforces the limited scope of a permissible IPR ground.

First, the statute uses "only." The word "only" is a well-known modifier of limitation, and its usage imparts an intended exclusivity. *See* Merriam-Webster's Collegiate Dictionary (11th ed. 2006) ("[1]b: solely, exclusively" (capitalization omitted)); Oxford English Dictionary (3d ed. 2004) ("Solely, merely, exclusively;

with no one or nothing more besides; as a single or solitary thing or fact; no more than.”).

Second, the statute uses “consisting of.” In the prior appeal, the Court found that the phrase “prior art consisting of patents or printed publications” in both Sections 301(a) and 311(b) had a known meaning, limiting each statute to only “prior art patent[s] or prior art printed publication[s],” which excludes AAPA. *Qualcomm*, 24 F.4th at 1375. The statute’s intentional, repeated use of closed-ended, limiting language precludes non-311(b) evidence from forming the “basis” of an IPR ground. Rather, the foundation of an IPR ground must solely be prior art patents or publications.

Accordingly, a ground that is based, alone or in part, on evidence that is not itself a prior art patent or printed publication does not rest “only on the basis of prior art consisting of patents or printed publications.” 35 U.S.C. § 311(b). The merits of such a ground therefore cannot be decided in an IPR. And in most cases (including here, as discussed in Section I.C below), there can be no legitimate debate regarding a patent challenger’s alleged basis for an IPR obviousness ground.

For instance, a petitioner exceeds Section 311(b)’s limitations when it designates the basis of a ground as including not “only … prior art consisting of patents or printed publications,” but also AAPA or other non-311(b) evidence.

After all, "in an *inter partes* review the petitioner is master of its complaint." *SAS Inst., Inc. v. Iancu*, 138 S. Ct. 1348, 1355 (2018). So if the petitioner formulates a ground that defines itself beyond what Section 311(b) permits, that should be the end of the matter.

A petitioner also runs afoul of Section 311(b) if it tries to evade the statute's limitations by not listing non-311(b) evidence as the basis of a ground but nonetheless using that evidence as such. Although AAPA, along with expert testimony and other non-311(b) evidence, may play a supporting role such as "establishing the background knowledge possessed by a person of ordinary skill in the art," *Qualcomm*, 24 F.4th at 1375-76, it cannot, consistent with the statutory language, be used as the basis of a ground.

At the very least, Section 311(b) bars a ground where the petitioner *both* designates the "basis" for its challenge as including non-311(b) evidence, *and also* uses non-311(b) evidence in such an impermissible manner. As discussed in Section I.C below, that is precisely the scenario here for Apple's Ground 2.

### B. The Proper Interpretation Of Section 311(b) Comports With The Court's Precedent

In the prior appeal, the Court noted that Section 311(b)'s prohibition against "AAPA constitut[ing] 'prior art consisting of patents or printed publications,'" *Qualcomm*, 24 F.4th at 1369, is not inconsistent with using AAPA and other non-311(b) evidence in a distinct, permissible role, in an otherwise-valid IPR ground.

*See id.* at 1375-76. As this Court's and other precedent makes clear, the distinction between evidence forming the basis of an obviousness theory, versus evidence used as support for the skilled artisan's general knowledge, is well understood.

For example, in *Koninklijke Philips N.V. v. Google LLC*, 948 F.3d 1330 (Fed. Cir. 2020), the Court permitted the use of AAPA in IPR proceedings, where the petitioner used the AAPA as evidence of general knowledge of the skilled artisan. *See id.* at 1337-38. Notably, the AAPA was not the basis of any ground. Rather, the basis of the ground was SMIL 1.0, a prior art printed publication. *See id.* at 1334-35. The AAPA played a distinct role; it was used in conjunction with other evidence including expert testimony and the Hua document to demonstrate "the skilled artisan's knowledge when determining whether it would have been obvious to modify the prior art," i.e., modifying the SMIL 1.0 reference in light of general knowledge of pipelining (as relevant to the final two steps of the challenged claims). *Id.* at 1334, 1337; *see also id.* at 1338 ("[T]he Board relied on expert evidence, which was corroborated by Hua, in concluding that pipelining was not only in the prior art, but also within the general knowledge of a skilled artisan."); *id.* at 1339 (reiterating that the petitioner's arguments for establishing the general knowledge of a claim element rested not only on AAPA but also, "for example, citations to an expert declaration as well as the Hua reference").

Thus, the *Philips* Court explained that "the Board did not violate § 311(b) or the inter partes review statute in determining that the claims would have been obvious over SMIL 1.0 in light of the general knowledge of a skilled artisan." *Id.* at 1338. Accordingly, because the petitioner was not using the AAPA as the basis of the ground, and the ground was based on the SMIL 1.0 reference, the ground did not run afoul of Section 311(b).

Meanwhile, in a separate section of its opinion, *Philips* also made clear another point salient to this appeal: The petitioner's choice as to how it presents its grounds, including the role and manner in which it uses its evidence, controls. *See id.* at 1335-37; *see also SAS*, 138 S. Ct. at 1355. In *Philips*, the Board had *sua sponte* instituted a ground not raised in the petition: SMIL 1.0 *in combination with the Hua reference*. 948 F.3d at 1334. But as noted above, the petitioner had not offered Hua as forming the basis of a ground, and instead cited Hua solely "as evidence of general knowledge." *Id.* The Court found the Board's repurposing of Hua impermissible: "[T]he Board erred by instituting inter partes review based on a combination of prior art references not advanced in Google's petition." *Id.* at 1335. Citing *SAS*, the Court reiterated: "[T]he Board does not 'enjoy[] a license to depart from the petition and institute a *different* inter partes review of its own design.'" *Id.* at 1336 (quoting *SAS*, 138 S. Ct. at 1356; bracketing by *Philips*). And a ground based on a prior art reference in light of general knowledge is not

equivalent to a ground based on two purported prior art references—these constitute *different* grounds. *See id.* at 1335; *see also Lone Star Silicon Innovations LLC v. Iancu*, 809 F. App'x 773, 777 (Fed. Cir. 2020) (noting *Philips*'s distinction between "SMIL in view of Hua" and "SMIL 'in light of the general knowledge of the skilled artisan'").

Other precedent likewise distinguishes between evidence presented as the "basis" of an IPR ground and the limited role that other evidence may play in the ground. Thus, in *Yeda Research v. Mylan Pharmaceuticals Inc.*, 906 F.3d 1031 (Fed. Cir. 2018), also involving an IPR, the Court distinguished between evidence that qualifies under Section 311(b) versus non-311(b) evidence, and emphasized the limited role of the latter in an IPR. There, the Board's unpatentability determination had relied on teachings in a "Khan 2009" reference that did not qualify as statutory prior art because it post-dated the challenged patents. *Id.* at 1037. Similar to *Philips*, the petitioner in *Yeda* had not included Khan 2009 in the basis for its ground, and largely limited its use of Khan 2009 to a secondary role. *See id*. at 1040. In approving that limited, supporting use, the Court endorsed the Board's "recogni[tion] that non-prior art evidence of what was known 'cannot be applied, independently, as teachings separately combinable' with other prior art, but 'can be relied on for their proper supporting roles, e.g., indicating the level of ordinary skill in the art, what certain terms would mean to one with ordinary skill

in the art, and how one with ordinary skill in the art would have under-stood a prior art disclosure.'" *Id*. at 1041.

In a similar vein, the Court recognized this same distinction in *Ariosa Diagnostics v. Verinata Health, Inc.*, 805 F.3d 1359 (Fed. Cir. 2015), which also arose from IPRs. There, the Court distinguished between the "pieces of prior art presented as the basis for obviousness," versus evidence used "to document the knowledge that skilled artisans would bring to bear in reading the prior art identified as producing obviousness." *Id.* at 1365. Thus, the Court distinguished Exhibit 1010 as not "one of the pieces of prior art defining a combination for obviousness"; instead, the petitioner used it in the latter role, as evidence of general knowledge. *Id.*; *see also Lone Star*, 809 F. App'x at 777 (observing that "the instituted ground was based on Watatani and Tanaka, and that the additional references were being relied on exclusively for their teachings about what was well-known in the art").

Moreover, although Section 311(b) applies only to IPRs, the inquiry into the basis of an obviousness theory, versus evidence being invoked for other uses, arises in other contexts as well. Thus, courts routinely differentiate between the use of a reference as allegedly invalidating art and for other purposes such as evidence of general knowledge. *See, e.g.*, *Hyosung TNS Inc. v. ITC*, 926 F.3d 1353, 1360 (Fed. Cir. 2019) (on appeal of an ITC determination, considering a

petitioner's reliance on a reference "not as a separate piece of prior art to be combined with [the other references], but rather as evidence of the knowledge of a person of ordinary skill in the art"); *Allergan, Inc. v. Teva Pharms. USA, Inc.*, 15-CV-1455, 2017 U.S. Dist. LEXIS 225041, at *17 (E.D. Tex. Aug. 3, 2017) (Bryson, J., by designation) (in district-court patent-infringement litigation, noting the distinction between offering prior art as invalidating art as part of an asserted obviousness combination, versus prior art "offered not as invalidating references, but as evidence that is relevant to the invalidity issues"); *Finjan, Inc. v. Sophos, Inc.*, No. 14-cv-1197, 2016 WL 2988834, at *12 (N.D. Cal. May 24, 2016) (recognizing the distinction between using prior art references as "background material" versus "as invalidating prior art references").

At bottom, precedent from this Court and others reinforces what the statutory text of Section 311(b) makes clear. Although AAPA and other non-311(b) evidence can play a secondary role in an IPR, such evidence cannot form the "basis" of an IPR ground. And while the inquiry may be more extensive in some cases than others, when a petitioner both denominates its "basis" for a ground as including AAPA, and uses the AAPA as if it were itself a prior art reference forming the basis of the ground, it is plain that such a ground violates Section 311(b). Consequently, the merits of that ground cannot be decided in an IPR.

### C. Apple's Ground 2 Contravenes The Plain Meaning Of Section 311(b)

Under these principles, Apple's Ground 2 plainly exceeds Section 311(b)'s limitations because the "basis" of Ground 2 is not "*only* … prior art *consisting* of patents or printed publications." 35 U.S.C. § 311(b) (emphases added). Not only has Apple consistently denominated the "basis" for Ground 2 as including AAPA, but even beyond that, Apple has extensively used the AAPA as if it were itself a Section 311(b) prior art reference. This is a clear case where the ground is contrary to the statutory limit on IPRs.

#### 1. Apple Defined The Basis Of Ground 2 As Including AAPA

Apple's petition explicitly, and repeatedly, formulated the basis of Ground 2 as including AAPA. That renders Ground 2 improper in and of itself, and should be the end of the matter.

From the outset, and expressly using a key statutory term, Apple's petition denominated the "Basis" of Ground 2 as "AAPA in view of Majcherczak," as shown in this table from Apple's petition:

| Ground | '674 Patent Claims | Basis for Rejection |
| --- | --- | --- |
| **Ground 1** | **1, 2, 5-7** | §103: Steinacker in view of Doyle and Park |
| **Ground 2a** | **1, 2, 5, and 6,** | §103: Applicants Admitted Prior Art (AAPA) in view of Majcherczak |
| **Ground 2b** | **7** | §103: AAPA in view of Majcherczak and Matthews |

Appx205 (IPR2018-01315) (punctuation omitted); *accord* Appx2526 (IPR2018-01316). In so listing the "Basis" as "AAPA in view of Majcherczak," Apple cannot now plausibly claim that the basis consists "only" of Majcherczak.

Nor was Apple's initial denomination of Ground 2 a one-time slip of the pen. To the contrary, its petition used this formulation throughout. For instance, the petition's subheadings for arguing unpatentability reiterated that Apple defined "GROUND 2[]" as "Applicant's Admitted Prior Art in view of Majcherczak":

| |
|---|
| **B. [GROUND 2a] – Applicant's Admitted Prior Art in view of Majcherczak Renders Claims 1, 2, 5, and 6 Obvious** |

Appx240 (IPR2018-01315); *accord* Appx2570 (IPR2018-01316). And in further subsections, Apple continued to argue the combination of AAPA—as a purported prior art reference—with Majcherczak:

| |
|---|
| **3. Combination of AAPA and Majcherczak** |

| |
|---|
| **4. Motivation to Combine AAPA and Majcherczak** |

Appx246 & Appx248 (IPR2018-01315); *accord* Appx2576 & Appx2578 (IPR2018-01316). Apple's petition could not have been clearer: the "basis" of Ground 2 includes AAPA. Apple has consistently defined the evidentiary basis of Ground 2 as including—in fact, starting with—AAPA.

Moreover, in the prior appeal, Apple acknowledged (as it had to) that its petition defined the "basis" of Ground 2 as including AAPA. For instance, Apple

admitted to the Court that Ground 2 "is *based on AAPA* in view of the Majcherczak reference" Appx5087 (emphasis added):

> Apple petitioned for *inter partes* review of the '674 patent on two grounds.[2] Appx204-206. One ground, presented as Ground 2, is based on AAPA in view of the Majcherczak reference. *Id.* For certain dependent claims, Apple further relied

Appx5087. Apple likewise shorthanded Ground 2 to its "*AAPA* grounds." Appx5127 (emphasis added); Appx5128. And more generally, Apple's arguments on the interpretation of Section 311(b) consistently advocated AAPA as the basis of Ground 2. Appx5100-5121.

In short, Apple chose to define Ground 2's "Basis" as "AAPA in view of Majcherczak," and as "the master of its own petition," *Intuitive Surgical, Inc. v. Ethicon LLC*, 25 F.4th 1035, 1041 (Fed. Cir. 2022), Apple cannot now distance itself from the way it chose to "define the contours of the proceeding." *SAS*, 138 S. Ct. at 1355. Neither the Board nor the Court may recharacterize the manner in which Apple formulated Ground 2. *See Philips*, 948 F.3d at 1335-37; *see* Section I.B, *supra*.

**2. Apple Extensively Used AAPA As The Basis Of Ground 2**

Even if the Court were to look beyond Apple's express, repeated definition of Ground 2's basis as including AAPA, it is likewise clear that Apple in fact used AAPA in contravention of Section 311(b). The arguments Apple presented in its

petition consistently treated the AAPA as if it were itself an alleged prior art reference. Indeed, Apple's arguments for Ground 2 are substantively meaningless without the AAPA as an alleged prior art system. Apple's arguments consistently used the AAPA to form the basis of its ground.

Apple urged obviousness by treating the POC system 10 in Figure 1 of the '674 patent as if it were a prior art reference itself, and as forming the basis of its ground. Apple started with the AAPA as its base system for its obviousness arguments and then structured its motivation-to-combine theory in terms of arguing why an artisan starting with the AAPA system would have been motivated to modify the AAPA system by incorporating an element from Majcherczak, not the other way around. *See* Appx248 (describing motivation "to integrate [a] feedback transistor … from Majcherczak[] … into the … system … of the AAPA," which would result in "the AAPA's … system" performing a function described by Majcherczak; further describing this as a "modification to the … system … of the AAPA"); Appx247 (asserting Apple's theory that Majcherczak's feedback transistor would be "integrated into the AAPA … system").

Not just by text, but by annotated figures too, Apple uniformly made clear that Ground 2 is based on AAPA. Apple's own depiction of Ground 2 shows how it used the AAPA system (Figure 1 of the '674 patent, depicted on the left) as a purportedly combinable prior art reference, and as the fundamental premise of its

ground:




Appx247. In numerous images, Apple repeatedly depicted Figure 1 of the '674 patent, with annotations to show its asserted modification in view of Majcherczak, never starting with and modifying Majcherczak instead. *See, e.g.*, Appx247; Appx251; Appx253; Appx256; Appx258 (repeatedly depicting Figure 1).

Claim 1 is representative. Apple started with the AAPA system and relied on it for almost every limitation recited in claim 1, with Majcherczak playing only an ancillary role. *See, e.g.*, Appx249-259. Apple defined the purported "AAPA" as the system depicted in Figure 1 of the '674 patent and its accompanying description. Appx240. As the petition described it, "the only substantive difference from the perspective of the claims between the prior art POC system 10 described in the AAPA and the purportedly inventive POC network 40 illustrated in FIG. 4 of the '674 Patent is the inclusion of a feedback network." Appx242. In

other words, Apple relied exclusively on the AAPA system but for inclusion of "the feedback transistor M6 from Majcherczak's voltage detector." Appx253-255; *see also* Appx1353-1371.

This use is plainly distinct from any purported theory using the AAPA as evidence of general knowledge, which Apple did not present. Apple and its expert based their obviousness theory on the notion that "the POC system 10 and its description in the background of the '674 Patent are known by Dr. Horst to constitute Applicant's Admitted Prior Art ('AAPA')." Appx240 (IPR2018-01315); *accord* Appx2570 (IPR2018-01316). Neither Apple nor its expert provided any other evidence that Figure 1 of the patent was in the prior art or in the skilled artisan's general knowledge, nor even argued that the artisan would have had this knowledge without having viewed the AAPA, nor how that general knowledge would have informed the artisan's understanding of Majcherczak. Instead of any such independent assessment, Apple's expert acknowledged that he simply relied on Apple's counsel's directive to treat Figure 1 as prior art: "I have been informed by counsel to treat the POC system 10 shown in FIG. 1 and its description in the 'Background' of the '674 Patent as prior art, which I will refer to as Applicant's Admitted Prior Art ('AAPA')." Appx1354.

Likewise, Apple did not use the AAPA merely to "supply[] a missing claim limitation." *Qualcomm*, 24 F.4th at 1376. In order for AAPA or other non-311(b)

evidence to "supply[] a missing claim limitation," *id.*, there must be an initial system or starting point from which that claim limitation is "missing." Apple pointed to none here. It did not, for instance, present any theory or argument starting with Majcherczak and modifying it with respect to the limitations that Apple relied on the AAPA to supply. Further, Apple used the AAPA for the vast majority of limitations.

A final point: Consideration of Apple's starting point of AAPA does not overplay labels of "primary" and "secondary" references. As the Court has recognized, while characterization "of prior art as 'primary' and 'secondary'" is usually "a matter of presentation with no legal significance," "there may be some cases in which relevant factual determinations inhere in such characterization of prior art references." *In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012). The Section 311(b) inquiry is such a case—how a petitioner uses its asserted evidence matters. Here, Apple did not argue that a skilled artisan would have modified Majcherczak to obtain the challenged claims. Nor did Apple present Majcherczak as the basis for a single-reference obviousness ground. Instead, Apple fundamentally relied on the AAPA system as the foundation of Ground 2. That primacy of the AAPA system for Ground 2 further confirms that the ground is based on AAPA.

In short, Apple's use of AAPA in Ground 2 is different in kind from the secondary role noted in the Court's prior decisions in *Philips* and *Yeda* and in other precedent. Unlike IPR grounds that use AAPA or other non-311(b) evidence in a permissible, secondary manner, Apple's obviousness contentions improperly used the AAPA as if it qualified as Section 311(b) art, even relying exclusively on the AAPA for the overwhelming majority of the recited claim limitations, in contravention of the statute.

* * *

Although cases may exist where it is difficult to determine whether a petitioner's use of AAPA is permissible under the statute, this is not one of them. Apple's own petitions and other repeated representations eliminate any legitimate dispute about the way Apple sought to use the AAPA in this case. Apple consistently defined Ground 2 and argued it in a manner far beyond the "statutory limit in Section 311." *Qualcomm*, 24 F.4th at 1377.

## II. THE BOARD'S DECISION IS WRONG

In deeming Ground 2 permissible under Section 311(b), the Board interpreted the statute incorrectly. Notably, the Board accurately recognized that Apple sought to use "AAPA *in combination with* prior art patents or printed publications," and that Apple "identifie[d] the relevant challenge as being *based on* AAPA and Majcherczak (with or without Matthews)." Appx26 (emphases added);

*see also* Appx23 ("Petitioner's grounds involve a combination of AAPA and prior art patent(s)…."); Appx25 (acknowledging that Apple relied on the AAPA for "claim limitation[s] not taught in a prior art patent or printed publication"). Yet, the Board disregarded all of this simply because Ground 2 included one or more prior art patents or printed publications. That is not what the statute says.

### A. The Board's Statutory Interpretation, Based On Recent Director Guidance, Is Wrong

The Board stated that "[t]he answer to this question [on remand] is found in the Updated Guidance." Appx23; *see also* Appx66 (Judge Galligan concurrence). The Board's decision and the Updated Guidance, however, both read the statute incorrectly.

The Court owes no deference to the Board on an issue of statutory interpretation, *see Unwired Planet*, 841 F.3d at 1379, nor any deference to the Updated Guidance. As the Court has held, Patent Office guidance "is not, itself, the law," "does not carry the force of law, and is not binding" on the Court. *In re Rudy*, 956 F.3d 1379, 1382 (Fed. Cir. 2020) (addressing Patent Office guidance on Section 101); *see also id.* at 1383 (observing that, where Patent Office guidance "contradicts or does not fully accord with [the Court's] caselaw," the caselaw "must control"). Apple itself correctly recognized in the prior appeal that the Court reviews the Board's statutory interpretation de novo, Appx5099, and that "[t]his Court owes no deference to the Director's Guidance." Appx5122.

In any event, whether evaluating the Board's decision itself, or the Updated Guidance on which it is predicated, the statutory interpretation they share is wrong. Where, as here, "a statute's language carries a plain meaning, the duty of an administrative agency is to follow its commands as written, not to supplant those commands with others it may prefer." *SAS*, 138 S. Ct. at 1355. The statutory language here is plain, and the Board and the Patent Office have no discretion to supplant its commands or permit what it forbids.

The Board and the Updated Guidance posit the wrong test for determining whether AAPA is the "basis" of a ground under Section 311(b). Their overly simplistic standard greenlights any ground that includes at least one prior art patent or printed publication: "If an IPR petition relies on admissions in combination with reliance on one or more prior art patents or printed publications, those admissions do not form 'the basis' of the ground…." Appx23; Appx5267. Applying this test here, the Board concluded that, "[b]ecause Petitioner's grounds involve a combination of AAPA and prior art patent(s), AAPA does not form the basis of the ground." Appx23.

That is the wrong test. Section 311(b) requires an inquiry that goes beyond a simple determination of whether at least one prior art patent or printed publication is asserted in a ground. In using the incorrect test, the Board failed to apply the statute.

Rather than the question posed by the Board and the Updated Guidance, the relevant question is whether the evidentiary "basis" of the ground is "only … prior art consisting of patents or printed publications." *See Qualcomm*, 24 F.4th at 1377 ("[W]e remand to the Board to determine whether Majcherczak forms the basis of Apple's challenge, or whether the validity challenge impermissibly violated the statutory limit in Section 311."). "Only," not "also," is the statutory text. Thus, if the ground's "basis" includes non-311(b) evidence, the ground is improper, regardless of whether the ground *also* includes a prior art patent or printed publication.

The Board and its application of the Updated Guidance also leaned incorrectly on its view that the AAPA in Ground 2 "is simply being used to provide missing limitations," allegedly pursuant to *Philips*. Appx23-24. As discussed above, Apple did not use the AAPA merely as evidence of "'general knowledge' to supply a missing claim limitation," *Philips*, 948 F.3d at 1337; instead, Apple used the AAPA as if it were itself a Section 311(b) prior art reference. *See* Section I.C, *supra*.

At bottom, the test applied by the Board directly conflicts with the statutory language. That test permits grounds so long as they include at least one prior art patent or printed publication—e.g., that test condones a ground asserting as its basis "a combination of AAPA and prior art patent(s)." Appx23; *see* Appx5267.

That rewrites a core limiting principle of the statute, expanding it to effectively allow petitioners' unfettered use of AAPA and other non-311(b) evidence. The agency cannot supplant plain statutory language with its preferred standard.

### B. The Board's Other Reasoning Merely Adheres To The Same Erroneous View

The Board (though not joined by one panel member) continued its discussion by attempting to justify its statutory interpretation (and that of the Updated Guidance) over Qualcomm's position. None of the Board's attempts, however, has merit.

For instance, the Board misapprehended "Federal Circuit case law discussing the use of admissions in proceedings." Appx24; *see* Appx24-25. Some of those cases involved district-court litigation not governed by Section 311(b), and thus say nothing about the meaning of the statute and ways in which a petitioner permissibly may use AAPA in an IPR ground without violating Section 311(b). *See PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342 (Fed. Cir. 2007); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560 (Fed. Cir. 1998). As for *Philips* and this Court's decision in the prior appeal, as discussed in Section I.B above, those cases do not support the Board's and the Director's allowance of applicant admissions—non-311(b) evidence—*to form the basis of an IPR ground*. Such use is directly contrary to the statute. The Board erred in disregarding the distinction between AAPA and other asserted admissions

improperly used to form the basis of an IPR ground, and permissible use of such evidence in other roles in an IPR. *See* Section I.B, *supra*.

Meanwhile, the Board mistakenly stated that case law supporting that distinction—*Yeda*—is "inapplicable" and "has no bearing on the use of an applicant's admission." Appx29. The Board stated that the *Yeda* Court's recitation of language from a prior Board decision was mere "dicta" and could be disregarded by the Board here. Appx29. That is incorrect. That language in *Yeda* explained that non-311(b) evidence "cannot be applied, independently, as teachings separately combinable." *Yeda*, 906 F.3d at 1041. As the Court already recognized in its decision in the prior appeal, that language accurately reflects the limited and distinct role that non-311(b) evidence can play in an IPR, compared to evidence that qualifies as prior art under Section 311(b). *See Qualcomm*, 24 F.4th at 1376 (citing *Yeda* as "affirming PTO's reliance on a non-prior art document in *inter partes* review for limited purposes"). *Yeda* is not "inapplicable." *See also* Section I.B, *supra*.

The Board also tried to diminish Apple's repeated statements denominating and defining Ground 2 as based on AAPA. According to the Board, "[a]t most, the statements describe how the grounds include both AAPA and a prior art patent, Majcherczak." Appx26. But Apple's statements do much more than simply identify that Ground 2 includes or uses AAPA in some fashion. As discussed

above, how Apple chose to define the *basis* of Ground 2 is highly relevant when determining whether the basis impermissibly includes non-311(b) evidence. And Apple chose to define the basis as "AAPA in view of Majcherczak." In using the incorrect test, the Board failed to recognize Apple's role as the master of its petition, improperly downplayed the importance of "how the challenge was stated" in Apple's petition, Appx27, and wrongly deemed irrelevant the highly salient facts discussed in Section I.C, above.

When turning to Qualcomm's analysis of the "foundation or starting point" of the ground, the Board tried to diminish Qualcomm's arguments by hitching them to the prior Director's Guidance that used a foundation test "removed from and inconsistent with the Updated Guidance." Appx27. Qualcomm's arguments, however, were not predicated on the 2020 Guidance; rather, those arguments are anchored in the plain meaning of Section 311(b) itself. *See* Appx886-887.

Finally, the Board suggested that Qualcomm's reliance on *Philips*'s directive against reformulating a ground was "inapposite," since there "has been no change in formulation of Ground 2." Appx29. The Board was correct that there was no change to Ground 2, and in fact the Board's substantive analysis on remand was exactly the same as when the Board, in its original Final Written Decisions, thought Apple could use the AAPA as a purported prior art patent. Appx29. But that is precisely why Qualcomm's point was not "inapposite." As Qualcomm

explained, Apple may not reframe its ground from what its petition argued, and the Board correctly did not allow Apple to do so. Appx925. As *Philips* explains, a ground based on a prior art reference in combination with non-311(b) evidence is distinct from a ground based on the prior art reference in light of the general knowledge (as evidenced in some respect by that non-311(b) evidence), and the two grounds are not interchangeable. *See* 948 F.3d at 1335; *see also* Part I.C, *supra*. Therefore, Apple's Ground 2—"AAPA in view of Majcherczak"—is distinct from a ground of, for instance, Majcherczak in light of the general knowledge as evidenced by the AAPA. Ground 2 is therefore incurably impermissible, and as the Board respected, Apple cannot reformulate Ground 2 out of its violation of Section 311(b).

* * *

The Board's decision is at odds with the plain text of Section 311(b). Under the correct interpretation, the "basis" of Apple's Ground 2 unquestionably includes AAPA. The Court should thus reverse the Board's judgment, and uphold the challenged claims as patentable. *See FanDuel*, 966 F.3d at 1339 (courts may "hold unlawful and set aside agency action … not in accordance with law").

## CONCLUSION

The Board's judgment should be reversed and the claims upheld as patentable.

Dated: March 20, 2023

Respectfully submitted,

*/s/ Jennifer L. Swize*
JENNIFER L. SWIZE
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939

I. SASHA MAYERGOYZ
JONES DAY
110 N. Wacker Drive, Ste. 4800
Chicago, IL 60606
(312) 782-3939

DAVID B. COCHRAN
JONES DAY
901 Lakeside Avenue
Cleveland, OH 44114
(216) 586-3939

MATTHEW J. RUBENSTEIN
JOHN M. GRAVES
JONES DAY
90 South 7th Street, Ste. 4950
Minneapolis, MN 55402
(612) 217-8800

*Counsel for Appellant Qualcomm Incorporated*

# ADDENDUM

# ADDENDUM TABLE OF CONTENTS


| Date | Description | Appx Pages |
|---|---|---|
| 11/10/2022 | Final Written Decision on Remand | Appx1-67 |
| | U.S. Patent No. 8,063,674 | Appx68-83 |

Trials@uspto.gov
571-272-7822

Paper 40
Date: November 10, 2022

UNITED STATES PATENT AND TRADEMARK OFFICE

---

BEFORE THE PATENT TRIAL AND APPEAL BOARD

---

APPLE INC.,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

---

IPR2018-01315, IPR2018-01316
Patent 8,063,674 B2[1]

---

Before TREVOR M. JEFFERSON, DANIEL J. GALLIGAN, and SCOTT B. HOWARD, *Administrative Patent Judges*.

Opinion for the Board filed by *Administrative Patent Judge* SCOTT B. HOWARD.

Opinion Concurring filed by *Administrative Patent Judge* DANIEL J. GALLIGAN.

HOWARD, *Administrative Patent Judge*.

JUDGMENT
Final Written Decision on Remand
Determining All Challenged Claims Unpatentable
*35 U.S.C. § 318(a)*

---

[1] The parties may not use this style heading in any subsequent papers without prior authorization.

# I. INTRODUCTION

In these *inter partes* reviews, instituted pursuant to 35 U.S.C. § 314, Apple Inc. ("Petitioner" or "Apple") challenges claims 1, 2, 5–9, 12, 13, and 16–22 ("the challenged claims") of U.S. Patent No. 8,063,674 B2 (Ex. 1001, "the '674 patent"), owned by Qualcomm Incorporated ("Patent Owner").

The references applied against the challenged claims are identical in each of the cases. A joint hearing was held for these cases. The parties rely on the same declarants submitting identical declarations in each case for testimonial evidence. The briefing on remand is substantially the same. Under these circumstances, we determine that a combined Final Decision will promote a just, speedy, and inexpensive resolution of these proceedings.

## *A. IPR2018-01315 Procedural History*

Petitioner filed a Petition to institute an *inter partes* review of claims 1, 2, and 5–7 of the '674 patent pursuant to 35 U.S.C. §§ 311–319. Paper 2[2] ("Petition" or "Pet."). Patent Owner filed a Preliminary Response. Paper 6. We instituted an *inter partes* review of claims 1, 2, and 5–7 on all grounds of unpatentability alleged in the Petition. Paper 7 ("Institution Decision" or "Inst. Dec.").

After institution of trial, Patent Owner filed a Response (Paper 12, "PO Resp."), Petitioner filed a Reply (Paper 16, "Pet. Reply"), and Patent Owner filed a Sur-reply (Paper 19, "PO Sur-reply").

A joint hearing for IPR2018-01315 and IPR2018-01316 was held on October 11, 2019. Paper 25 ("Tr.").

---

[2] Unless otherwise noted, all citations are to IPR2018-01315. We note that identical exhibits and substantially identical papers were filed in each of the proceedings.

### *B. IPR2018-01316 Procedural History*

Petitioner filed a Petition to institute an *inter partes* review of claims 8, 9, 12, 13, and 16–22 of the '674 patent pursuant to 35 U.S.C. §§ 311–319. IPR2018-01316, Paper 2 ("1316 Pet."). Patent Owner filed a Preliminary Response. IPR2018-01316, Paper 6. We instituted an *inter partes* review of claims 8, 9, 12, 13, and 16–22 on all grounds of unpatentability alleged in the Petition. IPR2018-01318, Paper 7 ("1316 Inst. Dec.").

After institution of trial, Patent Owner filed a Response (IPR2018-01316, Paper 12, "1316 PO Resp."), Petitioner filed a Reply (IPR2018-01316, Paper 16, "1316 Pet. Reply"), and Patent Owner filed a Sur-reply (IPR2018-01316, Paper 19, "1316 PO Sur-reply").

### *C. The Final Written Decision, the Federal Circuit Appeal, and the Remand Proceeding*

We issued a consolidated Final Written Decision which held all of the challenged claims unpatentable. Paper 26 ("Final Decision," "Final Dec."). In particular, we concluded that, based on the language of 35 U.S.C. § 311(b) and our rules, applicant admitted prior art could form the basis of an *inter partes* review petition. Final Dec. 18–22. Based on the combination of AAPA[3] and Majcherczak, we determined that Petitioner had proven by a preponderance of the evidence that the challenged claims were unpatentable as obvious. *Id.* at 22–54. Additionally, we held that Petitioner failed to prove the challenged claims were unpatentable as obvious in view of Steinacker, Doyle, and Park. *Id.* at 59–81.

[3] AAPA refers to the specific applicant admissions identified by Petitioner in the '674 Patent. *See* footnote 9, *infra*.

Patent Owner filed a Notice of Appeal of the Final Written Decision with the United States Court of Appeals for the Federal Circuit. Paper 27. In that Notice of Appeal, Patent Owner indicated that the issues on appeal may include, *inter alia*, the "determination that alleged Applicant Admitted Prior Art (AAPA) is eligible for use in *inter partes* review proceedings." *Id.* at 1.

On February 1, 2022, the Federal Circuit issued a decision in the appeal vacating our Final Decision and remanding for further proceedings. *Qualcomm Inc. v. Apple Inc.*, 24 F.4th 1367 (Fed. Cir. 2022). Specifically, the Federal Circuit held that we "incorrectly interpreted § 311(b)'s 'prior art consisting of patents or printed publications' to encompass [applicant admitted prior art] contained in the challenged patent." *Id.* at 1376–77. However, because "the use of [applicant admitted prior art] can be permissible in an *inter partes* review," the Federal Circuit remanded with instructions "to determine whether Majcherczak forms the basis of Apple's challenge, or whether the validity challenge impermissibly violated the statutory limit in Section 311." *Id.* at 1377.

With regard to the ground involving Steinacker, Doyle, and Park, the Federal Circuit held that "there was no error in the Board's finding that Apple made an insufficient showing of a motivation to combine Doyle with Steinacker—a prerequisite to its proposed three-way combination of Doyle with Steinacker and with Park." 24 F.4th at 1377.

Following the remand from the Federal Circuit, we held a conference call with the parties. *See* Paper 28, 2 (Order on Conduct of Proceedings on Remand). During the conference, we authorized the parties to submit two rounds of simultaneous briefing. *See id.* Petitioner and Patent Owner,

respectively, submitted Opening Briefs on Remand. Paper 31 ("Pet. Remand Br."); Paper 32 ("PO Remand Br."). The parties also each submitted a Responsive Brief on Remand. Paper 37 ("Pet. Resp. Remand Br."); Paper 39 ("PO Resp. Remand Br.").

Patent Owner requested an oral hearing on remand, which we took under advisement. *See* Paper 28 at 2–3. Given the nature of the issue on remand, no additional oral argument was held. *See* Patent Trial and Appeal Board, Standard Operating Procedure 9[4] at 7 ("In most cases, an additional oral hearing will not be authorized. Normally, the existing record and previous oral argument will be sufficient."), 8 (indicating no additional oral argument when there was an "Erroneous Application of Law").

The Board has jurisdiction under 35 U.S.C. § 6(b). This Final Written Decision on Remand issues pursuant to 35 U.S.C. § 318(a). For the reasons that follow, we determine that Petitioner has shown by a preponderance of the evidence that the challenged claims are unpatentable.

*D. Real Party in Interest*

Petitioner identified Apple Inc. as the real party in interest. Pet. 64. Patent Owner identified Qualcomm Incorporated as the real party in interest. Paper 3, 2 (Patent Owner's Mandatory Notices).

*E. Related Proceedings*

The parties identified the following patent litigation proceedings in which the '674 patent was asserted: *In re Certain Mobile Electronic*

---

[4] Available at https://www.uspto.gov/sites/default/files/documents/sop_9_%20procedure_for_decisions_remanded_from_the_federal_circuit.pdf.

*Devices and Radio Frequency and Processing Components Thereof* (ITC Inv. No. 337-TA-1093) and *Qualcomm Inc. v. Apple Inc.*, Case No. 3:17-cv-02398 (S.D. Cal.). Pet. 64–65; Paper 3, 2.[5]

### *F. The '674 Patent*

The '674 patent is titled "Multiple Supply-Voltage Power-Up/Down Detectors." Ex. 1001, code (54). According to the '674 patent, "many newer integrated circuit devices include dual power supplies: one lower-voltage power supply for the internally operating or core applications, and a second higher-voltage power supply for the I/O circuits and devices." *Id.* at 1:22–25.

The '674 patent further states that "[i]n order to facilitate communication between the core and I/O devices, level shifters are employed." *Id.* at 1:28–29. "Because the I/O devices are connected to the core devices through level shifters, problems may occur when the core devices are powered-down." *Id.* at 1:29–32. An example of such a problem described in the '674 patent is how stray currents while the core is powering down can cause the level shifters to "send a signal to the I/O devices for transmission" resulting in the I/O devices "transmit[ting] the erroneous signal into the external environment." *Id.* at 1:34–40.

One prior art solution identified in the '674 patent is the use of "power-up/down detectors to generate a power-on/off-control (POC) signal internally [which] instructs the I/O devices when the core devices are shut down." Ex. 1001, 1:55–58. Figure 1 of the '674 patent is reproduced below.

---

[5] According to Petitioner, the district court proceeding and the ITC investigation have been dismissed. Paper 15, 1 (Petitioner's Updated Mandatory Notices).




(PRIOR ART)
FIG. 1

Figure 1 "is a circuit diagram illustrating a conventional POC system for multiple supply voltage devices" which is identified as being prior art. *Id.* at 4:18–19, Fig. 1.

The '674 patent identifies a number of issues associated with the Figure 1 design. For example, when I/O power supply 104 is on and core power supply 103 is off, powering on the core power supply results in "a period in which all three transistors within power up/down detector 100 are on," resulting in a virtual short "to ground causing a significant amount of current to flow from I/O power supply 104 to ground." Ex. 1001, 2:21–29. "This 'glitch' current consumes unnecessary power." *Id.* at 2:29–30. Although the glitch current can be reduced by reducing the size of transistors M1-M3, such a reduction limits "the actual amount of current that can pass through the transistors" and reduces their switching speeds, which "translates into less sensitivity in detecting power-up/down of core supply voltage 103 or longer processing time for power-up/down events." *Id.* at 2:31–39; *see also id.* at 2:63–3:11.

According to the ’674 patent, these problems can be solved by using “one or more feedback circuits coupled to the up/down detector” that “are configured to provide feedback signals to adjust a current capacity of said up/down detector.” Ex. 1001, 3:31–34. An example of such a feedback circuit is shown in Figure 4, reproduced below:




Figure 4 “is a circuit diagram illustrating another POC network configured according to the teachings of the present disclosure.” *Id.* at 4:28–30. The ’674 patent describes the operation of the feedback circuit in Figure 4 as follows:

> The feedback network 310 comprises a transistor M8 connected in parallel to the transistor M4. The transistor M8 is also configured as a p-type transistor, such that when the feedback signal from the inverting amplifier 400 is high, the transistor M8 is switched off, and when the feedback signal is low, the transistor M8 is switched on. Thus, when the $V_{core}$ 301 is off, producing a high detection signal, the inverting amplifier 400 inverts that signal to a logic low which causes the transistor M8 to switch on. As the $V_{core}$ 301 is powered-on, the detection signal changes to a logic low, which changes the feedback signal from the inverting amplifier 400 to a logic high, which, in turn, turns the transistor M8 off. While the transistor M8 is

> off, the power up/down detector 306 has a decreased current capacity, i.e., smaller current will flow through the transistor M8 because of the amplified low signal. The voltage level caused by the $V_{core}$ 301 on the gate terminals of M4 and M5 could in some glitch or stray signal situations, cause leakage through M4 and M5. Because the feedback signal for the transistor M8 is received from the inverting amplifier 400, when the $V_{core}$ 301 powers-down, the feedback signal will switch quickly from a logic high to a logic low, which will then switch the transistor M8 on. Thus, in the circuit configuration depicted in FIG. 4, the power up/down detector 40 will detect the $V_{core}$ 301 powering down more quickly than the existing POC networks.

*Id*. at 6:4–28.

### *G. Illustrative Claim*

Petitioner challenges claims 1, 2, and 5–9, 12, 13, and 16–22 of the '674 patent. Pet. 1; 1316 Pet. 1. Claim 1 is independent, is illustrative of the subject matter of the challenged claims, and reads as follows:

> 1. A multiple supply voltage device comprising:
>
> a core network operative at a first supply voltage; and
>
> a control network coupled to said core network wherein said control network is configured to transmit a control signal, said control network comprising: an up/down (up/down) detector configured to detect a power state of said core network; processing circuitry coupled to said up/down detector and configured to generate said control signal based on said power state;
>
> one or more feedback circuits coupled to said up/down detector, said one or more feedback circuits configured to provide feedback signals to adjust a current capacity of said up/down detector;
>
> at least one first transistor coupled to a second supply voltage, the at least one more first transistor being configured to

> switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on;
>
> at least one second transistor coupled in series with the at least one first transistor and coupled to said first supply voltage, the at least one second transistor being configured to switch on when said first supply voltage is powered on and to switch off when said first supply voltage is powered down;
>
> at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor.

Ex. 1001, 8:44–9:3 (the '674 patent).

### *H. Prior Art and Asserted Grounds*

Petitioner asserts that claims 1, 2, and 5–9, 12, 13, and 16–22 are unpatentable on the following grounds:

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 1, 2, 5–9, 12, 13, 16–22 | 103(a)[6] | Steinacker,[7] Doyle,[8] and Park[9] |
| 1, 2, 5, 6, 8, 9, 12, 13, 17–21 | 103(a) | AAPA,[10] Majcherczak[11] |

[6] The Leahy-Smith America Invents Act ("AIA") included revisions to 35 U.S.C. §§ 102, 103 that became effective on March 16, 2013. Because the '674 patent issued from an application filed before March 16, 2013, we apply the pre-AIA versions of the statutory bases for unpatentability.

[7] Steinacker, US 7,279,943 B2, issued Oct. 9, 2007 (Ex. 1005).

[8] Doyle, US 4,717,836, issued Jan. 5, 1988 (Ex. 1006).

[9] Park, J. C. & Mooney, V. J. (Nov. 2006). Sleepy Stack Leakage Reduction. *IEEE Transactions on Very Large Scale Integration (VLSI) Systems, 14*(11), 1250–1263 (Ex. 1007).

[10] Petitioner identifies Figure 1 and the text at column 1, line 22 through column 2, line 39 of the '674 patent as Applicant Admitted Prior Art. *See* Pet. 37, 43, 46.

[11] U.S. Pub. No. US 2002/0163364 A1, published Nov. 7, 2002 (Ex. 1008).

| Claims Challenged | 35 U.S.C. § | References/Basis |
|---|---|---|
| 7, 16, 22 | 103(a) | AAPA, Majcherczak, Matthews[12] |

Additionally, Petitioner relies on the testimony of Robert W. Horst, Ph. D. (Ex. 1003; Ex. 1018) and Jacob Robert Munford (Ex. 1016). Patent Owner filed Dr. Horst's cross-examination as Exhibits 2003 and 2006. Patent Owner relies on the testimony of Dr. Massoud Pedram (Ex. 2002). Petitioner filed Dr. Pedram's cross-examination as Exhibit 1017.

## II. ANALYSIS

### *A. Legal Principles*

In *Graham v. John Deere Co. of Kansas City*, 383 U.S. 1 (1966), the Supreme Court set out a framework for assessing obviousness under 35 U.S.C. § 103 that requires consideration of four factors: (1) the "level of ordinary skill in the pertinent art," (2) the "scope and content of the prior art," (3) the "differences between the prior art and the claims at issue," and (4) "secondary considerations" of non-obviousness such as "commercial success, long-felt but unsolved needs, failure of others, etc." *Id.* at 17–18.[13] "While the sequence of these questions might be reordered in any particular case," *KSR Int'l Co. v. Teleflex Inc.*, 550 U.S. 398, 407 (2007), the U.S. Court of Appeals for the Federal Circuit has repeatedly emphasized that "it is error to reach a conclusion of obviousness until all those factors are considered," *WBIP, LLC v. Kohler*, 829 F.3d 1317, 1328 (Fed. Cir. 2016).

[12] U.S. Patent No. 6,646,844 B1, issued Nov. 11, 2003 (Ex. 1009).

[13] Neither party presented objective evidence of non-obviousness. *See* Pet.; PO Resp. Accordingly, we do not consider that factor in the following analysis.

*B. Level of Ordinary Skill in the Art*

The level of ordinary skill in the art is "a prism or lens" through which we view the prior art and the claimed invention. *Okajima v. Bourdeau*, 261 F.3d 1350, 1355 (Fed. Cir. 2001). Factors pertinent to a determination of the "level of ordinary skill in the art include (1) educational level of the inventor; (2) type of problems encountered in the art; (3) prior art solutions to those problems; (4) rapidity with which innovations are made; (5) sophistication of the technology; and (6) educational level of workers active in the field." *Envtl. Designs, Ltd. v. Union Oil Co. of Cal.*, 713 F.2d 693, 696–697 (Fed. Cir. 1983) (citing *Orthopedic Equip. Co. v. All Orthopedic Appliances, Inc.,* 707 F.2d 1376, 1381–82 (Fed. Cir. 1983)). Not all such factors may be present in every case, and one or more of these or other factors may predominate in a particular case. *Id.* Moreover, "[t]hese factors are not exhaustive but are merely a guide to determining the level of ordinary skill in the art." *Daiichi Sankyo Co. Ltd, Inc. v. Apotex, Inc.*, 501 F.3d 1254, 1256 (Fed. Cir. 2007).

Dr. Horst testifies that a person having ordinary skill in the art would have had "at least an undergraduate degree in electrical engineering, or a related field, and three years of experience in circuit and system design." Ex. 1003 ¶ 33. Additionally, Dr. Horst testifies that "a person of ordinary skill with less than the amount of experience noted above could have had a correspondingly greater amount of educational training such a graduate degree in a related field." *Id.*

In our Institution Decisions, "we adopt[ed] Dr. Horst's definition of the level of ordinary skill in the art, with the exception of the language 'at least.'" Inst. Dec. 13; 1316 Inst. Dec. 13. Patent Owner agrees with our

formulation, *see* PO Resp. 9; 1316 PO Resp. 9, and Petitioner did not address it in its Reply. *See generally* Pet. Reply; 1316 Pet. Reply.

Accordingly, we find on the record as a whole that a person of ordinary skill in the art would have an undergraduate degree in electrical engineering, or a related field, and three years of experience in circuit and system design. Additionally, a person of ordinary skill with less than the amount of experience noted above could have had a correspondingly greater amount of educational training such a graduate degree in a related field.

### *C. Claim Construction*

In this *inter partes* review, we construe claim terms in an unexpired patent according to their broadest reasonable construction in light of the specification of the patent in which they appear. 37 C.F.R. § 42.100(b) (2017).[14] "Under a broadest reasonable interpretation, words of the claim must be given their plain meaning, unless such meaning is inconsistent with the specification and prosecution history." *Trivascular, Inc. v. Samuels*, 812 F.3d 1056, 1062 (Fed. Cir. 2016). In addition, the Board may not "construe claims during [an *inter partes* review] so broadly that its constructions are unreasonable under general claim construction principles." *Microsoft Corp. v. Proxyconn, Inc.*, 789 F.3d 1292, 1298 (Fed. Cir. 2015) (emphasis omitted), *overruled on other grounds by Aqua Products, Inc. v. Matal*, 872

[14] We apply the district court claim construction standard to petitions filed on or after November 13, 2018. *See Changes to the Claim Construction Standard for Interpreting Claims in Trial Proceedings Before the Patent Trial and Appeal Board*, 83 Fed. Reg. 51340 (Oct. 11, 2018) (to be codified at 37 C.F.R. pt. 42). Because Petitioner filed its petitions before November 13, 2018 (*see* Pet.; 1316 Pet.), we apply the broadest reasonable interpretation (BRI) standard.

F.3d 1290 (Fed. Cir. 2017) (en banc). An inventor may provide a meaning for a term that is different from its ordinary meaning by defining the term in the specification with reasonable clarity, deliberateness, and precision. *In re Paulsen*, 30 F.3d 1475, 1480 (Fed. Cir. 1994).

Use of the word *means* in a claim gives rise to a rebuttable presumption that 35 U.S.C. § 112, sixth paragraph, analysis applies to interpret the claim. *Williamson v. Citrix Online, LLC*, 792 F.3d 1339, 1348 (Fed. Cir. 2015). Construing a means-plus-function claim term is a two-step process, wherein we first identify the claimed function and then determine what structure, if any, disclosed in the specification corresponds to the claimed function. *Id.* at 1348–51. Our rules specifically require that a petition for *inter partes* review identify how each challenged claim is to be construed, including identification of the corresponding structure for means-plus-function limitations. *See* 37 C.F.R. § 42.104(b)(3) ("Where the claim to be construed contains a means-plus-function . . . limitation as permitted under 35 U.S.C. 112[(6)], the construction of the claim must identify the specific portions of the specification that describe the structure, material, or acts corresponding to each claimed function.").[15] "[S]tructure disclosed in the specification is 'corresponding' structure only if the specification or prosecution history clearly links or associates that structure to the function recited in the claim." *Med. Instrumentation & Diagnostics Corp. v. Elekta*

[15] 37 C.F.R. § 42.104(b)(3) refers to § 112(f). Section 4(c) of the AIA redesignated 35 U.S.C. § 112, sixth paragraph as 35 U.S.C. § 112(f). Because the '674 patent has a filing date before the effective date of this provision of the AIA, we use the citation § 112, sixth paragraph.

*AB*, 344 F.3d 1205, 1210 (Fed. Cir. 2003) (quoting *B. Braun Med. Inc. v. Abbott Labs.*, 124 F.3d 1419, 1424 (Fed. Cir. 1997)).

Petitioner proposes a claim construction for "processing circuitry." Pet. 10; 1316 Pet. 5. Petitioner also contends that the claims contain several means-plus-function limitations. 1316 Pet. 6–9.

Patent Owner does not believe the term "processing circuitry" or the means-plus-function limitations need to be construed. PO Resp. 8; 1316 PO Resp. 8–9.

Having considered the evidence presented, we conclude that, with the exception of the means-plus-function limitations, no express claim construction of any term is necessary. *See Nidec Motor Corp. v. Zhongshan Broad Ocean Motor Co.*, 868 F.3d 1013, 1017 (Fed. Cir. 2017) (stating that "we need only construe those claim limitations 'that are in controversy, and only to the extent necessary to resolve the controversy'" (quoting *Vivid Techs., Inc. v. Am. Sci. & Eng'g, Inc.*, 200 F.3d 795, 803 (Fed. Cir. 1999))).

With regard to the means-plus-function limitations, we are persuaded by Petitioner's identification of both the function set forth in the claim and the structure in the written description that is linked to the function, and adopt them as our own. *See* 1316 Pet. 6–9.

### *D. Obviousness over AAPA in View of Majcherczak*

#### *1. Overview of AAPA*

The '674 patent describes a prior art "power-up/down detector[] to generate a power-on/off-control (POC) signal internally." Ex. 1001, 1:55–57, Fig. 1. The prior art design is shown in Figure 1, reproduced below.




(PRIOR ART)
FIG. 1

*Id.* at Fig. 1. "FIG. 1 is a circuit diagram illustrating a conventional POC system for multiple supply voltage devices" and is identified as prior art. *Id.* at 4:18–19, Fig. 1. According to the '674 patent, the POC "is made up of three functional blocks: power-up/down detector 100, signal amplifier 101, and output stage 102. Power-up/down detector 100 has PMOS transistor M1 and NMOS transistors M2-M3." *Id.* at 1:60–63.

2. *Overview of Majcherczak*

Majcherczak is titled "Power Supply Detection Device" and relates "to a power supply detection device for an integrated circuit using at least two power supply voltages." Ex. 1008, code (54), ¶ 1. Majcherczak describes a voltage detection device that detects when the core voltage is powered down or there is an excessively slow build-up of the voltage. Ex. 1008, code (57), ¶¶ 8–11.

Figure 2 of Majcherczak is shown below.




Figure 2 shows a detection device "compris[ing] an output stage E3 following the input stage E1, to obtain the desired output levels for the inverse detection signal CORE-OFFn." Ex. 1008 ¶¶ 35–37.

3. *Using Applicant Admitted Prior Art During an Inter Partes Review*

a. *The Updated Guidance and the Use of Applicant Admitted Prior Art in Inter Partes Review Proceedings*

Prior to briefing on remand, the Director issued guidance discussing how the PTAB will treat a petitioner's reliance on statements made in the specification of a challenged patent. *See* June 9, 2022 USPTO Memorandum Updated Guidance on the Treatment of Statements of the Applicant in the Challenged Patent in *Inter Partes* Reviews Under § 311 ("Updated Guidance").[16] The Updated Guidance supersedes prior guidance (Updated Guidance, 1); accordingly, we apply the Director's Updated

[16] Available at https://www.uspto.gov/sites/default/files/documents/2022060912updatedAAPAmemo.pdf.

Guidance. *See* Updated Guidance, 1 ("The guidance in this Memorandum shall be followed by all members of the Patent Trial and Appeal Board (PTAB or Board)."); 35 U.S.C. § 3(a)(2)(A) (authorizing the Director to "provid[e] policy and management supervision for the Office"), cited by Updated Guidance at 2; *Arthrex, Inc. v. Smith & Nephew, Inc.*, 941 F.3d 1320, 1331 (Fed. Cir. 2019), *rev'd on other grounds*, *United States v. Arthrex*, 141 S.Ct. 1970 (2021) (The Director may "issue policy directives and management supervision of the Office" including "instructions that include exemplary applications of patent laws to fact patterns, which the Board can refer to when presented with factually similar cases.").

Section 311(b) of Title 35 of the U.S. Code limits the "basis" of an *inter partes* review to "prior art consisting of patents or printed publications." 35 U.S.C. § 311(b) (2018); *accord* Updated Guidance 2. "[B]ecause admissions are not prior art, and therefore cannot form the basis of an IPR, it is 'impermissible for a petition to challenge a patent relying on solely AAPA without also relying on a prior art patent or printed publication.'" Updated Guidance 2 (quoting *Qualcomm*, 24 F.4th at 1377). However, "[i]f an IPR petition relies on admissions in combination with reliance on one or more prior art patents or printed publications, those admissions do not form 'the basis' of the ground and *must be considered by the Board in its patentability analysis*." *Id.* at 4 (emphasis added).

The Updated Guidance further provides guidance on how to determine if the challenged patent contains an admission:

> Admissions may include statements in the specification of the challenged patent such as "It is well known that . . . ," "It is well understood that . . . ," or "One of skill in the art would

> readily understand that . . .," or may describe the technology as "prior art," "conventional," or ,"well-known."

Updated Guidance 4 (citing *McCoy v. Heal Sys., LLC*, 850 F. App'x 785, 789 (Fed. Cir. 2021) (non-precedential)). The Updated Guidance further provides that the patent owner may dispute whether the statement constitutes an admission: "Of course, parties may dispute the significance or meaning of statements in the specification or other evidence, including disputing whether specification statements constitute admissions or evidence of the background knowledge possessed by a person of ordinary skill in the art." *Id.* at 4–5.

*b. Petitioner's Arguments*

Petitioner argues that the '674 patent describes AAPA as "conventional." Pet. Remand Br. 1–3. Petitioner further argues that Majcherczak teaches both the alleged invention of the '674 patent—a feedback network—and a number of other claim limitations. *Id.* at 3–6; Pet. Resp. Remand Br. 2.

Petitioner also argues that "[t]he Petition's use of [Patent Owner]'s admissions to show what was known to a skilled artisan before the alleged invention falls squarely within permissible use of AAPA under the Guidance and relevant Federal Circuit precedent." Pet. Remand Br. 6. Specifically, Petitioner argues that "Majcherczak is at the heart of the Petition's relevant obviousness argument for every challenged claim" and no claim is challenged relying solely on AAPA. *Id.* According to Petitioner, "[b]oth the Federal Circuit's decision and the Guidance explicitly permit such use. [Updated] Guidance, 3 ('Admissions are "permissible evidence in an *inter partes* review for establishing the background knowledge possessed by a

person of ordinary skill in the art.'" (quoting *Qualcomm*, 24 F.4th at 1376))." *Id.* at 7.

Petitioner further argues that the number of limitations taught by AAPA is not relevant. Pet. Remand Br. 8; Pet. Resp. Remand Br. 2–3. According to Petitioner, "there is no basis for treating admissions any differently than other sources of proof of a skilled artisan's knowledge, such as expert testimony, background references, and so on." Pet. Remand Br. 8 (citing *Koninklijke Philips v. Google, LLC*, 948 F.3d 1330, 1337 (Fed. Cir. 2020); *Dow Jones & Co. v. Ablaise Ltd.*, 606 F.3d 1338, 1349-50 (Fed. Cir. 2010)). Petitioner further argues that "as the [Updated] Guidance explains, 'the order in which the petition presents the obviousness combination (e.g., prior art modified by admission or admission modified by prior art)' is not relevant." *Id.* (citing Updated Guidance 5; *see also In re Mouttet*, 686 F.3d 1322, 1333 (Fed. Cir. 2012)); *see also* Pet. Resp. Remand Br. 1 (arguing how the ground is styled is irrelevant). According to Petitioner, if the stylization of the grounds or use of the short hand "AAPA grounds" had been determinative, the Federal Circuit would not have remanded the proceeding. Pet. Resp. Remand Br. 1–2.

Petitioner also argues that if we adopt Patent Owner's test that "the 'basis' of a thing is something fundamental to it, or on which the thing rests," Majcherczak is the "basis" of Ground 2.[17] Pet. Resp. Remand Br. 3–5 (quoting PO Remand Br. 5–7). Specifically, Petitioner argues that the Petition "relies on (i.e., rests on) Majcherczak for every single challenged

[17] Ground 2 refers to what the Petitions identify as ground 2a (AAPA in view of Majcherczak) and ground 2b (AAPA in view of Majcherczak and Matthews).

claim." *Id.* at 4. According to Petitioner, because its theory that the addition of one or more feedback networks—the alleged improvement—to the standard system would have been obvious given Majcherczak's teachings, "[i]t defies credibility to suggest that this theory does not rest on Majcherczak, or that Majcherczak is not 'fundamental' to it." *Id.; see also id.* at 5 (expanding on argument).

### *c. Patent Owner's Arguments*

Patent Owner argues that Petitioner has repeatedly conceded that Majcherczak is not the basis of its Petition. PO Remand Br. 4–5. Specifically, Patent Owner argues that Petitioner states that the basis for rejection is "*Applicants Admitted Prior Art (AAPA)* in view of Majcherczak." *Id.* at 4 (citing Pet. 2). Patent Owner further argues that Petitioner uses AAPA "for almost every claim element" while Petitioner relies on "Majcherczak for only a limited aspect of the claims." *Id.*; *see also* PO Resp. Remand Br. 1–3 (arguing "whole swaths of arguments [in the Petition] do[] not mention Majcherczak"). Patent Owner further argues that Petitioner made similar statements in its appeal brief and rehearing petition. PO Remand Br. 5.

Patent Owner also argues that Petitioner's admissions that AAPA is the basis of the *inter partes* reviews are consistent with the statutory language. PO Remand Br. 5–8. Patent Owner argues that "the plain meaning of the 'basis' of a thing is something fundamental to it, or on which the thing rests, as numerous standard dictionary definitions demonstrate." *Id.* at 6 (citing dictionaries). Patent Owner further argues that "[t]he substance of Apple's petition makes clear that AAPA, not Majcherczak, was the 'foundation,' 'main constituent,' 'principal component,' and

'fundamental' and 'underlying fact' of Ground 2; Majcherczak played an ancillary role." *Id.*; *see also id.* at 6–8 (explaining how AAPA was the foundation of the grounds). According to Patent Owner, Petitioner "[b]arely acknowledg[es] § 311(b), [and] never purports to apply the statutory text or even attempts to define 'the basis'—the key provision on remand." PO Resp. Remand Br. 5.

Patent Owner also argues that the Federal Circuit's "specific holding and its discussion of the proper and improper uses of AAPA" when "applied to the circumstances here compels a finding that Ground 2 is impermissible." PO Remand Br. 8. According to Patent Owner, "[b]ecause Apple did not raise Majcherczak as 'the basis,' the Federal Circuit's decision confirms that Ground 2 is impermissible." *Id.* (footnote added).

Patent Owner also argues that "[t]he Updated Guidance on the treatment of AAPA in IPRs does not (and could not) compel a contrary conclusion." PO Remand Br. 9. Specifically, Patent Owner argues that "[i]t does not address the Federal Circuit's narrow directive for remand for this case to determine what is the basis of ground 2." *Id.* Although Patent Owner "recognizes that statements in the Updated Guidance, and its recent application by the Director, would suggest" that the AAPA grounds are permissible because they include a prior art patent, Patent Owner argues "Congress did not use such language; rather, it expressly limited IPRs to grounds 'only on the basis of prior art consisting of patents or printed publications.'" *Id.* at 9–10.

Patent Owner also argues that the Petition does not use AAPA as evidence of general knowledge. PO Resp. Remand Br. 3–4. Instead, Patent Owner argues that Petitioner uses AAPA as a reference and Petitioner

cannot rewrite the Petition at this late date. *Id.* (citing *Koninklijke Philips*, 948 F.3d 1330; *Yeda Research & Development Co. v. Mylan Pharmaceuticals Inc.*, 906 F.3d 1031 (Fed. Cir. 2018)).

Patent Owner also argues that Petitioner "cannot defend Ground 2 by saying Majcherczak teaches the '674 Patent's purported 'novel feature.'" PO Resp. Remand Br. 4. According to Patent Owner, Petitioner took the opposite position in its Reply and such an analysis is inconsistent with the language of 35 U.S.C. § 103(a). *Id.* at 4–5.

*d. Our Analysis*

By statute, *inter partes* review proceedings can only be requested "on a ground that could be raised under section 102 or 103 and *only on the basis* of prior art consisting of patents or printed publications." 35 U.S.C. § 311(b) (emphasis added); *see also Qualcomm*, 24 F.4th at 1374. Thus, the issue before us is whether AAPA improperly formed the "basis" of Petitioner's challenge. *See Qualcomm*, 24 F.4th at 1376–77 (remanding to determine "whether AAPA improperly formed the 'basis' of Apple's challenge").

The answer to this question is found in the Updated Guidance: "If an IPR petition relies on admissions in combination with reliance on one or more prior art patents or printed publications, those admissions do not form 'the basis' of the ground and *must be considered by the Board in its patentability analysis*." Updated Guidance 4 (emphasis added). Because Petitioner's grounds involve a combination of AAPA and prior art patent(s), AAPA does not form the basis of the ground. *See* Pet. 2 (setting forth the grounds); 1316 Pet. 2 (same). Instead, it is the prior art patents—Majcherczak and, when used, Matthews—that form the basis of the

challenge and AAPA is simply being used to provide missing limitations. *See MED-EL Elektromedizinische Geräte Ges.M.B.H. v. Advanced Bionics AG,* IPR2020-01016, Paper 44 at 4 (PTAB Aug. 22, 2022) (Director Review Decision) ("As discussed above, the Petition relies on AAPA in combination with either Petersen, Zilberman and/or Saaski. Accordingly, AAPA "do[es] not form 'the basis' of the ground and must be considered by the Board in its patentability analysis." (quoting Updated Guidance 4) (modifications in original)).

This is consistent with Federal Circuit case law discussing the use of admissions in proceedings. Specifically, the Federal Circuit "has held 'it is appropriate to rely on admissions in a patent's specification when assessing whether that patent's claims would have been obvious' in an *inter partes* review proceeding." *Qualcomm*, 24 F.4th at 1375 (quoting *Koninklijke Philips*, 948 F.3d at 1339); *see also PharmaStem Therapeutics, Inc. v. ViaCell, Inc.*, 491 F.3d 1342, 1362 (Fed. Cir. 2007) ("Admissions in the specification regarding the prior art are binding on the patentee for purposes of a later inquiry into obviousness."); *Constant v. Advanced Micro-Devices, Inc.*, 848 F.2d 1560, 1570 (Fed. Cir. 1998) ("A statement in a patent that something is in the prior art is binding on the applicant and patentee for determinations of anticipation and obviousness."). Indeed, in *Koninklijke Philips* the Federal Circuit "rejected an argument that the general knowledge of a skilled artisan may not be relied on in an *inter partes* review because it does not constitute 'prior art consisting of patents or printed publications' under § 311(b)." *Qualcomm*, 24 F.4th at 1376. Thus, AAPA can be used to, *inter alia*, "supply[] a missing claim limitation." *Id.* (citing *Koninklijke Philips*, 948 F.3d at 1337–38) (alteration in original). Although, in these

proceedings, AAPA is supplying the missing claim limitation not taught in a prior art patent or printed publication, it does not form the basis of the *inter partes* review. *See id.* (recognizing that "even though evidence such as expert testimony and party admissions are not themselves prior art references, they are permissible evidence in an *inter partes* review for establishing the background knowledge possessed by a person of ordinary skill in the art.").

Although we agree with Petitioner that either (1) Majcherczak or (2) Majcherczak and Matthews form the basis for the challenges under Ground 2, we disagree with Petitioner's focus on Majcherczak as teaching the alleged invention of the '674 patent. *See* Pet. Remand Br. 3–6. As the Supreme Court has recognized, "there is no legally recognizable or protected 'essential' element, 'gist' or 'heart' of the invention in a combination patent." *Aro Mfg. Co. v. Converible Top Replacement Co.*, 365 U.S. 336, 345 (1961); *see also Allen Eng'g Corp. v. Bartell Indus., Inc.*, 299 F.3d 1336, 1345 (Fed. Cir. 2002) (citing *Aro*). Indeed, based on the language of 35 U.S.C. § 103(a), the Federal Circuit has explicitly held that the point of novelty test is "erroneous[]"; instead, the proper focus is on "the subject matter of the invention 'as a whole.'" *Rosemount, Inc. v. Beckman Instruments, Inc.*, 727 F.2d 1540, 1543 n.3 (Fed. Cir. 1984); *accord* 35 U.S.C. § 103(a) ("A patent may not be obtained though the invention is not identically disclosed or described as set forth in section 102, if the differences between the subject matter sought to be patented and the prior art are *such that the subject matter as a whole* would have been obvious at the time the invention was made to a person having ordinary skill in the art to which said subject matter pertains." (emphasis added)). Because the point of

novelty/gist of the invention test is inappropriate in an obviousness analysis and Petitioner cites no legal authority in support of its argument, we are not persuaded it is appropriate to use it in determining whether an admission in a specification forms the basis of an obviousness challenge in an *inter partes* review. Instead, we focus on the claimed subject matter as a whole. *See* Update Guidance, 5 ("Board panels should review whether the asserted ground *as a whole* as applied to each challenged claim *as a whole* relies on admissions in the specification in combination with reliance on at least one prior art patent or printed publication."). But the disagreement does nothing to detract from our conclusion that Petitioner properly used AAPA in combination with prior art patents or printed publications.

We do not agree with Patent Owner's argument that Petitioner has conceded that AAPA forms the basis of the Ground 2 challenge. Although Petitioner identifies the relevant challenge as being based on AAPA and Majcherczak (with or without Matthews), Patent Owner does not point to a concession that AAPA forms the basis of the ground. *See* PO Remand Br. 4–5. At most, the statements describe how the grounds include both AAPA and a prior art patent, Majcherczak. *Id.* But the fact that a ground relies on both applicant admissions and a prior art patent is not determinative. As the Federal Circuit recognized, "petitioner may rely on evidence beyond prior art documents in an *inter partes* review, even if such evidence itself may not qualify as the 'basis' for a ground set forth in a petition." *Qualcomm*, 24 F.4th at 1375–76. Furthermore, because "a patentee's admissions about the scope and content of the prior art provide a factual foundation as to what a skilled artisan would have known at the time of invention, it follows that AAPA may be used in similar ways in an *inter partes* review." *Id.* at 1376

(citation omitted). Thus, stating that a ground includes both AAPA and Majcherczak is not determinative as to what the ground is based on.

Moreover, the Updated Guidance clearly prohibits the very argument that Patent Owner presents. According to the Updated Guidance, "Board panels should not exclude the use of admissions based on . . . the order in which the petition presents the obviousness combination (e.g., prior art modified by admission or admission modified by prior art)." Updated Guidance 5. Instead, the Updated Guidance mandates that we "should review whether the asserted ground as a whole as applied to each challenged claim as a whole relies on admissions in the specification in combination with reliance on at least one prior art patent or printed publication." *Id.* Consistent with the Updated Guidance, we have reviewed the challenge as a whole and not how the challenge was stated.

We also disagree with Patent Owner's use of the foundation test. *See* PO Remand Br. 5–6. Although a previous Guidance Memo[18] directed that the Board examine the "foundation or starting point" of the ground (Guidance Memo 6 & n.6), that language is removed from and inconsistent with the Updated Guidance (Updated Guidance 5). Moreover, although the Federal Circuit was aware of the Guidance Memo when it issued the *Qualcomm* decision (24 F.4th at 1373), the Court did not direct us to apply the Guidance Memo and its foundation or starting point test in this remand.

[18] August 18, 2020 USPTO Memorandum Addressing Treatment of Statements of the Applicant in the Challenged Patent in Inter Partes Reviews under § 311 ("Guidance Memo"), available at https://www.uspto.gov/sites/default/files/documents/signed_aapa_guidance_memo.pdf.

We also disagree with Patent Owner's argument that prohibiting the use of AAPA in this proceeding is consistent with the Federal Circuit's decision. As discussed above, the Federal Circuit repeatedly held that it is appropriate to rely on evidence that is not prior art patents or printed publications in an *inter partes* review, including to supply missing elements. And it did so again in *Qualcomm*. 24 F.4th at 1375–76. Indeed, the entire point of the remand is to determine whether AAPA was the basis for these *inter partes* reviews. If the *Qualcomm* court determined, as Patent Owner argues, that AAPA was the basis, there would have been no need for the remand.

Nor do we see any inconsistency between the Updated Guidance and the Federal Circuit's decision. Notably, although the Federal Circuit remanded the cases to the Board to determine if AAPA was the basis for the *inter partes* reviews, it did not indicate a specific test to use. *See Qualcomm*, 24 F.4th at 1376–77 ("Having determined that (i) the Board incorrectly interpreted § 311(b)'s 'prior art consisting of patents or printed publications' to encompass AAPA contained in the challenged patent, but (ii) the use of AAPA can be permissible in an *inter partes* review, the next contested issue is whether AAPA improperly formed the 'basis' of Apple's challenge. Because the Board did not address this question in its final written decision, we remand to allow the Board to address this issue in the first instance."). Moreover, the Director explicitly relied on *Qualcomm* and the cases it cited in the Updated Guidance.

We also disagree with Patent Owner's argument that Petitioner is attempting to rewrite the Petition. In the Petition, and throughout the current briefing, Petitioner uses AAPA to supply missing claim limitations. There

has been no change in formulation of Ground 2 or what evidence is being used by Petitioner to prove unpatentability. Indeed, there has been no change during the remand as our application of the prior art patent(s) and AAPA to the claims in subsections 4–7, *infra*, is substantially identical to that in the Final Decision.[19] Thus, *Koninklijke Philips*'s admonition that it is an error to institute an *inter partes* review based on "a combination of prior art references [Petitioner] did not advance in its petition" is inapposite. *See* 948 F.3d at 1336.

Similarly inapplicable is *Yeda*. In that case, the Board considered a non-prior art study that started before the filing date of the challenged patent but which was not prior art. *Yeda*, 906 F.3d at 1041. It has no bearing on the use of an applicant's admission. Moreover, the sentence cited by Patent Owner limiting the use of non-prior art references is actually a quote from a Board decision, not a holding of the Federal Circuit:

> The Board has recognized that non-prior art evidence of what was known "cannot be applied, independently, as teachings separately combinable" with other prior art, but "can be relied on for their proper supporting roles, e.g., indicating the level of ordinary skill in the art, what certain terms would mean to one with ordinary skill in the art, and how one with ordinary skill in the art would have under-stood a prior art disclosure." *Dominion Dealer Sols., LLC v. AutoAlert, Inc.*, IPR2014-00684, 2014 WL 5035359, at *5 (P.T.A.B. Oct. 6, 2014).

*Id.* At most, it is dicta. And to the extent it is inconsistent with Federal Circuit cases that directly address the use of non-prior art such as admissions (*see Qualcomm* and *Koninklijke Philips*), that dicta is neither persuasive nor controlling.

---

[19] The only changes are the correction of obvious typographical errors.

Accordingly, Petitioner has presented challenges on the "basis of prior art consisting of patents or printed publications," 35 U.S.C. § 311(b), namely Majcherczak and Matthews, and these references are appropriately considered in combination with AAPA.

4. *Claim 1*

a. *Undisputed Limitations*

Petitioner argues that the combination of AAPA and Majcherczak teaches all of the limitations recited in claim 1. *See* Pet. 37–56. Specifically, Petitioner argues a person of ordinary skill in the art would have combined the feedback circuit of Majcherczak with the POC described in AAPA as shown in the annotated figure reproduced below.




Pet. 44. The figure reproduced above shows Majcherczak's Figure 2 annotated by Petitioner (right) and a version of Figure 1 of the '674 patent (AAPA) modified by Petitioner to integrate the feedback transistor M6 from Majcherczak's Figure 2 (left). *Id.* Petitioner also provides a differently annotated version of its proposed combination as reproduced below.




**AAPA + Majcherczak POC System**

Pet. 50. The figure above shows what Petitioner contends is the combination of the feedback network of Majcherczak with the POC of AAPA. *Id.* Petitioner's annotations show what Petitioner argues is the power up/down detector in green, the signal processor in yellow, and the feedback network from Majcherczak in blue. *Id.*

Petitioner argues that AAPA in combination with Majcherczak teaches "[a] multiple supply voltage device" as recited in claim 1. Pet. 46. According to Petitioner, "AAPA describes that the prior art POC system 10 is useful in 'newer integrated circuit devices include dual power supplies: one lower-voltage power supply for the internally operating or core applications, and a second higher-voltage power supply for the I/O circuits and devices.'" *Id.* (quoting Ex. 1001, 1:22–25).

Petitioner also argues that AAPA in combination with Majcherczak teaches "a core network operative at a first supply voltage" as recited in claim 1. Pet. 46–47. Specifically, Petitioner argues AAPA includes power up/down detector 100 which is connected to the core power supply, which is a "lower-voltage power supply for the internally operating or core applications." *Id.* (citing Ex. 1001, 1:22–25, 1:60–64).

Petitioner further argues that AAPA in combination with Majcherczak teaches "a control network coupled to said core network wherein said control network is configured to transmit a control signal" as recited in claim 1. Pet. 47. Specifically, Petitioner argues "[t]he prior art power-on/off-control (POC) system 10 is a control network coupled to said core network (via core power supply $V_{core}$), and the POC system 10 is configured to transmit a power-on/off-control (POC) signal 107." *Id.* (citing Ex. 1001, 1:55–58, 1:65–2:13).

Petitioner also argues that AAPA in combination with Majcherczak teaches "said control network comprising: an up/down (up/down) detector configured to detect a power state of said core network; processing circuitry coupled to said up/down detector and configured to generate said control signal based on said power state" as recited in claim 1. *Id.* at 48–49. Specifically, Petitioner directs us to a comparison of Figure 4 of the '674 patent and the combination of AAPA and Majcherczak, both of which show a power/up down detector and a signal amplifier portion. Pet. 48. Petitioner further argues that "[t]he signal amplifier 101 and output stage 102 are processing circuitry coupled to said up/down detector and configured to generate the power-on/off-control (POC) signal 107 based on said power state." *Id.* at 49.

Petitioner argues the combination of AAPA and Majcherczak teaches "one or more feedback circuits coupled to said up/down detector, said one or more feedback circuits configured to provide feedback signals to adjust a current capacity of said up/ down detector" as recited in claim 1. *See* Pet. 49–52. Specifically, Petitioner argues that, when the teachings of AAPA and Majcherczak are combined as shown in the figure reproduced above, "the feedback transistor M6 is a feedback circuit coupled to the up/down detector 100 via its output." Pet. 51 (citing Ex. 1003 ¶ 141); *see also* Pet. 51–52 (citing Ex. 1003 ¶¶ 142–143). That is, according to Petitioner, "when both transistors M1 and M6 are 'on' (i.e., $V_{core}$ is off), the transistor M6 increases the current capacity of the power up/down detector 100" but "when both transistors M1 and M6 are 'off' (i.e., $V_{core}$ is on), the transistor M6 decreases the current capacity of the power up/down detector 100." Pet. 51–52 (citing Ex. 1003 ¶¶ 142–143).

Petitioner also argues that AAPA in combination with Majcherczak teaches "at least one first transistor coupled to a second supply voltage, the at least one more first transistor being configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on" as recited in claim 1. *See* Pet. 52–53. More specifically, Petitioner argues M1—a first transistor—is coupled to $V_{I/O}$—the I/O power supply or second supply voltage. *Id.* (citing Ex. 1003 ¶ 141; Ex. 1001, 1:62–2:1, 2:8–9). Petitioner further argues that "AAPA explains that the transistor M1 is configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on." Pet. 53 (citing Ex. 1001, 1:65–67, 2:8–9).

Petitioner further argues that AAPA in combination with Majcherczak teaches "at least one second transistor coupled in series with the at least one first transistor and coupled to said first supply voltage, the at least one second transistor being configured to switch on when said first supply voltage is powered on and to switch off when said first supply voltage is powered down" as recited in claim 1. *See* Pet. 54–55. More specifically, Petitioner argues transistor M3 is a second transistor and "AAPA explains that the transistor M3 is configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on." *Id.* (citing Ex. 1003 ¶¶ 141, 144–147; Ex. 1001, 1:65–67, 2:8–9).

Petitioner also argues that AAPA in combination with Majcherczak teaches "at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor" as recited in claim 1. Pet. 55–56. Specifically, Petitioner points to transistor M2,[20] which, according to Petitioner, "is coupled in series between transistor M1 (i.e., the first transistor) and transistor M3 (i.e., the second transistor)." Pet. 56 (citing Ex. 1003 ¶ 144).

Patent Owner does not dispute Petitioner's contention that the combination of AAPA and Majcherczak teaches each of the limitations recited in claim 1. *See generally* PO Resp. 20–31; *see also* Pet. Reply 2

---

[20] The Petition interchangeably refers to transistor M2 and M3 as the third transistor. Pet. 56. However, the Petition specifically refers to the transistor highlighted in brown, which is transistor M2. We stated in the Institution Decision that we would "treat the reference to transistor M3 as a typographical error." Inst. Dec. 19 n.10. Neither party addressed this point in any subsequent briefing. *See generally* PO Resp.; Pet. Reply.

("Beyond this procedural issue [on whether applicant admitted prior art could be considered], Patent Owner's only substantive argument challenging Ground 2 is a purported lack of motivation to combine."); PO Sur-reply 2–19 (not disputing Petitioner's characterization of Patent Owner's argument).

We previously instructed Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] may be deemed waived." Scheduling Order, Paper 8, 5; *see also In re NuVasive, Inc.*, 842 F.3d 1376, 1380–81 (Fed. Cir. 2016) (determining Patent Owner waived arguments made only in its Preliminary Response but not raised in the Patent Owner Response after institution).

Based on the undisputed evidence before us and the reasons set forth in the Petition, Pet. 37–56, we find that the combination of AAPA and Majcherczak teaches all of the limitations recited in claim 1.

*b. Whether a Person of Ordinary Skill in the Art Would Have Combined AAPA and Majcherczak*

(1) Petitioner's Arguments

Petitioner argues that a person of ordinary skill in the art "would have been motivated to integrate the feedback transistor M6 from Majcherczak's voltage detector into the POC system 10 of AAPA in order to 'enable[] the proper stabilizing of the detection device.'" Pet. 45 (quoting Ex. 1008 ¶ 37) (citing Ex. 1003 ¶ 150). According to Petitioner, the "combination would result in AAPA's POC system 10 observing the 'hysteresis detection' described by Majcherczak, facilitating controlled operation of the I/O devices instructed by the POC signal on communications from the core devices when the core supply voltage is stably on." *Id.* (citing Ex. 1003 ¶ 150); *see also* Pet. Reply 2–5.

Petitioner further argues that "[i]t is undisputed in the [Patent Owner's Reponse] or by Dr. Pedram that adding Majcherczak's feedback transistor M6 to the AAPA as described in the Petition achieves the advantageous hysteresis described in Majcherczak." Pet. Reply 5 (citing PO Resp. 20–31; Ex. 2002 ¶¶ 67–85). According to Petitioner, "Dr. Pedram admits that it was possible to add hysteresis to the AAPA circuit shown in FIG. 1 of the '674 [p]atent, and that such an addition could help improve noise immunity of the circuit." *Id.* (citing Ex. 1017, 46:22–47:10).

Petitioner further argues that "it is irrelevant whether the prior art's explicit motivation to integrate Majcherczak's feedback transistor M6 into the AAPA matches the problem statement of the '674 [p]atent." Pet. Reply 6 (citing *Cross Med. Prods., Inc. v. Medtronic Sofamor Danek, Inc.*, 424 F.3d 1293, 1323 (Fed. Cir. 2005)). According to Petitioner, "[i]t is not necessary that the prior art suggest the combination to achieve the same advantage or result purportedly discovered by the Patent Owner." *Id.* (citing *In re Kahn*, 441 F.3d 977, 987 (Fed. Cir. 2006); *Cross*, 424 F.3d at 1323).

Moreover, according to Petitioner, a person of ordinary skill in the art would have a reasonable expectation of success:

> A POSITA would have perceived a reasonable expectation of success in making this modification to the POC system 10 of AAPA, because the POC system 10 and Majcherczak's voltage detector share many functionally commensurate elements, operate in a corresponding manner, and are used in the similar types of multiple supply voltage devices. [Ex. 1003] ¶ 151. Indeed, the integration of the feedback transistor M6 from Majcherczak's voltage detector would have simply been the use of a known technique (a feedback transistor to improve hysteresis) to improve similar devices (detection circuits in multiple supply voltage devices) in the same way. *Id.*

Pet. 45.

Petitioner also argues that any potential disadvantages with the modification identified by Patent Owner and Dr. Pedram—additional leakage current compared to AAPA or Majcherczak, glitch current, and DC fighting condition (*see* PO Resp. 21–31)—"fail to demonstrate the absence of motivation." Pet. Reply 8; *see also id.* at 7–12. Specifically, Petitioner argues that "[i]t is well understood that 'a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine.'" *Id.* at 8 (citing *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006)). According to Petitioner, in this case, "the explicit benefit articulated in Majcherczak is not undone or outweighed by the vague and unsupported disadvantages described in the [Patent Owner's Response] and by Dr. Pedram." *Id.*

Petitioner also argues that there is no evidentiary support for any of the potential disadvantages articulated by Patent Owner and Dr. Pedram. Pet. Reply 7–12. Specifically, Petitioner argues neither Patent Owner nor Dr. Pedram cite to any references to support the list of disadvantages and Dr. Pedram admitted that the list is hypothetical and "that he never simulated any of the prior art or proposed combinations to determine what, if any, performance issues would arise from the proposed combination." *Id.* at 7–8 (citing Ex. 1017, 40:15–41:13, 45:9–15, 59:4–8, 61:4–10, 65:7–14, 167:20–23, 170:13–171, 171:20–172:1, 180:6–16, 187:25–188:9) (footnote omitted). Petitioner further argues that "[w]ithout corroborating evidence to contradict the explicit motivating teaching of Majcherczak, Dr. Pedram's statements are unsupported, exposing them as insufficient to establish substantial evidence addressing or confronting the affirmative proof offered by

Petitioner." *Id.* at 8 (citing *Ericsson Inc. v. Intellectual Ventures I LLC*, 890 F. 3d 1336, 1346 (Fed. Cir. 2018)).

Petitioner further argues that the problems of the asserted combination alleged by Patent Owner are "not inherent in the proposed architectural combination. Rather, such issues would only potentially arise due to an improper selection of design characteristics such as the transistor sizes, threshold voltages, and values of $V_{I/O}$ and $V_{core}$." Pet. Reply 9 (citing Ex. 1018 ¶¶ 7–9, 74–77); *see also id.* at 12 ("Even assuming a POSITA would have considered these as potential disadvantages in implementing the proposed combination, the POSITA would nevertheless have been motivated for reasons cited within Majcherczak to make the combination, as the POR's alleged disadvantages and their potential adverse impacts either would not have been observed or a POSITA would have been able to minimize them." (citing Ex. 1018 ¶¶ 50–64)).

With regard to additional leakage current (PO Resp. 21–27), Petitioner argues that "Dr. Pedram acknowledged that it is the unclaimed design details—transistor sizes, threshold voltages, and values of $V_{I/O}$ and $V_{core}$—that will determine the amount of leakage present in the proposed combination." Pet. Reply 10 (citing Ex. 1017, 63:22-65:20). Petitioner further argues that "Dr. Horst shows through simulation of these designs" that the proper selection of design details result in "mitigat[ing] any potentially problematic increase in leakage current, leaving the power consumption due to leakage current to be relatively the same or even better than either the AAPA or Majcherczak alone." *Id.* (citing Ex. 1018 ¶¶ 50–64, 68–73).

With regard to glitch current (PO Resp. 27–30), Petitioner argues that because the '674 patent acknowledges that glitch current was an issue with AAPA, "the addition of Majcherczak's feedback transistor would not have created a new problem in the circuit." Pet. Reply 10 (citing Ex. 1001, 2:25–30; Ex. 1018 ¶¶ 31, 56, 57, 75–77). Petitioner further argues that Dr. Horst's simulation shows that the glitch current can be mitigated by a proper selection of threshold voltages. *Id.* at 11 (citing Ex. 1018 ¶¶ 21–31, 50–64).[21]

With regard to the DC fighting condition (PO Resp. 27–30), Petitioner argues that Dr. Pedram states that this "'could happen' only on 'rare occasions,' making any assessment of a hypothetical DC fighting condition a 'complicated task.'" Pet. Reply 11 (quoting Ex. 1017, 181:10–24). Petitioner further argues that "[t]he condition is so complicated and rare, in fact, that Dr. Pedram believes that a POSITA would not even see or be aware of this disadvantage when analyzing the proposed combinations." *Id.* (citing Ex. 1017, 175:11–15). According to Petitioner, a person of ordinary skill in the art "cannot have been dissuaded by a potential 'rare' problem he/she would not have even been aware of." *Id.* Petitioner further argues that the condition is dependent on the selection of design details and "this alleged problem did not arise in Dr. Horst's simulations." *Id.* at 11–12 (citing Ex. 1017, 172:10–173:16, 178:9–181:24; Ex. 1018 ¶¶ 30, 32, 33).

---

[21] Petitioner's Reply cites to Exhibit 2018. Based on the context of the sentence, this appears to be a typographical error and that Petitioner intended to cite Exhibit 1018.

(2) Patent Owner's Arguments

Patent Owner argues that, because "Petitioner's proposed combination results in a circuit with numerous operational flaws" that "would operate significantly worse than either the AAPA or Majcherczak had they been left unmodified," a person of ordinary skill in the art would "have had no reason to combine the alleged AAPA and Majcherczak as Petitioner proposes." PO Resp. 21; *see also id.* at 21–31; PO Sur-reply 2–19.

First, Patent Owner argues that "Petitioner's proposed addition of Majcherczak's transistor M6 to Fig. 1 of the '674 Patent (the alleged AAPA) results in *increased* leakage current, and the POSA would not be motivated to make Petitioner's proposed combination for at least this reason." PO Resp. 22 (citing Ex. 2002 ¶ 70); *see also id.* at 21–25; PO Sur-reply 4–5. Specifically, Patent Owner argues when the core power supply voltage ($V_{core}$) is on, "PMOS transistor M1 and feedback transistor M6 will be 'off,' and NMOS transistors M2 and M3 will be 'on' providing a path between the output of the power U/D detector 100 and ground." PO Resp. 23–24. Patent Owner further argues that "[b]ecause [$V_{core}$] is less then $V_{I/O}$, however, PMOS transistor M1 will be quite leaky, providing a high leakage path from $V_{I/O}$ to the output terminal of the power U/D detector 100." *Id.* at 24 (citing Ex. 2002 ¶ 72). Patent Owner further argues that "NMOS transistors N2 and M3 will be 'on,' providing a very low resistance path from the output terminal to Vss." *Id.* According to Patent Owner, as a consequence, "a high leakage DC path will exist between $V_{I/O}$ and Vss," which will result in more leakage current than would be present in the unmodified AAPA. *Id.* (citing Ex. 2002 ¶¶ 72–73).

Second, Patent Owner argues that the modified design "would also operate less effectively than Majcherczak alone." PO Resp. 25; *see also id.* at 25–27. Specifically, Patent Owner argues that "a [person having ordinary skill in the art] would have recognized that Majcherczak's power supply stage (E2) operates to reduce leakage current through the pull-up PMOS transistor (M4) in the input stage (E1) and thus helps to offset any additional leakage current introduced by the feedback transistor (M6)." *Id.* at 26 (citing Ex. 2002 ¶¶ 76–78). According to Patent Owner, because Petitioner does not suggest incorporating Majcherczak's power supply stage (E2) into the AAPA, "[t]he power detection circuit depicted in Fig. 2 of Majcherczak would thus operate with significantly less leakage current than Petitioner's proposed combination." *Id.* at 26–27 (citing Ex. 2002 ¶¶ 76–79).

Third, Patent Owner argues that Petitioner's proposed combination "would also introduce substantial operational problems during the process of powering on the core voltage supply (Vcore), causing increased glitch (i.e., crowbar) current and circuit instability." PO Resp. 27; *see also id.* at 27–30. More specifically, Patent Owner argues that "switching delays of the power up/down detector 100 and inverter 105 . . . will cause the feedback transistor M6 . . . to remain on for at least some delay period after the core power supply voltage (Vcore) turns on." *Id.* at 28 (citing Ex. 2002 ¶¶ 81–82). Patent Owner further argues that this can cause an unstable DC fighting condition during the inverter delay period. *Id.* (citing Ex. 2002 ¶ 83). According to Patent Owner, the DC fighting condition "can cause a downstream ripple effect such that Inverter 105 . . . becomes unstable, causing further instability in the 'feedback network' . . ., and potentially

resulting in a complete circuit breakdown" or, at the very least, worsen the glitch current. *Id.* at 28–30 (citing Ex. 2002 ¶¶ 83–84).

Patent Owner further argues that, contrary to Petitioner's arguments, a person of ordinary skill in the art would not seek to add hysteresis. PO Sur-reply 2–4. According to Patent Owner, a person having ordinary skill in the art would, instead, focus on how to solve the problems articulated in AAPA—high leakage current and slow switching times. *Id.* More specifically, Patent Owner argues that (1) a person having ordinary skill in the art would have avoided adding hysteresis because it would make the problems identified in the '674 patent worse, (2) in light of the switching-speed problem articulated in the AAPA, the addition of hysteresis involves impermissible hindsight, and (3) AAPA does not suggest that stability is a problem in AAPA's circuit. *Id.* at 4–6.

Patent Owner further argues that Petitioner's argument (Pet. Reply 7) that Dr. Pedram does not cite to any references to support his list of disadvantages is misplaced. PO Sur-reply 7. According to Patent Owner, no references are needed because the disadvantages "are all well-known phenomena that would be immediately apparent to the [person having ordinary skill in the art] upon considering the proposed combination" and "Petitioner sets forth no argument that the disadvantages described by Dr. Pedram are obscure or not generally understood, and such an assertion would be wrong." *Id.* Patent Owner further argues that "the reply cites no statute, rule, or caselaw to support the proposition that an expert's opinion must be corroborated by independent references." *Id.*

Patent Owner also argues that Petitioner's citation to "*Medichem, S.A. v. Rolabo, S.L.* that 'a given course of action often has simultaneous

advantages and disadvantages, and this does not necessarily obviate motivation to combine'" is misplaced because "the purported advantage of Majcherczak is no advantage at all." PO Sur-reply 7–8.

Finally, Patent Owner presents six arguments explaining why Dr. Horst's simulations do not prove that a person of ordinary skill in the art would have been motivated to combine AAPA and Majcherczak. *See* PO Sur-reply 8–18.

First, Patent Owner argues that "Petitioner's argument misunderstands the proper inquiry for obviousness." *Id.* at 8. According to Patent Owner, "[t]he relevant question is whether the [person of ordinary skill in the art] would be motivated to combine the alleged AAPA and Majcherczak to reach the claimed invention," not whether the person of ordinary skill in the art would combine the references and then use a simulation to determine a set of parameters that would avoid the problems identified by Dr. Pedram. *Id.* at 8–9.

Second, Patent Owner argues that the simulations are unreliable because Dr. Horst's supplemental declaration contained numerous errors. *See* PO Sur-reply 9–11. For example, Patent Owner points out how the results in the simulation of two different circuits were identical. *Id.* at 9 (comparing Ex. 1018 ¶ 12 with Ex. 1018 ¶ 23). Patent Owner points out that a corrective declaration with a new set of graphs intended to replace page 15 of the supplemental declaration introduced a new error in the results of Figure 4. *Id.* at 9–11 (citing Ex. 2007).

Third, Patent Owner argues that Dr. Horst selected unrealistic parameter values that the person of ordinary skill in the art would never use in the proposed combination of AAPA and Majcherczak. *See* PO Sur-

reply 11–16. Specifically, Patent Owner argues Dr. Horst selected a high FET threshold voltage that results in the problem of slow switching speed discussed in the ’674 patent, the selected channel length and width parameters were selected from the Voss reference (Exhibit 1022) that is not from the field related to the technology of AAPA, and that the values are divorced from real world considerations. *Id.*

Fourth, Patent Owner argues Dr. Horst “cherry picked” parameter values without providing a sufficient rationale for their selection. PO Sur-reply 16–17. Specifically, Patent Owner criticizes Dr. Horst for using the values of the Voss reference for most transistors but provides no explanation for why the Voss reference was not used for all transistors. *Id.* Patent Owner further argues that Dr. Horst explained at his deposition that he changed the width of the feedback transistor from that given in Voss because if the Voss parameters were used consistently, the simulation would fail. *Id.* at 17 (citing Ex. 2006, 101:24–102:17).

Fifth, Patent Owner argues that Dr. Horst’s simulation does not show that the combination of AAPA and Majcherczak does not result in increased leakage current. PO Sur-reply 17–18. Specifically, Patent Owner argues that ramping the $V_{core}$ to max value and then immediately pulling back—as done in the simulation—is not an accurate way of measuring leakage current. *Id* at 18. Patent Owner argues that leakage power is primarily a problem when $V_{core}$ is high and, if the simulation was addressing leakage, it should have left $V_{core}$ voltage at 3.3V for at least some time. *Id.* at 18.

Sixth, Patent Owner argues that a single simulation is not sufficient. PO Sur-reply 18–19. More specifically, Patent Owner argues that a typical engineer will perform thousands of computer simulations and that “a single

simulation result cannot provide an accurate indication of whether a circuit would operate correctly under realistic, real-world conditions." *Id.* at 19. Patent Owner further argues that, although Dr. Horst's testimony discusses a single simulation, Dr. Horst executed many more simulations, but did not save the results of those simulations. *Id.* at 18–19.

(3) Our Analysis

A conclusion of unpatentability based on obviousness must be supported by "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *Kahn*, 441 F.3d at 988 (citations omitted), *cited with approval in KSR*, 550 U.S. at 418. The requirement for a reason to combine the reference acts as a check on the potential for the improper use of hindsight. *Plantronics, Inc. v. Aliph, Inc.*, 724 F.3d 1343, 1354 (Fed. Cir. 2013) (holding that an articulated reasoning "is especially important to guard against the dangers of hindsight bias").

Based on the entirety of the record, we find Petitioner has shown sufficiently articulated reasoning with rational underpinning to support the legal conclusion of obviousness. Petitioner provides detailed analysis of the prior art and explains why, based on the teachings of the references, a person of ordinary skill in the art would have combined the references. *See* Pet. 37–45; Pet. Reply 3–6.

It is undisputed that Majcherczak identifies a problem with circuits with multiple supply voltage devices when the core voltage is powered down or slow to power up. *See* Ex. 1008 ¶¶ 7–8; *see also* Pet. 39. Specifically, Majcherczak states that

> [w]hen the core supply voltage disappears, the two logic voltages DATA and /DATA fall to zero. The two control transistors are then off. The voltage at an output of the

> translator becomes uncontrollable and dependent on the leakage currents in the transistors of the translator, or on a contradiction between two logic signals.

Ex. 1008 ¶ 7.

Majcherczak teaches using an output stage E3 which includes a "transistor M6 for pulling the output node Nin of the inverter of the input stage to the interface [I/O] power supply voltage Vdd3." Ex. 1008 ¶ 37. Majcherczak describes that "transistor M6 enables the proper stabilizing of the detection device. It maintains the node Nin at Vdd3, by feedback." *Id.* Majcherczak further describes how this allows for a hysteresis detection:

> With the output stage E3, a hysteresis detection is obtained with a low threshold of switching from a state of the presence of a core power supply to a state of the absence of a core power supply, and a high threshold of switching of the detection circuit from a state of absence of the core supply to a state of presence of the core supply. In particular, if the output node Nin of the input stage is at Vdd3, then the signal IN applied to its input rises sufficiently to force the output node Nin downwards, and consequently, cut off the pull-down transistor M6. In a practical example, for integrated circuits using 0.18 $\mu$ technology with a core supply voltage of 1.8 volts, the high threshold may thus be equal to 0.98 volts and the low threshold may be equal to 0.33 volts.

*Id.* ¶ 38. "[H]ysteresis detection is useful for ensuring that the level shifters only operate to facilitate communications between the core network and the I/O network when the core supply voltage is stably on." Ex. 1003 ¶ 138 (Horst Decl.).

We are persuaded by the evidence in the record that a person having ordinary skill in the art would have "integrate[d] feedback transistor M6 from Majcherczak's voltage detector into the POC system 10 of the AAPA in order to 'enable[] the proper stabilizing of the detection device.'"

Ex. 1003 ¶ 150 (Horst Decl.) (quoting Ex. 1008 ¶ 37). The person having ordinary skill of the art would have made such a modification to add hysteresis detection to AAPA's POC system 10, thereby "ensuring that the I/O devices instructed by the POC signal only operate on communications from the core devices when the core supply voltage is stably on." *Id.*

It is inapposite that the reason for the modification is different from the problem being addressed in the '674 patent. In *KSR*, the Supreme Court rejected the application of rigid rules, such as considering only the problem the patentee was trying to solve:

> The first error of the Court of Appeals in this case was to foreclose this reasoning by holding that courts and patent examiners should look only to the problem the patentee was trying to solve. *The Court of Appeals failed to recognize that the problem motivating the patentee may be only one of many addressed by the patent's subject matter.* The question is not whether the combination was obvious to the patentee but whether the combination was obvious to a person with ordinary skill in the art. *Under the correct analysis, any need or problem known in the field of endeavor at the time of invention and addressed by the patent can provide a reason for combining the elements in the manner claimed.*

*KSR*, 550 U.S. at 420 (emphases added, citations omitted). Instead, the Supreme Court applied a flexible approach, holding that "if a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417; *see also id.* ("When a patent simply arranges old elements with each performing the same function it had been known to perform and yields no more than one would expect from such an

arrangement, the combination is obvious.") (internal quotation and citation omitted).

Consistent with the Supreme Court's *KSR* holding, the Federal Circuit has similarly rejected arguments based on a reason to combine that were different from the one identified by the patentee. For example, in *Samsung Electronics Co. v. UUSI, LLC*, the Federal Circuit reversed a PTAB decision that required the reason to combine the references to be directed to the same problem as identified in the challenged patent:

> UUSI next argues that the Board was correct in finding that Gerpheide was addressed to a different problem, referring us to its expert's testimony regarding the fact that Gerpheide and the '183 patent were directed to different problems and solved those problems in different ways. **Samsung argues that under *KSR International Co. v. Teleflex Inc.,* 550 U.S. 398, 127 S.Ct. 1727, 167 L.Ed.2d 705 (2007), the Board's decision was legally erroneous because it required the proffered motivation to combine Gerpheide with Ingraham/Caldwell to be the same as the one that animated the patentee in arriving at the claimed invention. We agree with Samsung**. The Board's categorical rejection of the teachings from a single input device to those of a multi input device is not supportable. "[I]f a technique has been used to improve one device, and a person of ordinary skill in the art would recognize that it would improve similar devices in the same way, using the technique is obvious unless its actual application is beyond his or her skill." *Id.* at 417, 127 S.Ct. 1727.

*Samsung Electronics Co. v. UUSI, LLC*, 775 F. App'x 692, 695 (Fed. Cir. 2019) (emphasis added); *see also In re Conrad*, 759 F. App'x 982, 985 (Fed. Cir. 2019) ("The Supreme Court and this court, however, have repeatedly held that the motivation that a person of ordinary skill in the art would have had to combine prior art references need not be the same motivation that inspired the patent owner." (citation omitted)); *In re Beattie*, 974 F.2d 1309,

1312 (Fed. Cir. 1992) ("As long as some motivation or suggestion to combine the references is provided by the prior art taken as a whole, the law does not required that the references be combined for the reasons contemplated by the inventor.").

Furthermore, the evidence shows that a person having ordinary skill in the art would have had a reasonable expectation of success. *See* Ex. 1003 ¶ 151 (Horst Decl.). Specifically we are persuaded by Dr. Horst's testimony that "the integration of feedback transistor M6 from Majcherczak's voltage detector would have simply been the use of a known technique (a feedback transistor to provide hysteresis) to improve similar devices (detection circuits in multiple supply voltage devices) in the same way." *Id.*

We disagree with Patent Owner's arguments, discussed below.

**Explicit Motivation:** As a preliminary matter, for the reasons discussed above with regard to reason to combine, we are not persuaded by Patent Owner's argument that an explicit motivation to combine the references is required for obviousness. *See* PO Sur-reply 2–6. Moreover, Patent Owner's argument that Majcherczak's hysteresis detection does not provide an explicit motivation to combine the references is not timely and waived. *See* PO Sur-reply 2–6. Petitioner made its hysteresis argument in the Petition and Patent Owner did not address the arguments in its Response. *Compare* Pet. 45 (relying on hysteresis detection for the reason to combine the references), *with* PO Resp. 20–31 (not discussing hysteresis); *see also* Tr. 74:13–18 (acknowledging the argument was not raised in the Patent Owner's Response). Although Patent Owner addresses this argument in its Sur-reply, "arguments for patentability not raised in the response may be deemed waived." Scheduling Order, Paper 8, 5; *see also Nuvasive*, 842 F.3d

at 1380–81 (holding that an argument not presented in Patent Owner's response is waived); *Dell Inc. v. Acceleron, LLC*, 884 F.3d 1364, 1369 (Fed. Cir. 2018) (holding that the Board was not obligated to consider an "untimely argument"). Because Patent Owner did not address Petitioner's argument regarding an explicit motivation in the Patent Owner's Response, that argument is waived.

**Potential Issues:** We do not agree with Patent Owner that a person having ordinary skill in the art would not have combined AAPA with Majcherczak because of the following potential issues identified by Dr. Pedram: additional leakage current compared to AAPA, glitch current, and a DC fighting condition. *See* PO Resp. 21–25, 27–31. Patent Owner's argument relies exclusively on Dr. Pedram's testimony as support for why a person having ordinary skill in the art would not make the proposed modification due to the identified "problems." *See id.* (citing Ex. 2002 ¶¶ 70–74, 81–85). However, Dr. Pedram does not cite to any evidence to support his opinions. *See* Ex. 2002 ¶¶ 70–74, 81–85. That is, Dr. Pedram does not cite to any tests, references, or simulations that support his opinion. *Id.*; Ex. 1017, 41:6–13, 171:20–171:3 (Pedram Dep.).

This stands in marked contrast to Dr. Horst's testimony. In response to Dr. Pedram's argument that the combination of AAPA and Majcherczak would result in increased leakage current, glitch current, or a DC fighting condition, Dr. Horst conducted a computer simulation to demonstrate that, with the appropriate selection of design details, those potential problems

could be managed. *See* Ex. 1018 ¶¶ 21–33 (Horst Supp. Decl.); Ex. 2007 (Horst Corrective Decl.).[22]

Our rules provide that "[e]xpert testimony that does not disclose the underlying facts or data on which the opinion is based is entitled to little or no weight." 37 C.F.R. 42.65(a). In light of the failure to provide any corroboration, such as a simulation, we give Dr. Pedram's conclusory, unsupported testimony little weight. *See In re Am. Acad. of Sci. Tech Ctr.*, 367 F.3d 1359, 1368 (Fed. Cir. 2004) ("[T]he Board is entitled to weigh the declarations and conclude that the lack of factual corroboration warrants discounting the opinions expressed in the declarations."); *Verlander v. Garner*, 348 F.3d 1359, 1371 (Fed. Cir. 2003) (noting that the Board has discretion to accord little weight to broad conclusory statements from expert witness); *Ashland Oil, Inc. v. Delta Resins & Refractories, Inc.*, 776 F.2d 281, 294 (Fed. Cir. 1985) (noting that the "[l]ack of factual support" for an expert opinion "may render the testimony of little probative value").

In contrast to the potential issues discussed in the preceding paragraphs, Dr. Pedram provides some factual support for his testimony that the proposed modification would result in an increased leakage current compared to Majcherczak alone. *See* Ex. 2002 ¶¶ 75–80 (citing Ex. 1008). However, although Dr. Pedram may have established that "[t]he power detection circuit depicted in Fig. 2 of Majcherczak would thus operate with significantly less leakage current than Petitioner's proposed combination, which omits the power supply stage (E2) of Majcherczak," (Ex. 2002 ¶ 79), that is not the relevant issue. Instead, the issue is whether a person of

---

[22] We address Patent Owner's arguments regarding Dr. Horst's simulation *infra*.

ordinary skill in the art would have improved AAPA by "integrat[ing] feedback transistor M6 from Majcherczak's voltage detector into the POC system 10 of the AAPA in order to 'enable[] the proper stabilizing of the detection device.'" Ex. 1003 ¶ 150 (Horst Decl.) (quoting Ex. 1008 ¶ 37).

Moreover, merely identifying potential problems that could arise with a combination of references is not, by itself, enough to demonstrate that the combination would not have been obvious. Rather, "a given course of action often has simultaneous advantages and disadvantages, and this does not necessarily obviate motivation to combine." *Medichem, S.A. v. Rolabo, S.L.*, 437 F.3d 1157, 1165 (Fed. Cir. 2006) (citing *Winner Int'l Royalty Corp. v. Wang*, 202 F.3d 1340, 1349 n. 8 (Fed. Cir. 2000)). Accordingly, "[t]he fact that the motivating benefit comes at the expense of another benefit, however, should not nullify its use as a basis to modify the disclosure of one reference with the teachings of another. Instead, the benefits, both lost and gained, should be weighed against one another." *Winner*, 202 F.3d at 1349 n.8. Although Patent Owner and Dr. Pedram identify potential problems with the combination of AAPA and Majcherczak, they do not weigh the relative advantages and disadvantages. Considering only one half of the analysis is not sufficient. This is especially true in light of (1) the explicit benefit discussed in Majcherczak and (2) the unsupported identification of potential issues in the Patent Owner's Response and Dr. Pedram's testimony.

Additionally, we are persuaded by Dr. Horst's testimony that any potential problems in the combination would have been addressed by the person having ordinary skill in the art by the selection of appropriate design characteristics such as the transistor sizes, threshold voltages, and values of

$V_{I/O}$ and $V_{core}$. *See* Ex. 1018 ¶¶ 74–77; *see also id.* ¶¶ 50–73. That is, the simulation performed by Dr. Horst shows that, under at least one set of design characteristics, the problems identified by Dr. Pedram do not exist. *Id.* ¶¶ 21–31 (Horst Supp. Decl.); Ex. 2007 ¶¶ 2–4 (Horst Corrective Decl.). Although the evidence does not show that every permutation of design characteristics will work, the evidence does show that it would have been within the ability of a person having ordinary skill in the art to determine appropriate design values to minimize or eliminate the potential problems identified by Dr. Pedram.

**Reliability of Dr. Horst's Simulations:** We do not agree with Patent Owner that Dr. Horst's simulation is unreliable because the results for two different circuits are identical. *See* PO Sur-reply 9 (citing Ex. 1018, ¶¶ 12, 23). As Patent Owner concedes, prior to his deposition, Dr. Horst prepared a corrective declaration pointing out the mistake and replacing the erroneous charts from page 15. *Id.* at 9–10; *see also* Ex. 2007 (Horst Corrective Decl). In light of Dr. Horst's recognition that he "inserted the wrong set of graphs when preparing [his] supplemental report" and timely provided a correction prior to cross examination, *see* Ex. 2007, ¶ 2, we do not find that the original mistake renders the simulation unreliable. To the contrary, we credit Dr. Horst for recognizing his mistake and providing the correct graphs.

Nor are we persuaded that the introduction of a second mistake in the corrective declaration renders the simulation unreliable. *See* PO Sur-reply 9–11. A comparison of the results of Dr. Horst's simulation relating to Figure 4 of the '674 patent and the combination of AAPA and Majcherczak from his Supplemental Declaration—the original simulation report—is reproduced below.




Simulations of the '674 Figure 4 circuit (left) and AAPA+ Majcherczak (right). Waveforms are nearly identical.

Ex. 1018 ¶ 23 (Horst Supp. Decl.). The figure above shows the results of Dr. Horst's simulation of the circuit of Figure 4 of the '674 patent (left) and the circuit that is the result of the combination of AAPA and Majcherczak (right). *Id.* Relevant to our analysis, the third graph for the Figure 4 circuit is labeled Is(M6). Patent Owner has not alleged any error in the labeling of this chart. *See generally* PO Sur-reply.

However, in the replacement graph of the Corrective Declaration, that graph is relabeled as Is(M2). Ex. 2007, ¶ 2 (Horst Corrective Decl.); *see also* PO Sur-reply. As Patent Owner points out in the Sur-reply, there is no transistor M2 in the Figure 4 embodiment. *See* Ex. 1018 ¶ 22. Because the labeling was correct in the original version and the correction focused on the graphs on the right side, not the left, this appears to be no more than a typographical error. As such, it does not have a substantial impact on Dr. Horst's credibility.

In conclusion, we have considered Patent Owner's arguments. However, based on the entirety of the record, we find Dr. Horst's simulations and Dr. Horst's discussion of those simulations reliable.

**Selection of Simulation Values:** Additionally, we are not persuaded by Patent Owner's argument that the values selected by Dr. Horst are divorced from real world considerations. First, Patent Owner argues that "Dr. Horst conceded, however, that his simulations enabled him to choose any desired threshold voltage, even if that voltage was inconsistent with the transistor's minimum feature size and the supply voltage." PO Sur-reply 15–16 (citing Ex. 2006, 93:3–13). However, Patent Owner's characterization is not consistent with Dr. Horst's testimony. Instead, during the cited cross-examination, Dr. Horst simply testified that "you can directly set the threshold value . . . not dependent on the – on that minimum feature size parameter"; he never stated that it was inconsistent with the minimum feature size, as argued by Patent Owner. Ex. 2006, 93:3–13.

Second, although Patent Owner argues that "when asked whether his selected threshold voltage of 2.3V would be typical for transistors having a 5V supply voltage and a minimum feature size of 0.8 μm, Dr. Horst conceded that he chose the 2.3V value simply because it 'gave good results,'" that is also not supported by the actual testimony. *See* PO Sur-reply 16 (citing Ex. 2006, 94:5–13). Dr. Horst was not asked whether the value was typical but instead stated that he made the selection because it gave expected results for the '674 patent Figure 4—the patented design. Ex. 2006, 94:5–13. Although the results may have been unreliable had Dr. Horst selected values designed to make AAPA/Majcherczak circuit provide good results, Patent Owner has not sufficiently explained why it is improper

to pick design parameters that would make the reference circuit (Figure 4 of the '674 patent) work in the manner described in the '674 patent. For the same reason, we are unpersuaded by Patent Owner's argument that Dr. Horst "cherry picked" design parameters so that the circuit would work; rather, Dr. Horst simply testified that he adjusted the parameters to make reference '674 patent Figure 4 circuit work. *Compare* PO Sur-reply 17, *with* Ex. 2006, 101:24–102:17.

Third, Patent Owner's arguments that Dr. Horst used unrealistic parameter values, that the simulation fails to show that the combination does not result in increased leakage current, or that the simulation consisted of only a single simulation are not sufficient to rebut Petitioner's persuasive evidence on why a person having ordinary skill in the art would have combined AAPA and Majcherczak. *See* PO Sur-reply 11–15, 17–19. Petitioner did not offer the simulation and testimony to demonstrate that a person having ordinary skill in the art would combine the references. Instead, Petitioner offered the simulation and Dr. Horst's accompanying testimony to rebut Dr. Pedram's testimony regarding potential problems with the circuit. *See* Pet. Reply 10–12. Because we are not persuaded by Dr. Pedram's testimony regarding the potential problems, even if we accepted Patent Owner's criticisms and discounted Dr. Horst's simulation and accompanying testimony, Dr. Horst's original testimony regarding the benefits of hysteresis detection is sufficient to demonstrate why a person having ordinary skill in the art would have been motivated to combine Majcherczak and AAPA.

Accordingly, for the reasons discussed above, Petitioner provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See Kahn*, 441 F.3d at 988.

*c. Conclusion*

We have considered the entirety of the evidence submitted by the parties, both for and against obviousness, and determine that Petitioner has shown by a preponderance of the evidence that claim 1 of the '674 patent would have been obvious over the combined teachings of AAPA and Majcherczak.

*5. Claims 2, 5, and 6*

Petitioner presents persuasive arguments and evidence regarding claims 2, 5, and 6, each of which depends from claim 1. *See* Pet. 57–62.

Claim 2 recites "wherein said one or more feedback circuits comprise: one or more first feedback transistors coupled in parallel with said one or more first transistors and coupled to receive feedback from said processing circuitry, wherein said one or more first feedback transistors are configured to switch off when said processing circuitry indicates that said first supply voltage is powered on." Ex. 1001, 9:4–11. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitation recited in claim 2. Pet. 57–59; *see also* Ex. 1003 ¶¶ 141, 146 (Horst Decl.).

Claim 5 recites "further comprising: an input/output (I/O) network operative at a second supply voltage, wherein said I/O network is coupled to said core network and said control network, and wherein said I/O network is configured to receive said control signal." Ex. 1001, 9:34–39. Petitioner argues that the combination of AAPA and Majcherczak teaches the

additional limitation recited in claim 5. Pet. 59–60; *see also* Ex. 1003 ¶¶ 148–149 (Horst Decl.).

Claim 6 recites that "the device is integrated into a semiconductor die." Ex. 1001, 9:40–41. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitation recited in claim 6. Pet. 61–62; *see also* Ex. 1003 ¶¶ 124, 125 (Horst Decl.).

Patent Owner does not separately address the additional limitations recited in claims 2, 5, and 6. *See generally* PO Resp.

Having considered the entirety of the evidence submitted by both parties, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 2, 5, and 6 of the '674 patent would have been obvious to a person of ordinary skill in the art based on the combined teachings of AAPA and Majcherczak.

*6. Claims 8 and 17*

Claims 8 and 17 are independent claims. Ex. 1001, 9:48–10:3, 11:14–12:5. Petitioner relies on the same combination of AAPA and Majcherczak discussed above in subsection 4(a), and makes similar arguments regarding the limitations of claims 8 and 17. *Compare* Pet. 43–44, 46–56, *with* 1316 Pet. 51–52, 54–63. That is, Petitioner relies on the same combination of AAPA and Majcherczak and maps the limitations recited in method claim 8 and system claim 17 to the operation of the circuit. *See* 1316 Pet. 51–52, 54–63.

Patent Owner does not dispute that the combination of AAPA and Majcherczak teaches each of the limitations recited in claims 8 and 17. *See generally* 1316 PO Resp. 20–31; *see also* 1316 Pet. Reply 2 ("Beyond this procedural issue [on whether applicant admitted prior art could be

considered], Patent Owner's only substantive argument challenging Ground 2 is a purported lack of motivation to combine."); 1316 PO Sur-reply 2–19 (not disputing Petitioner's characterization of Patent Owner's argument).

We previously instructed Patent Owner that "any arguments for patentability not raised in the [Patent Owner Response] may be deemed waived." 1316 Paper 8, 5 (Scheduling Order); *see also NuVasive*, 842 F.3d at 1380–81 (determining Patent Owner waived arguments made only in its Preliminary Response but not raised in the Patent Owner Response after institution).

Based on the undisputed evidence before us and the reasons set forth in the Petition (Pet. 45–63), we find that the combination of AAPA and Majcherczak teaches all of the limitations recited in claims 8 and 17.

Petitioner and Patent Owner rely on the same arguments and evidence discussed above in subsections D(4)(b)(1) and (2) as to whether a person having ordinary skill in the art would have combined AAPA and Majcherczak. *Compare* Pet. 45; PO Resp. 20–31; Pet. Reply 2–12; PO Sur-reply 2–19, *with* 1316 Pet. 53; 1316 PO Resp. 20–31; 1316 Pet. Reply 2–12; 1316 PO Sur-reply 2–19.

For the reasons discussed above in subsection D(4)(b)(3), Petitioner provided "some articulated reasoning with some rational underpinning to support the legal conclusion of obviousness." *See Kahn*, 441 F.3d at 988.

Accordingly, having considered the entirety of the evidence submitted by the parties, both for and against obviousness, we determine that Petitioner has shown by a preponderance of the evidence that claims 8 and 17 of the '674 patent would have been obvious over the combined teachings of AAPA and Majcherczak.

7. *Claims 9, 12, 13, 16, and 18–21*

Claims 9, 12, 13, and 18–21 depend, directly or indirectly, from claim 8 or 17. Ex. 1001, 10:4–10, 10:34–52, 11:7–13. 12:6–30.

Claims 9 and 13 recite "wherein said [decreasing/increasing] said current capacity comprises: receiving a first feedback signal from said signal processor at one or more first feedback transistors coupled in parallel with said one or more first transistors; and switching [off/on] said one or more first feedback transistors in response to said first feedback signal." Ex. 1001, 10:4–10, 10:45–51. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitation recited in claims 9 and 13. 1316 Pet. 63–65; *see also* Ex. 1003 ¶¶ 142, 145 (Horst Decl.).

Claim 12 recites

> wherein said detecting said power-down comprises:
>
> receiving a logic-low signal at said control gate of said one or more first and second transistors, wherein said one or more first transistors are configured to switch on in response to said logic-low signal, and wherein said one or more second transistors are configured to switch off in response to said logic-low signal; and
>
> transmitting a detection signal to a signal processor from said one or more first transistors based on said received logic-low signal.

Ex. 1001, 10:33–44. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitations recited in claim 12. 1316 Pet. 66–68; *see also* Ex. 1003 ¶¶ 141, 144–146 (Horst Decl.).

Claim 18 recites a "means for providing a feedback signal associated with at least one of: said detected power-on or said detected power-down, wherein said feedback signal is used in said means for decreasing and said means for increasing." Ex. 1001, 12:6–10. Petitioner argues that the

combination of AAPA and Majcherczak teaches the additional limitation recited in claim 18. 1316 Pet. 68–70; *see also* Ex. 1003 ¶¶ 141, 145, 146 (Horst Decl.).

Claims 19 and 20 recite "wherein said means for [decreasing/increasing] said current capacity comprises: means, responsive to said feedback signal, for switching [off/on] one or more transistors of a plurality of transistors, wherein said plurality of transistors define said current capacity of said power on/off detector." Ex. 1001, 12:11–22. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitation recited in claims 19 and 20. 1316 Pet. 70–72; *see* Ex. 1003 ¶¶ 141–143, 145, 146 (Horst Decl.).

Claim 21 recites that "the device is integrated into a semiconductor die." Ex. 1001, 12:23–24. Petitioner argues that the combination of AAPA and Majcherczak teaches the additional limitation recited in claim 21. 1316 Pet. 73; *see also* Ex. 1003 ¶¶ 124, 125 (Horst Decl.).

Patent Owner does not separately address the additional limitations recited in claims 9, 12, 13, 16, and 18–21. *See generally* 1316 PO Resp.

Having considered the entirety of the evidence submitted by both parties, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 9, 12, 13, 16, and 18–21 of the '674 patent would have been obvious to a person having ordinary skill in the art based on the combined teachings of AAPA and Majcherczak.

### *E. Obviousness over AAPA, Majcherczak, and Matthews*

#### *1. Overview of Matthews*

Matthews is titled "Apparatus for Power-on Disable in a Multiple Power Supply System and a Method Therefor" and is directed "to a system

such as an embedded system that has multiple power supplies that are synchronized during initialization of the system." Ex. 1009, code (54), 1:9–12. More specifically, Matthews teaches an apparatus "for disabling portions of a system, circuit, etc. having multiple power supplies," which provides the advantages of disabling "certain portions of a system" "during system power-on or other times when power supply voltage levels may be changing," in order to prevent those portions "from generating erroneous data." *Id.* at 1:63–2:10.

*2. Claim 7, 16 and 22*

Claim 7 depends from claim 6 and recites that "the semiconductor die is incorporated in a device selected from a group consisting of a mobile phone, personal data assistant (PDA), navigation device, fixed location data unit, set-top box, music player, video player, entertainment unit, and computer." Ex. 1001, 9:42–47. Claims 16 and 22 recite a substantially similar limitation. *See id.* at 11:7–13, 12:25–30.

Petitioner argues Matthews teaches the additional limitation recited in claims 7, 16, and 22. *See* Pet. 62–64; 1316 Pet. 74–76; *see also* Ex. 1003 ¶¶ 152–155. Specifically, Petitioner argues Matthews teaches that the system in which its "power-on disable module is integrated 'may be a <u>wireless communication device</u> [e.g., a mobile phone] or a system board or component thereof, or <u>a computer system</u>, a system board or peripheral device thereof." Pet. 63 (quoting Ex. 1009, 5:35–37); 1316 Pet. 75 (quoting Ex. 1009, 5:35–37) (emphasis in original). Petitioner further argues that a person having ordinary skill in the art "would have found it obvious to utilize the POC system 10 described in the AAPA to be used in 'wireless communication device [e.g., a mobile phone] or a system board or

component thereof, or a computer system, a system board or peripheral device thereof.'" Pet. 63–64 (quoting Ex. 1003 ¶ 155); 1316 Pet. 76 (quoting Ex. 1003 ¶ 155).

Patent Owner does not separately address the additional limitations recited in claims 7, 16, and 22. *See generally* PO Resp.; 1316 PO Resp. Instead, Patent Owner argues that "the addition of Matthews does not remedy any of the deficiencies noted above for the combination of the alleged AAPA and Majcherczak (Ground 2a), and Petitioner's obviousness argument as to claim 7 fails for the same reasons that its arguments for claims 1, 2, 5, and 6 fail." PO Resp. 31; *see also* 1316 PO Resp. 32 (for claims 16 and 22).

Patent Owner's arguments about AAPA and Majcherczak are not persuasive for the reasons given above. We are persuaded by Petitioner's analysis of the evidence cited in the Petition and find Petitioner has shown that the combination of AAPA, Majcherczak, and Matthews teaches the additional limitation recited in claims 7, 16, and 22. Additionally, for the reasons given in the Petition, we are also persuaded by Petitioner's arguments that a person having ordinary skill in the art would have combined the teachings of Matthews with the teachings of AAPA and Majcherczak and that there would have been a reasonable expectation of success.

Having considered the entirety of the evidence submitted by both parties, we determine that Petitioner has demonstrated by a preponderance of the evidence that claims 7, 16, and 22 of the '674 patent would have been obvious to a person of ordinary skill in the art based on the combined teachings of AAPA, Majcherczak, and Matthews.

## III. CONCLUSION[23]

For the foregoing reasons, and taking into account the Federal Circuit's decision, we conclude that Petitioner has demonstrated by a preponderance of the evidence the unpatentability of claims 1, 2, 5–9, 12, 13, and 16–22 of the '674 patent. Specifically, Petitioner has demonstrated by a preponderance of the evidence that (1) claims 1, 2, 5, 6, 8, 9, 12, 13, and 17–21 would have been obvious under 35 U.S.C. § 103 in light of AAPA and Majcherczak and (2) claims 7, 16, and 22 would have been obvious under 35 U.S.C. § 103 in light of AAPA, Majcherczak, and Matthews.

## IV. ORDER

In consideration of the foregoing, it is hereby:

ORDERED that claims 1, 2, 5–9, 12, 13, and 16–22 of the '674 patent are held unpatentable; and

FURTHER ORDERED that because this Decision is final, a party to the proceeding seeking judicial review of the Decision must comply with the notice and service requirements of 37 C.F.R. § 90.2.

---

[23] Should Patent Owner wish to pursue amendment of the challenged claims in a reissue or reexamination proceeding subsequent to the issuance of this decision, we draw Patent Owner's attention to the April 2019 *Notice Regarding Options for Amendments by Patent Owner Through Reissue or Reexamination During a Pending AIA Trial Proceeding*. *See* 84 Fed. Reg. 16654 (Apr. 22, 2019). If Patent Owner chooses to file a reissue application or a request for reexamination of the challenged patent, we remind Patent Owner of its continuing obligation to notify the Board of any such related matters in updated mandatory notices. *See* 37 C.F.R. § 42.8(a)(3), (b)(2).

In summary:

IPR2018-01315

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 1, 2, 5–7 | 103(a) | Steinacker, Doyle, Park[24] | | |
| 1, 2, 5, 6 | 103(a) | AAPA, Majcherczak | 1, 2, 5, 6 | |
| 7 | 103(a) | AAPA, Majcherczak, Matthews | 7 | |
| **Overall Outcome** | | | 1, 2, 5–7 | |

IPR2018-01316

| **Claims** | **35 U.S.C. §** | **Reference(s)/Basis** | **Claims Shown Unpatentable** | **Claims Not shown Unpatentable** |
|---|---|---|---|---|
| 8, 9, 12, 13, 16–22 | 103(a) | Steinacker, Doyle, Park[25] | | |
| 8, 9, 12, 13, 17–21 | 103(a) | AAPA, Majcherczak | 8, 9, 12, 13, 17–21 | |
| 16, 22 | 103(a) | AAPA, Majcherczak, Matthews | 16, 22 | |
| **Overall Outcome** | | | 8, 9, 12, 13, 16–22 | |

[24] Because this ground was not subject to the remand, we do not address it in this Decision.

[25] Because this ground was not subject to the remand, we do not address it in this Decision.

UNITED STATES PATENT AND TRADEMARK OFFICE

BEFORE THE PATENT TRIAL AND APPEAL BOARD

APPLE INC.,
Petitioner,

v.

QUALCOMM INCORPORATED,
Patent Owner.

IPR2018-01315, IPR2018-01316
Patent 8,063,674 B2

Before TREVOR M. JEFFERSON, DANIEL J. GALLIGAN, and SCOTT B. HOWARD, *Administrative Patent Judges*.

GALLIGAN, *Administrative Patent Judge*, concurring.

I agree with the majority that the challenged claims are unpatentable, and I join with all of the majority decision except for the discussion in Section II.D.3, which I join in part. In particular, I join Section II.D.3.a and the first two paragraphs of Section II.D.3.d. As the second paragraph of Section II.D.3.d states, the answer to the question we must decide on remand is found in the Director's Updated Guidance. Therefore, the remaining discussion in Section II.D.3 is unnecessary in my view, and I express no opinion on it.

PETITIONER:

W. Karl Renner
Thomas A. Rozylowicz
Timothy W. Riffe
David L. Holt
Whitney A. Reichel
FISH & RICHARDSON P.C.
axf-ptab@fr.com
tar@fr.com
riffe@fr.com
holt2@fr.com
wreichel@fr.com

PATENT OWNER:

Joseph M. Sauer
David B. Cochran
Joshua R. Nightingale
Matthew W. Johnson
Richard A. Graham
David M. Maiorana
Jennifer L. Swize
JONES DAY
jmsauer@jonesday.com
dcochran@jonesday.com
jrnightingale@jonesday.com
mwjohnson@jonesday.com
ragraham@jonesday.com
dmaiorana@jonesday.com
jswize@jonesday.com

US008063674B2

(12) **United States Patent**
**Kwon et al.**

(10) **Patent No.: US 8,063,674 B2**
(45) **Date of Patent: Nov. 22, 2011**

(54) **MULTIPLE SUPPLY-VOLTAGE POWER-UP/DOWN DETECTORS**

(75) Inventors: **Chang Ki Kwon**, San Diego, CA (US); **Vivek Mohan**, San Diego, CA (US)

(73) Assignee: **QUALCOMM Incorporated**, San Diego, CA (US)

( * ) Notice: Subject to any disclaimer, the term of this patent is extended or adjusted under 35 U.S.C. 154(b) by 165 days.

(21) Appl. No.: **12/365,559**

(22) Filed: **Feb. 4, 2009**

(65) **Prior Publication Data**

US 2010/0194200 A1 Aug. 5, 2010

(51) **Int. Cl.**

| | |
|---|---|
| ***H03L 7/00*** | (2006.01) |
| ***H03L 5/00*** | (2006.01) |
| ***H03K 5/153*** | (2006.01) |
| ***H03K 19/094*** | (2006.01) |

(52) **U.S. Cl.** ............. **327/143**; 327/72; 327/333; 326/68

(58) **Field of Classification Search** .................... 326/82, 326/83, 86, 87, 93, 112, 119; 327/333, 108
See application file for complete search history.

(56) **References Cited**

U.S. PATENT DOCUMENTS

4,781,051 A * 11/1988 Schultes et al. ................. 72/247
5,130,569 A 7/1992 Glica
5,495,453 A * 2/1996 Wojciechowski et al. ........................ 365/185.18
5,723,990 A * 3/1998 Roohparvar .................... 327/81
5,781,051 A * 7/1998 Sandhu ......................... 327/143
6,577,166 B2 * 6/2003 Lim ................................ 327/77
6,646,844 B1 11/2003 Matthews
6,900,666 B2 * 5/2005 Kursun et al. .................. 326/95
7,253,655 B2 8/2007 Kwon et al.
2002/0163364 A1 11/2002 Majcherczak
2006/0044027 A1 * 3/2006 Chen ............................ 327/143
2006/0103437 A1 5/2006 Kang
2007/0030039 A1 2/2007 Chen
2008/0100341 A1 * 5/2008 Kim ................................ 326/63
2008/0218223 A1 * 9/2008 Kimura ......................... 327/142
2009/0027087 A1 * 1/2009 Sukup et al. .................... 327/72

FOREIGN PATENT DOCUMENTS

WO 2007091211 8/2007

OTHER PUBLICATIONS

International Search Report and Written Opinion—PCT/US2010/023081, International Search Authority—European Patent Office—Aug. 5, 2010.

* cited by examiner

*Primary Examiner* — Shawki Ismail
*Assistant Examiner* — Dylan White
(74) *Attorney, Agent, or Firm* — Sam Talpalatsky; Nicholas J. Pauley; Jonathan T. Velasco

(57) **ABSTRACT**

A multiple supply voltage device includes an input/output (I/O) network operative at a first supply voltage, a core network coupled to the I/O network and operative at a second supply voltage, and a power-on-control (POC) network coupled to the I/O network and the core network. The POC network is configured to transmit a POC signal to the I/O network and includes an adjustable current power up/down detector configured to detect a power state of the core network. The POC network also includes processing circuitry coupled to the adjustable current power up/down detector and configured to process the power state into the POC signal, and one or more feedback circuits. For reducing the leakage current while also improving the power-up/down detection speed, the feedback circuit(s) are coupled to the adjustable current power up/down detector and configured to provide feedback signals to adjust a current capacity of the adjustable current power up/down detector.

**22 Claims, 8 Drawing Sheets**






(PRIOR ART)
FIG. 1




(PRIOR ART)
FIG. 2


30
300
$V_{I/O}$
302
I/O Network
301
$V_{Core}$
305
POC Network
304
Level Shifters
303
Core Network

FIG. 3A


302
I/O Network
305
311
POC
307
309
Output Buffer
308
Signal Processor
310
Feedback Network
300
$V_{I/O}$
306
Power U/D Detector
301
$V_{Core}$

FIG. 3B


40
V I/O
300
M4
M8
M5
310
Vcore
301
M6
M7
400
401
311
POC
Vss
Power U/D
Detector
306
Signal
Processor
308
Output
Buffer
309

FIG. 4



50
$V_{I/O}$
300
M4
M5
POC
311
310
400
401
$V_{core}$
301
M6
M9
M7
M10
Vss
Power U/D
Detector
306
Signal
Processor
308
Output
Buffer
309


FIG. 5


60
$V_{I/O}$
300
M4
M8
M5
310
310
400
401
POC
311
$V_{core}$
301
M6
M9
M7
M10
Vss
Power U/D
Detector
306
Signal
Processor
308
Output
Buffer
309

FIG. 6


700
Detect a power-on of a second supply voltage while a first supply voltage is already on.
701
Decrease a current capacity of a power on/off detector of the POC network responsive to the power-on detection.
702
Detect a power-down of the second supply voltage while the first supply voltage is on.
703
Increase the current capacity of the power on/off detector responsive to the power-down detection.

FIG. 7

# MULTIPLE SUPPLY-VOLTAGE POWER-UP/DOWN DETECTORS

## TECHNICAL FIELD

The present disclosure is related, in general, to integrated circuit devices and, more particularly, to power up/down detectors for multiple supply voltages devices.

## BACKGROUND

As technology has advanced there has been an increased ability to include more and more devices and components within integrated circuits. Semiconductor fabrication techniques have allowed these embedded devices to become smaller and have lower voltage requirements, while still operating at high-speeds. However, because these new integrated devices often interface with older technology devices or legacy products, input/output (I/O) circuits within the integrated circuit have remained at higher operating voltages to interface with the higher voltage requirements of these older systems. Therefore, many newer integrated circuit devices include dual power supplies: one lower-voltage power supply for the internally operating or core applications, and a second higher-voltage power supply for the I/O circuits and devices.

Core devices and applications communicate with operations outside of the integrated component through the I/O devices. In order to facilitate communication between the core and I/O devices, level shifters are employed. Because the I/O devices are connected to the core devices through level shifters, problems may occur when the core devices are powered-down. Powering down or power collapsing is a common technique used to save power when no device operations are pending or in progress. For example, if the core network is power collapsed, it is possible that the level shifters, whether through stray currents or the like, could send a signal to the I/O devices for transmission. The I/O devices assume that the core devices have initiated this communication, and will, therefore, transmit the erroneous signal into the external environment.

It has been found useful to have the I/O devices in a known state when the core networks are powered down. In order to guarantee these known states, solutions have included the addition of hardware or software for managing additional external signals to control the I/O circuitry. By using these external signals, the I/O circuitry can be controlled (e.g., placed in a known state) whenever the core power is collapsed. However, whether implementing this external signal management system using hardware or software, a considerable amount of delay is added to the operation of the integrated device. Although hardware is slightly faster than software controls, hardware solutions may have problems caused by significant additional power leakage on the I/O device side.

One hardware solution currently in use provides power-up/down detectors to generate a power-on/off-control (POC) signal internally. The POC signal instructs the I/O devices when the core devices are shut down. FIG. **1** is a circuit diagram illustrating standard POC system **10** for multiple supply voltage devices. POC system **10** is made up of three functional blocks: power-up/down detector **100**, signal amplifier **101**, and output stage **102**. Power-up/down detector **100** has PMOS transistor M**1** and NMOS transistors M**2**-M**3**. The gate terminals for each of M**1**-M**3** are connected to core power supply **103**, $V_{core}$. When core power supply **103** is power collapsed, M**2** and M**3** are switched off while M**1** is switched on, pulling up the input node to amplifier **105** to $V_{I/O}$, i.e., I/O power supply **104**. A "high" signal is input into amplifier **105** which inverts the output to a "low" signal. In output stage **102**, the low signal from amplifier **105** is processed in output buffer **106** and again inverted to a high signal for POC **107**. The high signal for POC **107** is transmitted to the I/O circuitry indicating that core power supply **103** has been shut down.



When core power supply **103**, $V_{core}$, is on, M**1** becomes very weak and M**2** and M**3** both switch strongly on, pulling the input node to amplifier **105** to $V_{SS}$, i.e., core power supply **103**. $V_{SS}$ is considered the logical low signal. Therefore, amplifier **105** inverts it to a high signal which is then processed in output buffer **106** and inverted again to a low signal. This signal detection process operates acceptably when either I/O power supply **104** is on and core power supply **103** is power collapsed or when core power supply **103** is powered-up before I/O power supply **104** is powered-up. However, when I/O power supply **104** is powered-up before core power supply **103** powers-up, substantial current leakage may occur in the power up/down detector **100** or in the POC **10**.

In the situation where I/O power supply **104** is on and core power supply **103** is off, M**1** is switched on with M**2** and M**3** switched off. When core power supply **103** is then powered up, M**2** and M**3** switch on, and M**1** becomes very weak. However, before M**1** can switch completely off, there is a period in which all three transistors within power up/down detector **100** are on. Thus, a virtual short is created to ground causing a significant amount of current to flow from I/O power supply **104** to ground. This "glitch" current consumes unnecessary power.

In order to reduce this stray power consumption, one solution may be adopted to decrease the sizes of transistors M**1**-M**3**. By reducing the size of M**1**-M**3**, the actual amount of current that can pass through the transistors is physically limited. However, because the transistors are now smaller, their switching speeds are also reduced. The reduced switching speed translates into less sensitivity in detecting power-up/down of core supply voltage **103** or longer processing time for power-up/down events.

FIG. **2** is an illustration of diagram **20** presenting the signal interactions in POC circuit **10** of FIG. **1**. Diagram **20** includes power supply diagram **21** and POC diagram **22**. As I/O power supply **104** is powered up, there is a steady increase until it reaches $V_{I/O}$. POC **107** follows I/O power supply **104** as it powers up to reach the high level. Similarly, when I/O power supply **104** maintains steady at $V_{I/O}$ at time **200**, POC **107** remains steady at the high signal. When core power supply **103** begins to power on at time **201** power up/down detector **100** (FIG. **1**) takes a little time to actually detect this new power level. Once detected, at time **202**, POC **107** is switched to the low value. POC **107** should, thereafter, remain at the low level until core power supply **103** is power collapsed, between times **203** and **205**. Again, because power up/down detector **100** (FIG. **1**) takes a little time to actually detect the new power level, POC **107** remains in the low state until time **204**, when the powering down is actually detected by power up/down detector **100**. This low state time, between time **202** and **204** is referred to as the normal operation region. Once core power supply **103** is completely off or power collapsed at time **205**, the input to amplifier **105** (FIG. **1**) is again pulled up to the high signal. POC **107** will then follow I/O power supply **104** as it also powers down between times **206** and **207**.

The leakage current between I/O power supply **104** and ground can be lessened because of the smaller transistor size. Thus, during the time between times **201** and **205** any leakage that occurs is reduced. However, this reduced leakage comes at the price of faster detection. If POC circuit **10** may include

the lower-threshold or bigger transistors, switching/detecting times would be faster. For example, as core power supply **103** begins to power up at time **201**, the lower-threshold or bigger transistors of power up/down detector **100** would detect the power-up at time **208**, instead of time **202**. Moreover when core power supply **103** begins powering down at time **203**, the power up/down detector **100** would detect the power-down at time **209**, instead of time **204**. This increase may be represented by the difference between the time periods of time **202** to **204** vs. time **208** to **209**. Therefore, the conventional solutions still have problems with leakage and switching times.

## SUMMARY

Various representative embodiments of the disclosure relate to integrated devices having multiple supply voltages. Further representative embodiments of the present disclosure relate to methods for reducing power consumption in a power on/off control (POC) network of a multiple supply voltage device. Additional representative embodiments of the present disclosure relate to systems for reducing power consumption in a POC network of a multiple supply voltage device.

A multiple supply voltage device includes a core network operative at a first supply voltage and a control network coupled to the core network. The control network is configured to transmit a control signal. The control network includes an up/down (up/down) detector configured to detect a power state of the core network. The control network further includes processing circuitry coupled to the up/down detector and is configured to generate the control signal based on the power state. The control network further includes one or more feedback circuits coupled to the up/down detector. The one or more feedback circuits are configured to provide feedback signals to adjust a current capacity of said up/down detector.

A method for reducing power consumption in a power on/off control (POC) network of a multiple supply voltage device includes detecting a power-on of a second supply voltage while a first supply voltage is already on, decreasing a current capacity of a power on/off detector of the POC network in response to the power-on detection, detecting a power-down of the second supply voltage while the first supply voltage is on, and increasing the current capacity of the power on/off detector in response to the power-down detection.

A system for reducing power consumption in a power on/off control (POC) network of a multiple supply voltage device includes a means for detecting a power-on of a second supply voltage while a first supply voltage is already on. The system further includes means for decreasing a current capacity of a power on/off detector of the POC network responsive to the power-on detection. The system further includes means for detecting a power-down of the second supply voltage while the first supply voltage is on, and means for increasing the current capacity of the power on/off detector responsive to the power-down detection.

The foregoing has outlined rather broadly the features and technical advantages of the present embodiments in order that the detailed description of the disclosure that follows may be better understood. Additional features and advantages of the embodiments will be described hereinafter which form the subject of the claims of the disclosure. It should be appreciated by those skilled in the art that the conception and specific embodiments disclosed may be readily utilized as a basis for modifying or designing other structures for carrying out the same purposes of the present disclosure. It should also be realized by those skilled in the art that such equivalent constructions do not depart from the spirit and scope of the disclosure as set forth in the appended claims. The novel features which are believed to be characteristic of the disclosure, both as to its organization and method of operation, together with further objects and advantages will be better understood from the following description when considered in connection with the accompanying figures. It is to be expressly understood, however, that each of the figures is provided for the purpose of illustration and description only and is not intended as a definition of the limits of the present disclosure.

## BRIEF DESCRIPTION OF THE DRAWINGS

For a more complete understanding of the present disclosure, reference is now made to the following descriptions taken in conjunction with the accompanying drawings.

FIG. **1** is a circuit diagram illustrating a conventional POC system for multiple supply voltage devices.

FIG. **2** is an illustration of a diagram presenting the signal interactions in the POC circuit of FIG. **1**.

FIG. **3**A is a block diagram illustrating an integrated circuit (IC) device having a power on control (POC) network configured according to the teachings of the present disclosure.

FIG. **3**B is a block diagram illustrating a POC network configured according to the teachings of the present disclosure.

FIG. **4** is a circuit diagram illustrating another POC network configured according to the teachings of the present disclosure.

FIG. **5** is a circuit diagram illustrating a further POC network configured according to the teachings of the present disclosure.

FIG. **6** is a circuit diagram illustrating still another POC network configured according to the teachings of the present disclosure.

FIG. **7** is a flowchart illustrating process blocks for implementing one embodiment according to the teachings of the present disclosure.

## DETAILED DESCRIPTION

Turning now to FIG. **3**A, a block diagram is presented illustrating an integrated circuit (IC) device **30** having a power on control (POC) network **305** configured according to one embodiment of the present disclosure. The IC device **30** is an integrated circuit that includes embedded components powered by multiple power supplies, such as the $V_{I/O}$ **300** and the $V_{core}$ **301**. The $V_{I/O}$ **300** and the $V_{core}$ **301** supply several different voltage level power supplies to different components and networks within the IC device **30**. Two such embedded networks are the I/O network **302** and the core network **303**. The I/O network **302** operates at a voltage level provided by the $V_{I/O}$ **300**. The Core network **303** operates at a voltage level provided by the $V_{core}$ **301**, which is usually a lower voltage than that provided by the $V_{I/O}$ **300**. Because the I/O network **302** and the core network **303** operate at different voltages, they are coupled together through level shifters **304** for communication. The level shifters **304** essentially shift the voltage levels of any communications that occur between the I/O network **302** and the core network **303**.

POC network **305** senses the status of the core network **303** and transmits a POC signal to the I/O network **302** and level shifters **304**. The POC signal either turns them on or off. This prevents stray signals received by the I/O network **302** from being mistakenly transmitted to devices or components external to the IC device **30**.

FIG. 3B is a block diagram illustrating a POC network **305** configured according to one embodiment of the present disclosure. The POC network **305** includes a power up/down detector **306**, processing circuitry **307**, and feedback network **310**. The processing circuitry **307** is made up of a signal processor **308** and an output buffer **309**. When the $V_{I/O}$ **300** is on and the $V_{core}$ **301** is off, the power up/down detector **306** provides a detection signal to the signal processor **308**, which processes the detection signal and transmits the processed signal to the output buffer **309**. The output buffer **309** then conditions the processed signal into a POC signal **311**, which is then transmitted to an I/O network **302**. Along the way, a feedback network **310** receives feedback from the signal processor **308** and feeds that signal back to the power up/down detector **306**. The power up/down detector **306** uses the feedback signal to adjust its current capacity. While the $V_{core}$ **301** is in an off or low state, the feedback signal allows the power up/down detector **306** to select a maximum current capacity. This maximum current capacity state makes the power up/down detector **306** more sensitive to detecting when the $V_{core}$ **301** either powers-up or powers-down, or both, depending on the circuit configuration of the power up/down detector **306**.

When the $V_{core}$ **301** powers-up while the $V_{I/O}$ **300** is on, the power up/down detector **306** detects the power-up and changes the value of the detection signal transmitted to the signal processor **308**. The process detection signal is then conditioned by the output buffer **309** into the changed POC signal **311** and transmitted to the I/O network **302**. With the changing signals being processed through the signal processing circuitry **307**, the feedback network **310** receives the new feedback signal that, when input into power the up/down detector **306**, causes the current capacity within the power up/down detector **306** to decrease. This decrease in current capacity will limit and reduce the amount of leakage current that may be dissipated through the power up/down detector **306** because of its connections to the $V_{I/O}$ **300** and the $V_{core}$ **301**.

FIG. **4** is a circuit diagram illustrating a POC network **40** configured according to one embodiment of the present disclosure. The POC network **40** has similar processing regions as the POC network **305** (FIGS. **3**A and **3**B), i.e., a power up/down detector **306**, a signal processor **308**, an output buffer **309**, and a feedback network **310**. The POC network **40** also generates a POC signal **311** and is coupled to a $V_{I/O}$ **300** and a $V_{core}$ **301**. As shown in the embodiment illustrated in FIG. **4**, the power up/down detector **306** comprises multiple transistors M**4**-M**7** coupled in series together. Each gate of the transistors M**4**-M**7** is coupled to the $V_{core}$ **301**, while the source terminal of the transistor M**4** is coupled to the $V_{I/O}$ **300**. The transistors M**4** and M**5** are p-type transistors and the transistors M**6** and M**7** are n-type transistors. Therefore, when the $V_{core}$ **301** is off, i.e., in a low state, the transistors M**4** and M**5** are switched on, while the transistors M**6** and M**7** are switched off.

In contrast, when the $V_{core}$ **301** is on, i.e., in a high state, transistors M**4** and M**5** become very weak while transistors M**6** and M**7** are strongly switched on. M**6** and M**7** turning on pulls the voltage of the input to inverting amplifier to $V_{SS}$, which is a logical low signal compared with $V_{I/O}$. $V_{SS}$ is designed as the logical low signal and may comprise ground, 0 V, or some other selected voltage level that represents the logical low symbol. Thus, when the $V_{core}$ **301** is off, the transistors M**4** and M**5** pull up the voltage level at the input to an inverting amplifier **400** to the $V_{I/O}$ **300**. Therefore, the input to the inverting amplifier **400** is high when the $V_{core}$ **301** is off and low when the $V_{core}$ **301** is on. The inverting amplifier **400** then amplifies and inverts the detection signal before transmitting it to the inverting buffer **401** for conditioning and inverting for the POC signal **311**.

The feedback network **310** comprises a transistor M**8** connected in parallel to the transistor M**4**. The transistor M**8** is also configured as a p-type transistor, such that when the feedback signal from the inverting amplifier **400** is high, the transistor M**8** is switched off, and when the feed back signal is low, the transistor M**8** is switched on. Thus, when the $V_{core}$ **301** is off, producing a high detection signal, the inverting amplifier **400** inverts that signal to a logic low which causes the transistor M**8** to switch on. As the $V_{core}$ **301** is powered-on, the detection signal changes to a logic low, which changes the feedback signal from the inverting amplifier **400** to a logic high, which, in turn, turns the transistor M**8** off. While the transistor M**8** is off, the power up/down detector **306** has a decreased current capacity, i.e., smaller current will flow through the transistor M**8** because of the amplified low signal. The voltage level caused by the $V_{core}$ **301** on the gate terminals of M**4** and M**5** could in some glitch or stray signal situations, cause leakage through M**4** and M**5**. Because the feedback signal for the transistor M**8** is received from the inverting amplifier **400**, when the $V_{core}$ **301** powers-down, the feedback signal will switch quickly from a logic high to a logic low, which will then switch the transistor M**8** on. Thus, in the circuit configuration depicted in FIG. **4**, the power up/down detector **40** will detect the $V_{core}$ **301** powering down more quickly than the existing POC networks.

FIG. **5** is a circuit diagram illustrating a POC network **50** configured according to one embodiment of the present disclosure. The POC network **50** comprises multiple transistors M**4**-M**7** in the power up/down detector **306** coupled together in a fashion similar to the POC network **40** (FIG. **4**) with each gate coupled to a $V_{core}$ **301**, and the source terminal of the transistor M**4** coupled to a $V_{I/O}$ **300**. A signal processor **308** comprises an inverting amplifier **400**, and an output buffer **309** includes an inverting buffer **401**. The POC network **50** generates a POC signal **311**, which will be transmitted to the I/O network to which the POC network **50** is coupled. In the POC network **50**, a feedback network **310** is configured with the transistors M**9** and M**10** coupled in parallel with the transistor M**7**. The transistors M**6**, M**7**, M**0**, are the same type, n-type or can be low-threshold n-type transistors to speed up the power-on detection. The transistor M**9** receives its feedback signal from the output of the inverting buffer **401**, while the gate of the transistor M**10** is connected to the $V_{core}$ **301**.

In operation, when the $V_{I/O}$ **300** is on and the $V_{core}$ **301** is off, the inverting amplifier **400** receives a logic high signal by virtue of the $V_{I/O}$ **300**, which, when amplified and inverted by the inverting amplifier **400** and then conditioned and inverted by the inverting buffer **401**, provides a logic high feedback signal. This high signal would normally switch M**9** in the feedback network **310** on. However, because M**6**, M**7**, and M**10** are all off, there is no channel formation within the transistor M**9** to switch it on. When the $V_{core}$ **301** powers on, M**4** and M**5** become very weak, while M**6**, M**7**, and M**10** switch on, which immediately causes M**9** to switch on because its gate is already connected to a logic high input. M**6** and M**7** switching on pulls the input to the inverting amplifier **400** down to a logical low signal, i.e., $V_{SS}$. The low detection signal input to the inverting amplifier **400** is amplified and inverted and then conditioned and inverted again at the inverting buffer **401**. Once the inverting buffer **401** outputs a low signal, the feedback of that low to the transistor M**9** will switch M**9** off, which, because switching M**9** off stops the channel formation in the transistor M**10**, causes the transistor M**10** to also switch off. Thus, the configuration of the POC

network **50**, as illustrated in FIG. **5**, operates to detect the $V_{core}$ **301** powering on faster than the existing POC networks, while still reducing the amount of leakage current while the $V_{core}$ **301** is on. The feedback signal used by the transistor M**9** allows the power up/down detector **306** to adjust its current capacity, which reduces the leakage current at the same time as the detection speed is improved.

FIG. **6** is a circuit diagram illustrating a POC network **60** configured according to one embodiment of the present disclosure. The POC network **60** includes a feedback network **310** configured according to the circuit arrangements of both the POC network **40** (FIG. **4**) and the POC network **50** (FIG. **5**). As such, multiple transistors M**4**-M**7** make up the power up/down detector **306**. The feedback network **310** includes transistor M**8**, coupled in parallel to the transistor M**4**, and the transistors M**9** and M**10**, coupled in parallel with the transistor M**7**. The detection signal from the power up/down detector **306** provides input to an inverting amplifier **400** of a signal processor **308**, which amplifies and inverts the detection signal for input to an inverting buffer **401** of an output buffer **309**. The conditioned and inverted POC signal **311** is then transmitted to the appropriate I/O and level shifter network of the system. The feedback transistor M**8** obtains its feedback signal from the output of the inverting amplifier **400**, while the feedback transistor M**9** obtains its feedback signal from the output of the inverting buffer **401**. Using these feedback signals, as described with respect to the POC network **40** (FIG. **4**) and the POC network **50** (FIG. **5**), the POC network **60** is able to increase the speed that the $V_{core}$ **301** is quickly detected both in the power-on and power-off stages. At the same time, because the feedback network **310** provides the capability of the POC network **60** to adjust the current capacity of the power up/down detector **306**, the unwanted leakage current can also be reduced during the $V_{core}$ **301** normal operation periods.

It should be noted that each of the embodiments described with respect to the POC network **40** (FIG. **4**), the POC network **50** (FIG. **5**), and the POC network **60** (FIG. **6**) has its own advantages. For example, the POC network **50** (FIG. **5**) is able to have a considerably improved performance characteristic with the addition of very small thin-oxide circuitry to the overall silicon. Thus, each of the illustrated embodiments, as well as the various additional and/or alternative embodiments of the present disclosure represent improvements over the existing systems and methods.

FIG. **7** is a flowchart illustrating process blocks for implementing one embodiment of the present disclosure. In block **700**, a power-on of a second supply voltage is detected while a first supply voltage is already on. At block **701** a current capacity of a power on/off detector of the POC network is decreased responsive to the power-on detection. At block **702** a power-down of the second supply voltage is detected while the first supply voltage is on. At block **703** the current capacity of the power on/off detector is increased responsive to the power-down detection.

Some embodiments of an exemplary wireless communication system include multiple remote units and multiple base stations. It can be recognized that typical wireless communication systems may have many more remote units and base stations. The remote units include multiple semiconductor devices having power detection, as discussed above. Embodiments include forward link signals from the base stations and the remote units and reverse link signals from the remote units to the base stations.

In other embodiments, a remote unit is a mobile telephone, another remote unit is a portable computer, and another remote unit is a fixed location remote unit in a wireless local loop system. For example, the remote units may be mobile phones, hand-held personal communication systems (PCS) units, portable data units such as personal data assistants, navigation devices (e.g., GPS enabled devices,) set-top boxes, music players, video players, entertainment units, fixed location data units such as meter reading equipment, or any other device that stores or retrieves data or computer instructions, or any combination thereof. Although these embodiments illustrates remote units according to the teachings of the disclosure, the disclosure is not limited to these exemplary illustrated units. The disclosed device may be suitably employed in any device which includes a semiconductor device.



Although specific circuitry has been set forth, it will be appreciated by those skilled in the art that not all of the disclosed circuitry is required to practice the disclosure. Moreover, certain well known circuits have not been described so as to maintain focus on the disclosure. Similarly, although the description refers to logical "0" or "low" and logical "1" or "high" in certain locations, one skilled in the art appreciates that the logical values can be switched, with the remainder of the circuit adjusted accordingly, without affecting operation of the present disclosure.

Although the present disclosure and its advantages have been described in detail, it should be understood that various changes, substitutions and alterations can be made herein without departing from the spirit and scope of the disclosure as defined by the appended claims. Moreover, the scope of the present application is not intended to be limited to the particular embodiments of the process, machine, manufacture, composition of matter, means, methods and steps described in the specification. As one of ordinary skill in the art will readily appreciate from the embodiments of the present disclosure, processes, machines, manufacture, compositions of matter, means, methods, or steps, presently existing or later to be developed that perform substantially the same function or achieve substantially the same result as the corresponding embodiments described herein may be utilized according to the present disclosure. Accordingly, the appended claims are intended to include within their scope such processes, machines, manufacture, compositions of matter, means, methods, or steps.

What is claimed is:

**1**. A multiple supply voltage device comprising:

a core network operative at a first supply voltage; and

a control network coupled to said core network wherein said control network is configured to transmit a control signal, said control network comprising: an up/down (up/down) detector configured to detect a power state of said core network; processing circuitry coupled to said up/down detector and configured to generate said control signal based on said power state;

one or more feedback circuits coupled to said up/down detector, said one or more feedback circuits configured to provide feedback signals to adjust a current capacity of said up/down detector;

at least one first transistor coupled to a second supply voltage, the at least one more first transistor being configured to switch on when said first supply voltage is powered down and to switch off when said first supply voltage is powered on;

at least one second transistor coupled in series with the at least one first transistor and coupled to said first supply voltage, the at least one second transistor being configured to switch on when said first supply voltage is powered on and to switch off when said first supply voltage is powered down;

at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor.

2. The multiple supply voltage device of claim 1 wherein said one or more feedback circuits comprise:

one or more first feedback transistors coupled in parallel with said one or more first transistors and coupled to receive feedback from said processing circuitry, wherein said one or more first feedback transistors are configured to switch off when said processing circuitry indicates that said first supply voltage is powered on.

3. The multiple supply voltage device of claim 1 wherein said one or more feedback circuits comprise:

one or more second feedback transistors coupled in parallel with said one or more second transistors and coupled to receive feedback from said processing circuitry, wherein said one or more second feedback transistors are configured to switch off when said processing circuitry indicates that said first supply voltage is powered on.

4. The multiple supply voltage device of claim 1 wherein said one or more feedback circuits comprise:

one or more first feedback transistors coupled in parallel with said one or more first transistors and coupled to receive feedback from said processing circuitry; and

one or more second feedback transistors coupled in parallel with said one or more second transistors and coupled to receive feedback from said processing circuitry;

wherein said one or more first and second feedback transistors are configured to switch off when said processing circuitry indicates that said first supply voltage is powered on.

5. The multiple supply voltage device of claim 1 further comprising:

an input/output (I/O) network operative at a second supply voltage, wherein said I/O network is coupled to said core network and said control network, and wherein said I/O network is configured to receive said control signal.

6. The multiple supply voltage device of claim 1, in which the device is integrated into a semiconductor die.

7. The multiple supply voltage device of claim 6, in which the semiconductor die is incorporated in a device selected from a group consisting of a mobile phone, personal data assistant (PDA), navigation device, fixed location data unit, set-top box, music player, video player, entertainment unit, and computer.

8. A method for reducing power consumption in a power on/off control (POC) network of a multiple supply voltage device, said method comprising:

detecting a power-on of a second supply voltage while a first supply voltage is already on;

decreasing a current capacity of a power on/off detector of said POC network in response to said power-on detection;

detecting a power-down of said second supply voltage while said first supply voltage is on;

increasing said current capacity of said power on/off detector in response to said power-down detection;

receiving a logic-high signal at a control gate of at least one first transistor, at least one second transistor and at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor, the at least one first transistor being configured to switch off in response to said logic-high signal, and the at least one second transistor being configured to switch on in response to said logic-high signal; and

transmitting a detection signal to a signal processor from the at least one second transistor based on said received logic-high signal.

9. The method of claim 8 wherein said decreasing said current capacity comprises:

receiving a first feedback signal from said signal processor at one or more first feedback transistors coupled in parallel with said one or more first transistors; and

switching off said one or more first feedback transistors in response to said first feedback signal.

10. The method of claim 8 wherein said decreasing said current capacity comprises:

receiving a second feedback signal from an output buffer of said POC network at one or more second feedback transistors coupled in parallel with said one or more second transistors; and

switching off said one or more second feedback transistors in response to said second feedback signal.

11. The method of claim 8 wherein said decreasing said current capacity comprises:

receiving a first feedback signal from said signal processor at one or more first feedback transistors coupled in parallel with said one or more first transistors;

switching off said one or more first feedback transistors in response to said first feedback signal;

receiving a second feedback signal from an output buffer of said POC network at one or more second feedback transistors coupled in parallel with said one or more second transistors; and

switching off said one or more second feedback transistors in response to said second feedback signal.

12. The method of claim 8 wherein said detecting said power-down comprises:

receiving a logic-low signal at said control gate of said one or more first and second transistors, wherein said one or more first transistors are configured to switch on in response to said logic-low signal, and wherein said one or more second transistors are configured to switch off in response to said logic-low signal; and

transmitting a detection signal to a signal processor from said one or more first transistors based on said received logic-low signal.

13. The method of claim 12 wherein said increasing said current capacity comprises:

receiving a first feedback signal from said signal processor at one or more first feedback transistors coupled in parallel with said one or more first transistors; and

switching on said one or more first feedback transistors in response to said first feedback signal.

14. The method of claim 12 wherein said increasing said current capacity comprises:

receiving a second feedback signal from an output buffer of said POC network at one or more second feedback transistors coupled in parallel with said one or more second transistors; and

switching on said one or more second feedback transistors in response to said second feedback signal.

15. The method of claim 12 wherein said increasing said current capacity comprises:

receiving a first feedback signal from said signal processor at one or more first feedback transistors coupled in parallel with said one or more first transistors;

switching on said one or more first feedback transistors in response to said first feedback signal;

receiving a second feedback signal from an output buffer of said POC network at one or more second feedback transistors coupled in parallel with said one or more second transistors; and

switching on said one or more second feedback transistors in response to said second feedback signal.

**16**. The method of claim **8**, wherein the multiple supply voltage device is applied in an electronic device, selected from a group consisting of a set top box, music player, video player, entertainment unit, navigation device, communications device, personal digital assistant (PDA), fixed location data unit, and a computer, into which a semiconductor device is integrated.

**17**. A system for reducing power consumption in a power on/off control (POC) network of a multiple supply voltage device, said system comprising:

means for detecting a power-on of a second supply voltage while a first supply voltage is already on;

means, responsive to said power-on detection, for decreasing a current capacity of a power on/off detector of said POC network;

means for detecting a power-down of said second supply voltage while said first supply voltage is on;

means, responsive to said power-down detection, for increasing said current capacity of said power on/off detector;

means for receiving a logic-high signal at a control gate of at least one first transistor, at least one second transistor and at least one third transistor coupled in series between the at least one first transistor and the at least one second transistor, the at least one first transistor being configured to switch off in response to said logic-high signal, and the at least one second transistor being configured to switch on in response to said logic-high signal; and

means for transmitting a detection signal to a signal processor from the at least one second transistor based on said received logic-high signal.

**18**. The system of claim **17** further comprising:

means for providing a feedback signal associated with at least one of: said detected power-on or said detected power-down, wherein said feedback signal is used in said means for decreasing and said means for increasing.

**19**. The system of claim **18** wherein said means for decreasing said current capacity comprises:

means, responsive to said feedback signal, for switching off one or more transistors of a plurality of transistors, wherein said plurality of transistors define said current capacity of said power on/off detector.

**20**. The system of claim **18** wherein said means for increasing said current capacity comprises:

means, responsive to said feedback signal, for switching on one or more transistors of a plurality of transistors, wherein said plurality of transistors define said current capacity of said power on/off detector.

**21**. The multiple supply voltage device of claim **17**, in which the device is integrated into a semiconductor die.

**22**. The multiple supply voltage device of claim **21**, in which the semiconductor die is incorporated in a device selected from a group consisting of a mobile phone, personal data assistant (PDA), navigation device, fixed location data unit, set-top box, music player, video player, entertainment unit, and computer.

* * * * *

UNITED STATES PATENT AND TRADEMARK OFFICE

# CERTIFICATE OF CORRECTION



PATENT NO. : 8,063,674 B2
APPLICATION NO. : 12/365559
DATED : November 22, 2011
INVENTOR(S) : Chang Ki Kwon and Vivek Mohan

It is certified that error appears in the above-identified patent and that said Letters Patent is hereby corrected as shown below:

In the Specification

Column 8, Line 58, the word “more” should be deleted

Signed and Sealed this
Fifth Day of December, 2017

Joseph Matal

Joseph Matal
*Performing the Functions and Duties of the*
*Under Secretary of Commerce for Intellectual Property and*
*Director of the United States Patent and Trademark Office*

## CERTIFICATE OF COMPLIANCE

1. This brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 10,120 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii) and Federal Circuit Rule 32(b).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type style requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word for Microsoft 365 in Times New Roman 14-point font.

Dated: March 20, 2023

*/s/ Jennifer L. Swize*
JENNIFER L. SWIZE
JONES DAY
51 Louisiana Avenue N.W.
Washington, DC 20001
(202) 879-3939
jswize@jonesday.com

*Counsel for Appellant Qualcomm Incorporated*